# EXHIBIT B

# Tab 1 to Exhibit B
## Civil, Summons, Verified Complaint
## Filed 8/4/09

STATE OF NEW YORK
SUPREME COURT                    COUNTY OF MONROE

---

ROSEMARIE OZBAKIR AND ALI DEMIR,

                         Plaintiffs,            **SUMMONS**

        -vs-

DANIEL J. SCOTTI, JR., MARCUS & MILLICHAP REAL
ESTATE INVESTMENT BROKERAGE COMPANY,         Index No.: 11/24-09
GLEN KUNOFSKY, ANDREW R. DORF, SCOTT DRAGOS,   Date Filed: 8-4-09
CHRIS ZORBAS, PGP VALUATION, INC.,
BRUCE D. COLEMAN, SOVEREIGN JF, LLC,
SOVEREIGN JF, SPE MANAGER, INC.,
EUREKA PETROLEUM, INC., TIBAROM, INC.,
ROCHESTER LUBE, LLC, SAMUEL E. PEARSON, III,
DEBORAH PICKETT, AND PAUL MORABITO,

                        Defendants.

---

To the Above-Named Defendants:

***YOU ARE HEREBY SUMMONED*** to answer the Complaint in this action and serve a copy
of your Answer on the Plaintiff's attorneys within twenty (20) days after the service of this
Summons, exclusive of the day of service (or within (30) days after this service is complete
if this Summons is not personally delivered to you within the State of New York); and in
case of your failure to appear or answer, judgment will be taken against you by default for
the relief demanded herein.

The place of trial shall be Monroe County.  Venue in this action is based upon the location
of the real property at issue and the residence of one of the Plaintiffs.

Dated: June 11, 2009          **THE STEELE LAW FIRM, P.C.**
      Oswego, New York.

                             *Kimberly A. Steele*
                            KIMBERLY A. STEELE, ESQ.
                         *Attorneys for Plaintiffs Rosemarie Ozbakir and*
                               *Ali Demir*
                         949 County Route 53
                         Oswego, New York 13126
                         Telephone:  (315) 216-4721
                         Facsimile:  (315) 216-6065
                         Email:       ksteele@thesteelelawfirm.com

1

**Plaintiffs' Addresses:**

Rosemarie Ozbakir
8617 Via Mallorca, Unit D
La Jolla, California 92037

Ali Demir
781 Fairport Road
East Rochester, New York 14445

**Defendants' Addresses:**

Daniel J. Scotti, Jr.
459 Meadowview Drive
Vacaville, California 95688

Marcus & Millichap Real Estate
Investment Brokerage Company
2626 Hanover Street
Palo Alto, California 94304

Glen Kunofsky
239 West 79th Street, No. 23
New York, New York 10024

Andrew R. Dorf
61 West 62nd Street, 14th Floor
New York, New York 10023

Scott Dragos
1750 Pacific Beach Drive
San Diego, California 92019

Chris Zorbas
6922 Camino Pacheco
San Diego, California 92111

PGP Valuation, Inc.
5796 Armada Drive, Suite 210
Carlsbad, California 92008

Bruce D. Coleman
18 Hinkley Lane
Rochester, New York 14624

Sovereign JF, LLC
777 California Avenue
Palo Alto, California 94304

Sovereign JF, SPE Manager, Inc.
777 California Avenue
Palo Alto, California 94304

Eureka Petroleum, Inc.
318 Barley Circle
Hanover, Pennsylvania 17331

Tibarom, Inc.
668 North Coast Highway, Suite 517
Laguna Beach, California 92651

Rochester Lube, LLC
668 North Coast Highway, Suite 517
Laguna Beach, California 92651

Samuel E. Pearson, III
3331 Alta Vista Road
Dover, Pennsylvania 17315

Deborah Pickett
146 Koenig Road
Bernville, Pennsylvania 19506

Paul Morabito
6451 South Virginia, No. 306
Reno, Nevada 895111

STATE OF NEW YORK
SUPREME COURT                    COUNTY OF MONROE

---

ROSEMARIE OZBAKIR AND ALI DEMIR,

                                   Plaintiffs,              **SUMMONS**

                -vs-

DANIEL J. SCOTTI, JR., MARCUS & MILLICHAP REAL
ESTATE INVESTMENT BROKERAGE COMPANY,               Index No.:
GLEN KUNOFSKY, ANDREW R. DORF, SCOTT DRAGOS,       Date Filed:
CHRIS ZORBAS, PGP VALUATION, INC.,
BRUCE D. COLEMAN, SOVEREIGN JF, LLC,
SOVEREIGN JF, SPE MANAGER, INC.,
EUREKA PETROLEUM, INC., TIBAROM, INC.,
ROCHESTER LUBE, LLC, SAMUEL E. PEARSON, III,
DEBORAH PICKETT, AND PAUL MORABITO,

                                   Defendants.

---

To the Above-Named Defendants:

***YOU ARE HEREBY SUMMONED*** to answer the Complaint in this action and serve a copy
of your Answer on the Plaintiff's attorneys within twenty (20) days after the service of this
Summons, exclusive of the day of service (or within (30) days after this service is complete
if this Summons is not personally delivered to you within the State of New York); and in
case of your failure to appear or answer, judgment will be taken against you by default for
the relief demanded herein.

The place of trial shall be Monroe County.  Venue in this action is based upon the location
of the real property at issue and the residence of one of the Plaintiffs.

Dated: June 11, 2009                    **THE STEELE LAW FIRM, P.C.**
       Oswego, New York.


                                        KIMBERLY A. STEELE, ESQ.
                                        *Attorneys for Plaintiffs Rosemarie Ozbakir and*
                                                    *Ali Demir*
                                        949 County Route 53
                                        Oswego, New York 13126
                                        Telephone:   (315) 216-4721
                                        Facsimile:   (315) 216-6065
                                        Email:       ksteele@thesteelelawfirm.com

1

STATE OF NEW YORK
SUPREME COURT          COUNTY OF MONROE

---

ROSEMARIE OZBAKIR AND ALI DEMIR,

                              Plaintiffs,          **VERIFIED**
                                                   **COMPLAINT**
              -vs-

DANIEL J. SCOTTI, JR., MARCUS & MILLICHAP REAL       Index No.: *11/24·09*
ESTATE INVESTMENT BROKERAGE COMPANY,                 Date Filed:
GLEN KUNOFSKY, ANDREW R. DORF, SCOTT DRAGOS,
CHRIS ZORBAS, PGP VALUATION, INC.,                              *8/4/09*
BRUCE D. COLEMAN, SOVEREIGN JF, LLC,
SOVEREIGN JF, SPE MANAGER, INC.,
EUREKA PETROLEUM, INC., TIBAROM, INC.,
ROCHESTER LUBE, LLC, SAMUEL E. PEARSON, III,
DEBORAH PICKETT, AND PAUL MORABITO,

                              Defendants.

---

        Plaintiffs Rosemarie Ozbakir and Ali Demir, by their attorneys The Steele Law Firm,

P.C., for their Verified Complaint against the Defendants herein, allege as follows:

                              **The Parties**

        1.      Plaintiff Rosemarie Ozbakir is an individual residing in the State of

California with a principal place of residence of 8617 Via Mallorca, Unit D, La Jolla,

California 92037.

        2.      Plaintiff Ali Demir is an individual residing in the State of New York with a

principal place of residence in Rochester, New York.  Plaintiff Rosemarie Ozbakir and

Plaintiff Ali Demir are collectively referred to hereinout as the "Plaintiffs".

        3.  Upon information and belief, Defendant Daniel J. Scotti, Jr. is an individual

residing in the State of California with a principal place of residence of 459 Meadowview

Drive, Vacaville, California 95688.

                              1

4.    Upon information and belief, Defendant Marcus & Millichap Real Estate Investment Brokerage Company (referred to hereinout as "Defendant Marcus & Millichap") is a foreign business corporation doing business in the State of New York with a principal place of business located at 2626 Hanover Street, Palo Alto, California 94304.

5.    Upon information and belief, Defendant Glen Kunofsky is an individual residing in the State of New York with a principal place of residence of 230 West 79th Street, No. 23, New York, New York 10024.

6.    Upon information and belief, Defendant Andrew R. Dorf is an individual residing in the State of New York with a principal place of residence of 61 West 62nd Street, 14th Floor, New York New York 10023.

7.    Upon information and belief, Defendant Scott Dragos is an individual residing in the State of California with a principal place of residence of 1750 Pacific Beach Drive, San Diego, California 92109.

8.    Upon information and belief, Defendant Chris Zorbas is an individual residing in the State of California with a principal place of residence of 6922 Camino Pacheco, San Diego, California 92111.

9.    Upon information and belief, Defendant PGP Valuation, Inc. is a foreign business corporation doing business in the State of New York with a principal place of business located at 5796 Armada Drive, Suite 210, Carlsbad, California 92008.

10.    Upon information and belief, Defendant Bruce D. Coleman is an individual residing in the State of New York with a principal place of residence of 18 Hinkley Lane, Rochester, New York 14624.

11.    Upon information and belief, Defendant Sovereign JF, LLC is a foreign

limited liability company doing business in the State of New York with a principal place of business located at 777 California Avenue, Palo Alto, California 94304.

12.     Upon information and belief, Defendant Sovereign JF, SPE Manager, Inc. is a foreign limited liability company doing business in the State of New York with a principal place of business located at 777 California Avenue, Palo Alto, California 94304

13.     Upon information and belief, Defendant Eureka Petroleum, Inc. is a New York domestic business corporation with a principal place of business located at 318 Barley Circle, Hanover, Pennsylvania 17331.

14.     Upon information and belief, Defendant Tibarom, Inc. is a foreign business corporation doing business in the State of New York with a principal place of business located at 668 North Coast Highway, Suite 517, Laguna Beach, California 92651.

15.     Upon information and belief, Defendant Rochester Lube, LLC is a foreign business corporation doing business in the State of New York with a principal place of business located at 668 North Coast Highway, Suite 517, Laguna Beach, California 92651.

16.     Upon information and belief, Defendant Samuel E. Pearson, III is an individual residing in the State of Pennsylvania with a principal place of residence of 3331 Alta Vista Road, Dover, Pennsylvania 17315.

17.     Upon information and belief, Defendant Deborah Pickett is an individual residing in the State of Pennsylvania with a principal place of residence of 146 Koenig Road, Bernville, Pennsylvania 19506.

18.     Upon information and belief, Defendant Paul Morabito is an individual residing in the State of Nevada with a principal place of residence of 6451 South Virginia Street, No. 306, Reno, Nevada, 89511.

3

## Nature of the Action

19.     The nature of this action pertains to the purchase of a commercial franchisee commonly known as the Jiffy Lube franchise, located at 781 Fairport Road, East Rochester, County of Monroe, State of New York 14445 (referred to hereinout as the "Premises").

20.     The Plaintiffs have been injured by the Defendants as a result of a real estate scam.

21.     The Defendants, acting in concert, undertook a deceitful course of conduct which conduct was intended to and did deprive the Plaintiffs of millions of dollars in both investment monies and in lost present and future rental stream.

22.     The Defendants engaged in deceitful and coordinated conduct with the Plaintiffs over the telephone, through electronic transmission or email, through facsimile, in person and through U.S. Mail commencing in October 2005.

23.     The Defendants used dummy or shell corporations to hide the scheme.

24.     The Defendants artificially inflated the value of the Premises.

25.     The Defendants used fraudulent sale and leaseback agreements.

26.     The Defendants used Leases with tenants installed by the Defendants.

27.     The Defendants used sham leases.

28.     The Defendants used tenants that were dummy corporations controlled by the Defendants.

29.     The Defendants used tenants that had no intentions in fulfilling their obligations under the Leases.

30.     The Defendants used rental rates in the Leases that were significantly higher than legitimate rental rates that a true and ordinary tenant would pay in an arm's length

4

transaction.

31.   The Defendants knowingly marketed and sold the Premises to the Plaintiffs at an artificially inflated price.

32.   The Defendants knowingly marketed and sold the Premises to the Plaintiffs using a sham Lease.

33.   The Defendants misrepresented the present and future anticipated income generated by the Premises.

34.   The Defendants misrepresented the ability of the business model presented by the Defendants to support the rents provided for in the Lease.

35.   The Defendants misrepresented the acreage of the Premises.

36.   The Defendants misrepresented the capitalization rate of the Premises.

37.   The Defendants misrepresented the actual value of the Premises.

38.   The Defendants misrepresented the actual value of the Lease of the Franchise.

39.   The Defendants misrepresented the financial strength and business experience of the tenants and franchisees.

40.   The Defendants knowingly used false and misleading marketing materials to induce the Plaintiffs into purchasing the Premises.

41.   The Defendants knowingly used false and misleading financial information to induce the Plaintiffs into purchasing the Premises.

42.   The Defendants knowingly used false and misleading projections to induce the Plaintiffs into purchasing the Premises.

43.   The Defendants knowingly used a false and misleading appraisal to induce

the Plaintiffs into purchasing the Premises.

44.    The Plaintiffs reasonably relied upon the misrepresentations of the Defendants.

45.    In relying upon the misrepresentations of the Defendants, the Plaintiffs purchased the Premises.

46.    The misrepresentations and fraud by the Defendants convinced the Plaintiffs to purchase the Premises.

47.    The Defendants did not disclose to the Plaintiffs that the fair market rent for the Premises was significantly less than the rent reflected in the marketing materials, financial information, projections, and the Lease.

48.    The Defendants did not disclose to the Plaintiffs that the fair market value of the Premises had been artificially inflated.

49.    The Defendants did not disclose to the Plaintiffs that the Lease of the Premises was a sham lease.

50.    The Defendants did not disclose to the Plaintiffs that the tenants of the Premises were dummy corporations.

51.    After the purchase of the Premises, the tenants installed by the Defendants abandoned the Premises owing rent, real property taxes, personal property taxes, assessments, license fees and other charges assessed against the Premises including water.

52.    After the purchase of the Premises, the tenants installed by the Defendants abandoned the Premises causing significant property damage.

53.    After the purchase of the Premises, the tenants installed by the Defendants abandoned the Premises and wrongfully took personal property belonging to the Jiffy Lube

6

franchise.

54.     The Plaintiffs were left with an abandoned Premises, grossly devalued, and deprived of at minimum a twenty four (24) year income stream of present and future lease payments and tax payments upon which the Plaintiffs were reasonably relying.

55.     The Plaintiffs were left with an abandoned Premises that was unable to be filled with a legitimate replacement tenant who were able to maintain the rental stream because the Lease did not contain legitimate rental rates.

56.     Due to the deceitful and coordinated conduct, the Plaintiffs were defrauded into purchasing the Premises that was worth only a fraction of what the Plaintiffs paid for it.

**History of Real Estate Transactions**

57.     Upon information and belief, on or about April 29, 2004, a Warranty Deed with Lien Covenant was filed with the County Clerk's Office of Monroe County which transferred ownership of the Premises to Defendant Bruce D. Coleman for a purchase price of $839,531.00. Attached hereto as **Exhibit "A"** and made a part hereof is a copy of the Warranty Deed filed April 29, 2004.

58.     Upon information and belief, on or about April 29, 2004, a Bargain and Sale Deed was filed with the County Clerk's Office of Monroe County which transferred ownership of the Premises from Defendant Bruce D. Coleman to Defendant Rochester Lube, LLC for a purchase price of $1,122,140.00. Attached hereto as **Exhibit "B"** and made a part hereof is a copy of the Bargain and Sale Deed filed April 29, 2004.

59.     Upon information and belief, on or about April 29, 2004, a Bargain and Sale Deed was filed with the County Clerk's Office of Monroe County which transferred ownership of the Premises from Defendant Rochester Lube, LLC as agent for Defendant

7

Tibarom, Inc. to Defendant Sovereign JF, LLC for a purchase price of $1,180,620.00. Attached hereto as **Exhibit "C"** and made a part hereof is a copy of the Bargain and Sale Deed filed April 29, 2004.

60.    Upon information and belief, on or about April 29, 2004, a Memorandum of Lease was filed with the County Clerk's Office of Monroe County which identified the Lessor of the Premises as Defendant Sovereign JF, LLC and the Lessees of the Premises as Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. Attached hereto as **Exhibit "D"** and made a part hereof is a copy of the Memorandum of Lease filed April 29, 2004.

61.    Upon information and belief, on or about July 21, 2004, a Limited Warranty Deed was filed with the County Clerk's Office of Monroe County which transferred ownership of the Premises from Defendant Sovereign JF, LLC to Defendant Daniel J. Scotti, Jr. for a purchase price of $1,324,529.00. Attached hereto as **Exhibit "E"** and made a part hereof is a copy of the Limited Warranty Deed filed July 21, 2004.

62.    Upon information and belief, on or about July 21, 2004, a Subordination, Non-Disturbance and Attornment Agreement was filed with the County Clerk's Office of Monroe County which identified Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. as the Tenants of the Premises. Attached hereto as **Exhibit "F"** and made a part hereof is a copy of the Subordination, Non-Disturbance and Attornment Agreement filed July 21, 2004.

63.    On or about January 13, 2006, a Bargain and Sale Deed was filed with the County Clerk's Office of Monroe County which transferred ownership of the Premises from Defendant Daniel J. Scotti, Jr. to the Plaintiffs for a purchase price of $1,480,000.00. Attached hereto as **Exhibit "G"** and made a part hereof is a copy of the Bargain and Sale

Deed dated January 13, 2006.

## The Marcus & Millichap Relationship

64.     In or around December 2004, the Plaintiffs and Defendant Marcus & Millichap commenced a relationship whereby Defendant Marcus & Millichap assisted the Plaintiffs in the exchange of real property in conjunction with Internal Revenue Code Section 1031 Like-Kind Exchange.

65.     On or about December 9, 2004, Defendant Marcus & Millichap by Defendant Chris Zorbas and Defendant Scott Dragos sent a correspondence to Plaintiffs regarding the Representation Agreement between Defendant Marcus & Millichap and the Plaintiffs and pertaining to a property that was a part of the Internal Revenue Code Section 1031 Like-Kind Exchange. Attached hereto as **Exhibit "H"** and made a part hereof is a copy of the letter dated December 9, 2004 as well as a copy of the fully executed Representation Agreement executed by Defendant Chris Zorbas and Defendant Scott Dragos.

66.     Upon information and belief, in or around at time before October 2005, the Defendants agreed to use a scheme to quickly unload the Premises that was previously used on other purchasers of similar Jiffy Lube franchises.

67.     The scheme included the use of mail, telephone, email, facsimiles and wire to perpetrate a fraud against the Plaintiffs.

68.     The scheme of the Defendants was not disclosed to the Plaintiffs.

## The Solicitations

69.     Defendant Marcus & Millichap provided to the Plaintiffs certain materials in conjunction with the purchase of the Premises, including an Offering Memorandum, financial summary, investment overview, location overview, terms of the Lease and balance

sheet of Defendant Tibarom, Inc.  Attached hereto as **Exhibit "I"** and made a part hereof are copies of the Offering Memorandum, financial summary, investment overview, location overview and balance sheet of Defendant Tibarom, Inc.

70.     The terms of the Lease included:   a twenty five (25) year lease period commencing on March 5, 2004 with an expiration date of February 28, 2029; a ten (10) year option period; a 7.5% initial return or capitalization rate; a net cash flow after debt service of One Hundred Twelve Thousand One Hundred Fifty Four Dollars ($112,154); base rental escalation of 1.6% annually; an annual base rent totaling $9,346.19; and a triple-net lease requiring the tenant to pay all expenses of the property including maintenance, insurance, taxes and water.  See **Exhibit "I"**.

71.     Defendant Eureka Petroleum, Inc. was marketed as the tenant.  See **Exhibit "I"**.

72.     The Premises was listed as containing 0.84 acres.  See **Exhibit "I"**.

73.     The Premises was marketed as having a ten (10) year oil agreement with Shell Oil Company which contained a right to cure any lease default.  See **Exhibit "I"**.

74.     The Premises was marketed as Shell Oil Company only signs the ten (10) year oil agreement with right to cure any lease default with Defendant Eureka Petroleum, Inc.  See **Exhibit "I"**.

75.     The Premises was marketed as being a part of the "Fastest Growing Franchisee in Jiffy Lube System".  See **Exhibit "I"**.

76.     The Premises was marketed as having "Zero Landlord Responsibilities". See **Exhibit "I"**.

77.     Defendant Marcus & Millichap, Defendant Glen Kunofsky, Defendant

Andrew R. Dorf, Defendant Scott Dragos, and Defendant Chris Zorbas aggressively marketed the Premises to the Plaintiffs as a safe, fairly-valued, income producing investment.

78.     Defendant Marcus & Millichap, Defendant Glen Kunofsky, Defendant Andrew R. Dorf, Defendant Scott Dragos, and Defendant Chris Zorbas marketed the Premises to the Plaintiff both orally and in writing as an excellent investment.

79.     Defendant Marcus & Millichap, Defendant Glen Kunofsky, Defendant Andrew R. Dorf, Defendant Scott Dragos, and Defendant Chris Zorbas marketed the Premises to the Plaintiff both orally and in writing as a financially stable investment having conservative risks and a secure retirement income.

80.     Defendant Marcus & Millichap, Defendant Glen Kunofsky, Defendant Andrew R. Dorf, Defendant Scott Dragos, and Defendant Chris Zorbas emphasized to the Plaintiffs both orally and in writing the fair market value and the long-term Lease.

81.     Defendant Marcus & Millichap, Defendant Glen Kunofsky, Defendant Andrew R. Dorf, Defendant Scott Dragos, and Defendant Chris Zorbas emphasized to the Plaintiffs both orally and in writing the right to cure any lease default by Shell Oil Company pursuant to an oil agreement.

82.     Defendant Marcus & Millichap, Defendant Glen Kunofsky, Defendant Andrew R. Dorf, Defendant Scott Dragos, and Defendant Chris Zorbas marketed to the Plaintiffs both orally and in writing that the tenants as being experienced and financially sound.

83.     Defendant Marcus & Millichap, Defendant Glen Kunofsky, Defendant Andrew R. Dorf, Defendant Scott Dragos, and Defendant Chris Zorbas marketed to the

11

Plaintiffs both orally and in writing that there would be no landlord responsibilities.

84.     Defendant Marcus & Millichap, Defendant Glen Kunofsky, Defendant Andrew R. Dorf, Defendant Scott Dragos, and Defendant Chris Zorbas marketed to the Plaintiffs both orally and in writing that the rental income from the Lease would cash flow or financially support debt obligations on the Premises.

### The Purchase

85.     On or about October 26, 2005, the Plaintiffs received from Defendant Marcus & Millichap a Defendant Marcus & Millichap form Letter of Intent whereby the Plaintiffs through their agent Defendant Scott Dragos of Defendant Marcus & Millichap expressed their intention of acquiring from Defendant Eureka Petroleum, Inc. the Premises for the sum of $1,480,000.00. Attached hereto as **Exhibit "J"** and made a part hereof is a copy of the Letter of Intent dated October 26, 2005.

86.     On or about October 26, 2005, the Plaintiffs executed the Defendant Marcus & Millichap form Letter of Intent. See **Exhibit "J"**.

87.     On or about October 26, 2005, the Letter of Intent was received by Defendant Marcus & Millichap via facsimile transmission to Defendant Scott Dragos. See **Exhibit "J"**.

88.     On or about October 27, 2005, Defendant Scott Dragos informed the Plaintiffs via email that two lenders were contacted and that he thinks "it is a wonderful deal for you . . .". Attached hereto as **Exhibit "K"** and made a part hereof is a copy of the email dated October 27, 2005.

89.     In the same email, an Activity Detail on the Premises was provided setting out among other things:  the listing price; lot size of 0.84 acres; a twenty five (25) year lease

period; a ten (10) year option period; a 7.5% initial return or capitalization rate; base rental escalation of 1.6% annually; a triple-net lease requiring the tenant to pay all expenses of the property including maintenance, insurance, taxes and water; a ten (10) year oil agreement with Shell Oil Company which contained a right to cure any lease default; a part of the "Fastest Growing Franchisee in Jiffy Lube System"; "Zero Landlord Responsibilities"; "rarest type of NNN Opportunity: New York State"; and that Defendant Eureka Petroleum, Inc. currently operated in "approximately 45 locations". See **Exhibit "K"**.

90.     On or about November 1, 2005, the Plaintiffs received from Defendant Scott Dragos a Defendant Marcus & Millichap form Counter to Letter of Intent dated October 26, 2005. Attached hereto as **Exhibit "L"** and made a part hereof is a copy of the Counter to Letter of Intent dated October 26, 2005.

91.     On or about November 5, 2005, the Plaintiffs executed the Defendant Marcus & Millichap form Counter to Letter of Intent with Defendant Daniel J. Scotti, Jr.   See **Exhibit "L"**.

92.     In said Counter to Letter of Intent, the Plaintiffs through their agent Defendant Scott Dragos of Defendant Marcus & Millichap expressed their intention of acquiring from Defendant Daniel J. Scotti the Premises for the sum of $1,480,000.00.   See **Exhibit "L"**.

93.     The Counter to Letter of Intent was received by Defendant Marcus & Millichap via facsimile transmission to Defendant Scott Dragos. See **Exhibit "L"**.

94.     On or about November 5, 2005, Defendant Marcus & Millichap by Defendant Scott Dragos sent via facsimile transmission to the Plaintiffs a signature page to the Letter of Intent as well as a Seller's Acceptance and Agreement to Pay Commission

13

executed by Defendant Daniel J. Scotti, Jr.   Attached hereto as **Exhibit "M"** and made a part hereof is a copy of the fax letter dated November 5, 2005.

95.      On or about November 5, 2005, the Plaintiffs sent via facsimile transmission to Defendant Marcus & Millichap through Defendant Scott Dragos an executed signature page to the Letter of Intent.  See **Exhibit "M".**

96.      On or about November 9, 2005, Defendant Marcus & Millichap prepared a receipt of documents listing for the Premises. Attached hereto as **Exhibit "N"** and made a part hereof is a copy of the receipt of documents listing for the Premises.

97.      On or about November 9, 2005, the Plaintiffs were provided by Defendant Marcus & Millichap an Activity Detail on the Premises showing:  the listing price; lot size of 0.84 acres; a twenty five (25) year lease period with twenty three (23) plus years remaining; a ten (10) year option period; a 7.5% initial return or capitalization rate; a net operating income of One Hundred Twelve Thousand One Hundred Fifty Four Thousand Dollars ($112,154); base rental escalation of 1.6% annually; a triple-net lease requiring the tenant to pay all expenses of the property including maintenance, insurance, taxes and water; a ten (10) year oil agreement with Shell Oil Company which contained a right to cure any lease default; a part of the "Fastest Growing Franchisee in Jiffy Lube System"; "Zero Landlord Responsibilities"; "rarest type of NNN Opportunity:  New York State"; and that Defendant Eureka Petroleum, Inc. currently operated in "approximately 45 locations". Attached hereto as **Exhibit "O"** and made a part hereof is a copy of the Activity Detail for the Premises.

98.      On or about November 14, 2005, Defendant Andrew R. Dorf of Defendant Marcus & Millichap provided to Defendant Scott Dragus of Defendant Marcus & Millichap

via email a letter regarding receipt of due diligence documents. Attached hereto as **Exhibit "P"** and made a part hereof is a copy of the letter dated November 14, 2005.

99.     On or about November 20, 2005, the Plaintiffs as the "Buyers" and Defendant Daniel K. Scotti as the "Seller" executed a Purchase Agreement for the purchase of the Premises for the sum of $1,480,000.00. Attached hereto as **Exhibit "Q"** and made a part hereof is a copy of the Purchase Agreement dated November 20, 2005.

100.    The Purchase Agreement was received by Defendant Marcus & Millichap via facsimile transmission. See **Exhibit "Q"**.

101.    On or about December 6, 2005, Defendant PGP Valuation, Inc. alleged to have prepared an appraisal summary report on the Premises. Attached hereto as **Exhibit "R"** and made a part hereof is a copy of the Invoice dated December 6, 2005 charging the sum of Three Thousand Five Hundred Dollars and Zero Cents ($3,500.00) for an appraisal summary report on the Premises.

102.    The appraisal summary report provided by Defendant PGP Valuation, Inc. used an inflated lease rate which caused the appraised value of the Premises to be artificially inflated.

103.    Upon information and belief, the appraisal summary report provided by Defendant PGP Valuation, Inc. used comparables provided by the Defendants on other properties also having artificially inflated value thereby causing the appraised value of the Premises to be artificially inflated.

104.    On or about December 9, 2005, Defendant Eureka Petroleum, Inc. provided a Tenant Estoppel Certificate to California Credit Union, the commercial lender of the Plaintiffs. Pursuant to the Tenant Estoppel Certificate, Defendant Eureka Petroleum, Inc.

identified that the Lease was a twenty five (25) year lease, commencing on March 5, 2004, expiring on February 28, 2029, having a one (1) additional ten (10) year renewal option period, having a monthly base rent amount of $9,346.19, and with base rental escalations of two percent (2%) annually. Attached hereto as **Exhibit "S"** and made a part hereof is a copy of the Tenant Estoppel Certificate dated December 9, 2005.

105.    On or about December 30, 2005, Defendant Daniel J. Scotti delivered to the Plaintiffs a Bargain and Sale Deed which was filed in the County Clerk's Office of Monroe County on or about January 13, 2006. See **Exhibit "G"**.

106.    On or about December 30, 2005, and in conjunction with the purchase of the Premises, the Plaintiffs became Landlord under the Lease with twenty three years eleven months remaining under the Lease.

107.    At the time of purchase of the Premises by the Plaintiffs, Defendant Sovereign JF, LLC was the lessor and Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. were the tenants.

108.    On or about January 20, 2006 and in conjunction with the purchase of the Premises, the Plaintiffs obtained and executed a Mortgage, Assignment of Rents and Security Agreement in the principal amount of Seven Hundred Thousand Dollars and Zero Cents ($700,000.00). Said Mortgage, Assignment of Rents and Security Agreement was filed in the County Clerk's Office of Monroe County on or about March 6, 2006. Attached hereto as **Exhibit "T"** and made a part hereof is a copy of the Mortgage, Assignment of Rents and Security Agreement dated January 20, 2006 and filed with the County Clerk's Office of Monroe County on March 6, 2006.

109.    In conjunction with the Mortgage, Assignment of Rents and Security

16

Agreement dated January 20, 2006 and filed with the County Clerk's Office of Monroe County on March 6, 2006, a Lease Subordination, Non-Disturbance and Attornment Agreement was filed in the County Clerk's Office of Monroe County on March 6, 2006. Attached hereto as **Exhibit "U"** and made a part hereof is a copy of the Lease Subordination, Non-Disturbance and Attornment Agreement dated filed with the County Clerk's Office of Monroe County on March 6, 2006.

110.     In said Lease Subordination, Non-Disturbance and Attornment Agreement, Defendant Eureka Petroleum, Inc. is named as the Tenant of the Premises and references that Defendant Eureka Petroleum, Inc. entered into the Lease on March 4, 2004.   See **Exhibit "U"**.

## The Tenants

111.     From the time of purchase of the Premises by the Plaintiffs to December 2006, Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. paid certain items of rent to the Plaintiffs.

112.     Upon information and belief, and on a date unknown to the Plaintiffs, and without the written consent of the Plaintiffs, the Lease was transferred to DDS Management, LLC, Peanut Oil, LLC, Defendant Samuel E. Pearson, III and Defendant Deborah Pickett (the "Assignees").

113.     Commencing in December 2006, the Assignees commenced paying certain items of rent to the Plaintiffs.

## The Breach

114.     In or around August, 2007, the Assignees ceased paying items of rent, real property taxes, personal property taxes, assessments, license fees and other charges assessed

17

against the Premises including water.

115.    Shortly thereafter, the Plaintiffs retained an attorney to seek eviction and to collect past due monies owed under the Lease.

116.    In or around December 2007, the Assignees abandoned the Premises without notice to the Plaintiffs.

117.    Upon abandoning the Premises, the Premises sustained property damage.

118.    Upon abandoning the Premises, equipment belonging to the Jiffy Lube franchise was wrongfully removed from the Premises.

119.    On or about March 17, 2008, the Plaintiffs took back possession of the Premises.

120.    The Plaintiffs demanded that Shell Oil Company cure the default of the Defendants in the Lease.

121.    Shell Oil Company elected not to cure the default.  Attached hereto as **Exhibit "V"** and made a part hereof is a correspondence from Shell Oil Company.

122.    Shortly after the Plaintiffs taking possession of the Premises, the Plaintiffs discovered that the Premises contains only 0.52 acres and not the 0.84 acres as misrepresented by the Defendants.

### The Co-Conspirators

123.    DDS Management, LLC, and Peanut Oil, LLC are non-parties to this action due to their 2008 filings for Chapter 7 bankruptcy protection in the United States Bankruptcy Court of the Middle District of Pennsylvania.

124.    Upon information and belief, Defendant Samuel E. Pearson, III is a member of DDS Management, LLC.

125.    Upon information and belief, Defendant Samuel E. Pearson, III is a member of Peanut Oil, LLC.

126.    Upon information and belief, Defendant Samuel E. Persons, III is the Chief Executive Officer of Defendant Eureka Petroleum, Inc.

127.    Defendant Samuel E. Persons, III is a co-conspirator in connection with the Defendants' scheme and controlled the sham tenants in the Premises.

128.    Upon information and belief, DDS Management, LLC is an alter-ego of Defendant Samuel E. Persons, III.

129.    Upon information and belief, Peanut Oil, LLC is an alter-ego of Defendant Samuel E. Persons, III.

130.    Upon information and belief, Defendant Eureka Petroleum, Inc. is an alter-ego of Defendant Samuel E. Persons, III.

131.    Defendant Samuel E. Persons, III controlled DDS Management, LLC, Peanut Oil, LLC and Defendant Eureka Petroleum, Inc., and directed the business and financial activities of these Defendants, used assets of these Defendants for personal uses, and caused assets of these Defendants to be transferred to him and other corporations without adequate consideration and as a mere shell game and to further the scheme and conspiracy which damaged the Plaintiffs.

132.    Upon information and belief, Defendant Deborah Pickett is a member of DDS Management, LLC.

133.    Upon information and belief, Defendant Deborah Pickett is a member of Peanut Oil, LLC.

134.    Defendant Deborah Pickett is a co-conspirator in connection with the

Defendants' scheme and controlled the sham tenants in the Premises.

135.   Upon information and belief, DDS Management, LLC is an alter-ego of Defendant Deborah Pickett.

136.   Upon information and belief, Peanut Oil, LLC is an alter-ego of Defendant Deborah Pickett.

137.   Defendant Deborah Pickett controlled DDS Management, LLC and Peanut Oil, LLC, and directed the business and financial activities of these Defendants, used assets of these Defendants for personal uses, and caused assets of these Defendants to be transferred to him and other corporations without adequate consideration and as a mere shell game and to further the scheme and conspiracy which damaged the Plaintiffs.

138.   Upon information and belief, Defendant Paul Morabito is or at one time was an officer of Defendant Sovereign JF, LLC.

139.   Upon information and belief, Defendant Paul Morabito is or at one time was an officer of Defendant Sovereign JF, SPE Manager, Inc.

140.   Upon information and belief, Defendant Paul Morabito is the Chief Executive Officer of Defendant Eureka Petroleum, Inc.

141.   Upon information and belief, Defendant Paul Morabito is the President and Secretary of Defendant Tibarom, Inc.

142.   Upon information and belief, Defendant Paul Morabito is or at one time was an officer of Defendant Rochester Lube, LLC.

143.   Defendant Paul Morabito is a co-conspirator in connection with the Defendants' scheme and controlled the sham tenants in the Premises.

144.   Upon information and belief, Defendant Sovereign JF, SPE Manager, Inc. is

the managing member and alter ego of Defendant Sovereign JF, LLC.

145.    Upon information and belief, Defendant Sovereign JF, LLC is an alter-ego of Defendant Paul Morabito.

146.    Upon information and belief, Defendant Sovereign JF, SPE Manager, Inc. is an alter-ego of Defendant Paul Morabito.

147.    Upon information and belief, Defendant Eureka Petroleum, Inc. is an alter-ego of Defendant Paul Morabito.

148.    Upon information and belief, Defendant Tibarom, Inc. is an alter-ego of Defendant Paul Morabito.

149.    Upon information and belief, Defendant Rochester Lube, Inc. is an alter-ego of Defendant Paul Morabito.

150.    Defendant Paul Morabito controlled Defendant Sovereign JF, LLC, Defendant Sovereign JF, SPE Manager, Inc., Defendant Eureka Petroleum, Inc., Defendant Tibarom, Inc., and Defendant Rochester Lube, Inc. and directed the business and financial activities of these Defendants, used assets of these Defendants for personal uses, and caused assets of these Defendants to be transferred to him and other corporations without adequate consideration and as a mere shell game and to further the scheme and conspiracy which damaged the Plaintiffs.

151.    Defendant PGP Valuation, Inc. prepared the appraisal for the Premises.

152.    The appraisal prepared by Defendant PGP Valuation, Inc. improperly reflected the artificially inflated fair market values manipulated and created by the Defendants.

153.    Upon information and belief, the Premises was appraised by Defendant PGP

21

Valuation, Inc. on the inflated rates of the Lease having the sham tenants.

154.    Upon information and belief, the Premises was appraised by Defendant PGP Valuation, Inc. using comparables of other Jiffy Lube franchises.

155.    Upon information and belief, the other Jiffy Lube franchises used by Defendant PGP Valuation, Inc. in its comparables involved in the same scheme that the Defendants used with the Plaintiffs.

156.    Defendant PGP Valuation, Inc. financially benefited from the scheme and received payment for its services of providing an artificially inflated appraisal report.

### FIRST CAUSE OF ACTION
### AS AGAINST EUREKA PETROLEUM, INC. AND TIBAROM, INC.:
### (Breach of Contract -- Past Due Rents)

157.    The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "156" as if fully set forth herein.

158.    Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. were the tenants of Defendant Sovereign JF, LLC at the Premises and pursuant to the Lease at the time the Plaintiffs purchased the Premises on or about December 30, 2005.

159.    The term of the Lease is twenty-five years, commencing on February 5, 2004 and ending on February 4, 2029.

160.    Pursuant to the Lease, Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. were to pay rent at a rate of $9,346.16 monthly during the initial year of the term of the Lease.  For subsequent years, the rent increased by one and six-tenths percent (1.6%) annually on the anniversary date of the Lease.  For the year beginning February 4, 2007 and ending February 4, 2008, Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. were to pay rent at a rate of $9,801.99 monthly.

161. Pursuant to the Lease, Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. were to pay monthly rent on or before the fifteenth (15th) day of the month for each month during the term of the Lease.

162. Pursuant to the Lease, Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. were to pay real property taxes, personal property taxes, assessments, license fees and other charges assessed against the Premises including water during the term of the Lease.

163. Pursuant to the Lease, any payment made more than ten (10) days after the due date had a late payment charge calculated at five percent (5%) of the amount of the delinquent payment.

164. Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. did not pay any items of rent for the months of August 2007 through and including December 2007 while continuing to occupy the Premises.

165. Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. did not pay real property taxes, personal property taxes, assessments, license fees and other charges assessed against the Premises including water during the term of the Lease and while continuing to occupy the Premises.

166. The failure of Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. to pay rents constitutes a material breach and default under the Lease.

167. The failure of Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. to pay real property taxes, personal property taxes, assessments, license fees and other charges assessed against the Premises including water during the term of the Lease constitutes a material breach and default under the Lease.

168. As a result of the failure of Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. to pay rent, the Plaintiffs suffered damages.

169. As a result of the failure of Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. to pay real property taxes, personal property taxes, assessments, license fees and other charges assessed against the Premises including water during the term of the Lease, the Plaintiffs suffered damages.

170. The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Two Hundred Thousand Dollars and Zero Cents ($200,000.00).

**SECOND CAUSE OF ACTION**
**AS AGAINST EUREKA PETROLEUM, INC. AND TIBAROM, INC.:**
**(Breach of Contract – Future Rents)**

171. The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "170" as if fully set forth herein.

172. The Lease provides that in the event of a default under the Lease, Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. shall be liable to the Plaintiffs for the amount by which the unpaid rent including taxes for the remaining term of the Lease exceeds the amount of such lost rent that Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. prove could reasonably be avoided plus interest thereon.

173. As a result of the default of Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. under the Lease, the Plaintiffs have been damaged.

174. The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Three Million Five Hundred Thousand Dollars and Zero Cents ($3,500,000.00).

## THIRD CAUSE OF ACTION
## AS AGAINST SOVEREIGN JF, LLC, SOVEREIGN JF, SPE MANAGER, INC., EUREKA PETROLEUM, INC. AND TIBAROM, INC.:
### (Breach of Contract – Purported Assignment)

175.    The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "174" as if fully set forth herein.

176.    Defendant Sovereign JF, SPE Manager, Inc. is the managing member and alter ego of Defendant Sovereign JF, LLC.

177.    On or about December 30, 2005, the interest of Defendant Sovereign JF, LLC in both the Premises and the Lease was transferred to the Plaintiffs and in conjunction with the purchase of the Premises by the Plaintiffs.

178.    Upon information and belief, and on a date unknown to the Plaintiffs, and without the written consent of the Plaintiffs, Defendant Sovereign JF, LLC, Defendant Eureka Petroleum, Inc., Defendant Tibarom, Inc., Defendant Samuel E. Pearson, III and Defendant Deborah Pickett, along with non-parties DDS Management, LLC, and Peanut Oil, LLC, executed an Assignment and Assumption of Lease Agreement.

179.    In or around December 2006, the Plaintiffs became aware of the purported Assignment when payments of rent from a different source were provided to the Plaintiffs.

180.    Pursuant to the Lease, a lessee may not assign or in any manner transfer the Lease either in whole or in part without the Plaintiffs' written consent.

181.    The Plaintiffs did not and have not accepted the purported Assignment.

182.    The Plaintiffs did not provide their written consent to the purported Assignment.

183.    The purported Assignment constitutes a material breach and default of the obligations of Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. under the

Lease.

184.   As a result of the purposed Assignment, the Plaintiffs have suffered damaged.

185.   The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Three Million Five Hundred Thousand Dollars and Zero Cents ($3,500,000.00).

**FOURTH CAUSE OF ACTION**
**AS AGAINST EUREKA PETROLEUM, INC. AND TIBAROM, INC.:**
**(Breach of Contract – Property Damage)**

186.   The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "185" as if fully set forth herein.

187.   At or around the time Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. abandoned the Premises, property damage was sustained.

188.   As a result of the property damage caused by Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc., Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc. breached the Lease.

189.   As a result of the breach of the Lease by Defendant Eureka Petroleum, Inc. and Defendant Tibarom, Inc., the Plaintiffs have been damaged.

190.   The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Eighty Thousand Dollars and Zero Cents ($80,000.00).

**FIFTH CAUSE OF ACTION**
**AS AGAINST ALTERNATIVELY**
**DEFENDANT SAMUEL E. PEARSON, III AND**
**DEFENDANT DEBORAH PICKETT:**
**(Breach of Contract – Past Due Rents)**

191.   The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "190" as if fully set forth herein.

192.   If the purported Assignment is a valid assignment of the Lease, then pursuant to the Lease, Defendant Samuel E. Pearson, III and Defendant Deborah Pickett were obligated to pay rent for the Premises.

193.   Defendant Samuel E. Pearson, III and Defendant Deborah Pickett did not pay rent for the months of August 2007 through and including December 2007 when the Premises was abandoned.

194.   Defendant Samuel E. Pearson, III and Defendant Deborah Pickett did not pay real property taxes, personal property taxes, assessments, license fees and other charges assessed against the Premises including water during the term of the Lease.

195.   Pursuant to the Lease, any payment made more than ten (10) days after the due date had a late payment charge calculated at five percent (5%) of the amount of the delinquent payment.

196.   If the purported Assignment is a valid assignment of the Lease, then the failure of Defendant Samuel E. Pearson, III and Defendant Deborah Pickett to pay rent for the months of August 2007 through and including December 2007 constitutes a material breach and default of the Lease.

197.   If the purported Assignment is a valid assignment of the Lease, then the failure of Defendant Samuel E. Pearson, III and Defendant Deborah Pickett to pay real property taxes, personal property taxes, assessments, license fees and other charges assessed against the Premises including water during the term of the Lease constitutes a material breach and default of the Lease.

198.   As a result of the failure of Defendant Samuel E. Pearson, III and Defendant Deborah Pickett to pay rent, the Plaintiffs suffered damages.

199.    As a result of the failure of Defendant Samuel E. Pearson, III and Defendant Deborah Pickett to pay real property taxes, personal property taxes, assessments, license fees and other charges assessed against the Premises including water during the term of the Lease, the Plaintiffs suffered damages.

200.    The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Two Hundred Thousand Dollars and Zero Cents ($200,000.00).

**SIXTH CAUSE OF ACTION
AS AGAINST ALTERNATIVELY
DEFENDANT SAMUEL E. PEARSON, III AND
DEFENDANT DEBORAH PICKETT:
(Breach of Contract – Future Rents)**

201.    The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "200" as if fully set forth herein.

202.    If the purported Assignment is a valid assignment of the Lease, then the Lease provides that in the event of a default under the Lease, Defendant Samuel E. Pearson, III and Defendant Deborah Pickett shall be liable to the Plaintiffs for the amount by which the unpaid rent for the remaining term of the Lease exceeds the amount of such lost rent that Defendant Samuel E. Pearson, III and Defendant Deborah Pickett prove could reasonably be avoided plus interest thereon.

203.    As a result of the default of Defendant Samuel E. Pearson, III and Defendant Deborah Pickett under the Lease, the Plaintiffs have been damaged.

204.    The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Three Million Five Hundred Thousand Dollars and Zero Cents ($3,500,000.00).

**SEVENTH CAUSE OF ACTION**
**AS AGAINST ALTERNATIVELY**
**DEFENDANT SAMUEL E. PEARSON, III AND**
**DEFENDANT DEBORAH PICKETT:**
**(Breach of Contract – Property Damage)**

205.    The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "204" as if fully set forth herein.

206.    If the purported Assignment is a valid assignment of the Lease, then at or around the time Defendant Samuel E. Pearson, III and Defendant Deborah Pickett abandoned the Premises, property damage was sustained.

207.    As a result of the property damage caused by Defendant Samuel E. Pearson, III and Defendant Deborah Pickett, Defendant Samuel E. Pearson, III and Defendant Deborah Pickett breached the Lease.

208.    As a result of the breach of the Lease by Defendant Samuel E. Pearson, III and Defendant Deborah Pickett, the Plaintiffs have been damaged.

209.    The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Eighty Thousand Dollars and Zero Cents ($80,000.00).

**EIGHTH CAUSE OF ACTION**
**AS AGAINST ALL OF THE DEFENDANTS:**
**(Negligent Misrepresentation)**

210.    The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "209" as if fully set forth herein.

211.    The Defendants used fraudulent sale and leaseback agreements.

212.    The Defendants artificially inflated the value of the Premises.

213.    The Defendants knowingly marketed and sold the Premises to the Plaintiffs at an artificially inflated price.

29

214.    The Defendants knowingly marketed and sold the Premises to the Plaintiffs using a sham Lease.

215.    The Defendants used dummy or shell corporations to hide the scheme.

216.    The Defendants used Leases with tenants installed by the Defendants.

217.    The Defendants used tenants that were dummy corporations controlled by the Defendants.

218.    The Defendants used tenants that had no intentions in fulfilling their obligations under the Leases.

219.    The Defendants used rental rates in the Leases that were significantly higher than legitimate rental rates that a true and ordinary tenant would pay in an arm's length transaction.

220.    The Defendants misrepresented the present and future anticipated income generated by the Premises, the ability of the business model presented by the Defendants to support the rents provided for in the Lease, the acreage of the Premises, the capitalization rate of the Premises, the actual value of the Premises, the actual value of the Lease of the Franchise, the financial strength and business experience of the tenants and franchisees

221.    The Defendants knowingly used false and misleading marketing materials, financial information, projections and appraisal to induce the Plaintiffs into purchasing the Premises.

222.    The Defendants knew that the representations that they were making to the Plaintiffs in connection with the marketing and sale of the Premises were false.

223.    The Defendants had no reasonable grounds for believing the representations made to the Plaintiffs to be true.

30

224.    The Defendants were aware that the Defendants did not have reasonable grounds for making the representations to the Plaintiffs.

225.    The Defendants made the misrepresentations to induce the Plaintiffs to purchase the Premises.

226.    The misrepresentations by the Defendants were not readily observable to the Plaintiffs.

227.    The misrepresentations by the Defendants were not known to the Plaintiffs at the time the Plaintiffs purchased the Premises.

228.    In reliance upon the misrepresentations of the Defendants, the Plaintiffs entered into an agreement to purchase the Premises.

229.    In reliance upon the misrepresentations of the Defendants, the Plaintiffs funded a deposit for the purchase of the Premises.

230.    In reliance upon the misrepresentations of the Defendants, the Plaintiffs acquired the Premises.

231.    In reliance upon the misrepresentations of the Defendants, the Plaintiffs obtained financing for the Premises.

232.    In reliance upon the misrepresentations of the Defendants, the Plaintiffs undertook other normal and customary activities associated with owning the Premises.

233.    In reliance upon the misrepresentations of the Defendants, the Plaintiffs expended monies on the Premises.

234.    If the Plaintiffs had known the actual facts, the Plaintiffs would not have taken such actions with respect to the Premises.

235.    The Plaintiffs sustained an actual pecuniary loss as the direct result of the

Defendants' wrong.

236.   The Plaintiffs have suffered damages not limited to the difference between the true value of the Premises at the time the Premises was acquired by the Plaintiff and the purchase price paid by the Plaintiffs.

237.   The Plaintiffs have suffered damages not limited to the losses of rents suffered as a result of the default on the Lease and the abandonment of the Premises by the tenants.

238.   The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00).

## NINTH CAUSE OF ACTION
### AS AGAINST ALL OF THE DEFENDANTS:
### (Deceptive Acts or Practices Under N.Y. General Business Law §349 )

239.   The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "238" as if fully set forth herein.

240.   The Defendants engaged in deceptive acts and practices in the conduct of business.

241.   The Defendants' deceptive acts and practices were material.

242.   Due to the Defendants' materially deceptive acts and practices, the Plaintiffs suffered harm.

243.   The Plaintiffs are entitled to recover from the Defendants their actual damages as well as their reasonable attorneys' fees and costs.

244.   The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00).

32

## TENTH CAUSE OF ACTION
## AS AGAINST ALL OF THE DEFENDANTS:
### (Racketeer Influenced and Corrupt Organization Act - RICO)

245.    The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "244" as if fully set forth herein.

246.    From October 2005 to the purchase of the Premises, the Defendants mailed letters, engaged in communications via email and facsimile and had conversations by telephone and in person with the Plaintiffs regarding the Premises including present and future anticipated income generated by the Premises, the ability of the business model presented by the Defendants to the Plaintiffs to support the rents provided for in the Lease, the capitalization rate of the Premises, the actual value of the Premises, the actual value of the Lease of the franchise on the Premises, and the financial strength and business experience of the tenants and the franchise.

247.    Upon information and belief, from on or about April 29, 2004 to on or about January 13, 2006, and pertaining to the transfer of the Premises between the Defendants and then to the Plaintiffs, the Defendants engaged in wire fraud activities as the Premises passed from one party to another for the amounts of consideration as set out in the corresponding deeds on file with the County Clerk's Office of Monroe County (See **Exhibit "A"** through **Exhibit "G"**).

248.    Upon information and belief, and from October 2003 to October 2004, the Defendants mailed letters, engaged in communications via email and facsimile and had conversations by telephone and in person, and engaged in wire fraud activities on ten (10) other Jiffy Lube franchises in the State of New York and specifically located at:  (1) 1010 Transit Way, Brockport, New York 14420; (2) 6480 Transit Road, Cheektowaga, new York

14043; (3) 4885 Transit Road, Lancaster, New York 14086; (4) 321 South Hamilton Street, Painted Post, New York 14870; (5) 141 Seneca Street, Hornell, New York 14843; (6) 3022 Ridge Road, West Rochester, New York 14626; (7) 234-330 Main Street, Binghamton, New York 13905; (8) 288 Hamilton Street, Geneva, New York 14456; (9) 2418 North Main Street, Warsaw, New York 14569; and (10) 137 Vestal Parkway, Vestal, New York 13850.

249.   Upon information and belief, and from October 2003 to October 2004, the Defendants employed the same scheme and fraudulent actions as the Defendants used with the Plaintiffs in the buying and selling of the ten (10) other Jiffy Lube franchises in the State of New York.

250.   The Defendants individually and the corporate Defendants through their officers, agents and employees, were employed, associated with and/or engaged in a pattern of racketeering activity with respect to the Premises and the ten (10) other known Jiffy Lube franchises in the State of New York and did so as a distinct enterprise.

251.   The Defendants' actions with respect to the Plaintiffs and the ten (10) other known Jiffy Lube franchises in the State of New York were continuing, yielded the same results, had similar participants, employed similar methods and are otherwise interrelated.

252.   The Defendants as an enterprise engaged in and had activities which affected interstate and foreign commerce.

253.   The Defendants engaged in and had activities which affected interstate and foreign commerce in furtherance of their common purpose to defraud the Plaintiffs.

254.   Alter-egos and shell companies were created and/or used as a tool to carry out the elements of the Defendants' illicit scheme and pattern of racketeering activity.

255.   The Defendants individually and the corporate Defendants through their

officers, agents and employees conducted in and/or participated in the enterprise's affairs.

256.   The Defendants' conduct and participation in the enterprise's affairs amounts to a pattern of racketeering activity.

257.   The Defendants individually and the corporate Defendants through their officers, agents and employees conducted in and/or participated in a related and continuous pattern of racketeering activity.

258.   The Defendants possessed the requisite fraudulent intent.

259.   The Defendants engaged in prohibited conduct of a distinct enterprise's affairs through a pattern of racketeering activity and in violation of the Racketeer Influenced and Corrupt Organization Act.

260.   Due to the Defendants' conduct the Plaintiffs have suffered an injury to its business and property.

261.   As a result of the Defendants' scheme, the Plaintiffs sustained damage to the value of the Plaintiff's investment together with present and future income stream expected and promised for the Premises.

262.   The Plaintiffs are entitled to its reasonable attorneys' fees and costs and litigation and treble damages.

263.   The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00).

## ELEVENTH CAUSE OF ACTION
## AS AGAINST ALL OF THE DEFENDANTS:
### (Fraud)

264.   The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "263" as if fully set forth herein.

265.   The Defendants participated in and had knowledge of the fraud.

266.   The Defendants intentionally misrepresented and/or concealed material information from the Plaintiffs including but not limited to present and future anticipated income generated by the Premises, the ability of the business model presented by the Defendants to the Plaintiffs to support the rents provided for in the Lease, the capitalization rate of the Premises, the actual value of the Premises, the actual value of the Lease of the franchise on the Premises, and the financial strength and business experience of the tenants and the franchise.

267.   The Defendants intentionally misrepresented and/or concealed material information over the telephone, through email, through facsimile, in person and through U.S. Mail.

268.   The Defendants were deceptive.

269.   The Defendants designed and perpetrated a fraudulent scheme to defraud the Plaintiffs.

270.   The Defendants designed and perpetrated a fraudulent scheme to defraud the material facts

271.   The Defendants conducted a fraudulent scheme to entrap the Plaintiffs into a purchasing the Premises.

272.   The Defendants conducted a fraudulent scheme to entrap the Plaintiffs into acquiring the Lease.

273.   The Defendants willfully and knowingly concealed material facts from the Plaintiffs.

274.   The Defendants knew the falsity of the misrepresentations at the time the

misrepresentations were made.

275.    The Defendants knew the material nature of the facts that they willfully and knowingly concealed from the Plaintiffs.

276.    The Defendants should have disclosed these facts at the time to the Plaintiffs.

277.    The Plaintiffs relied upon the Defendants representations.

278.    The Plaintiffs were unaware of the falsity or misleading nature of the misrepresentations.

279.    The Plaintiffs' reliance upon the misrepresentations was reasonable under the circumstances.

280.    As a result of such reliance, the Plaintiffs funded a deposit for the Premises.

281.    As a result of such reliance, the Plaintiffs purchased the Premises.

282.    As a result of such reliance, the Plaintiffs purchased the Premises.

283.    As a result of such reliance, the Plaintiffs obtain financing.

284.    As a result of such reliance, the Plaintiffs expended sums of monies in the normal and customary activities associated with owning the Premises.

285.    The Defendants performed the wrongful and fraudulent acts with the intent of gaining a financial advantage to the disadvantage of the Plaintiffs.

286.    The Defendants acted with an awareness of their wrongful conduct.

287.    The Plaintiffs have sustained damages and continue to sustain damages including economic and non-economic losses.

288.    The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00).

## TWELFTH CAUSE OF ACTION
## AS AGAINST ALL OF THE DEFENDANTS:
### (Breach of the Covenant of Good Faith and Fair Dealing)

289.    The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "288" as if fully set forth herein.

290.    The Defendants' actions were part of a scheme to realize gains from the Plaintiffs that are implicitly denied by contract.

291.    The Defendants' actions deprived the Plaintiffs of the fruit of their bargain.

292.    The Plaintiffs have sustained damages and continue to sustain damages by reason of the Defendants' breach of the covenant of good faith and fair dealing.

293.    The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00).

## THIRTEENTH CAUSE OF ACTION
## AS AGAINST ALL OF THE DEFENDANTS:
### (Unjust Enrichment)

294.    The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "293" as if fully set forth herein.

295.    The Defendants by reason of their wrongful conduct obtained substantial benefits from the Plaintiffs and at the cost, expense and detriment of the Plaintiffs.

296.    The Defendants knowingly and willingly accepted these benefits from the Plaintiffs.

297.    It is inequitable for the Defendants to retain these benefits at the cost, expense and detriment of the Plaintiffs.

298.    It is unconscionable for the Defendants to retain these benefits at the cost, expense and detriment of the Plaintiffs.

299.   The Defendants will be unjustly enriched if they are permitted to retain such funds.

300.   The Plaintiffs are entitled to recover from the Defendants all amounts wrongfully collected and improperly retained by the Defendants plus interest thereon.

301.   As a direct and proximate result of the Defendants' unjust enrichment, the Plaintiffs have suffered injury.

302.   The Plaintiffs must be restored to the position the Plaintiffs would have been in had the Defendants not been unjustly enriched.

303.   The Plaintiffs have no adequate remedy at law.

304.   It would be inequitable to permit the Defendants to retain the amounts wrongfully collected.

305.   The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00).

### FOURTEENTH CAUSE OF ACTION
### AS AGAINST ALL OF THE DEFENDANTS:
### (Promissory Estoppel)

306.   The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "305" as if fully set forth herein.

307.   The Defendants made oral promises to the Plaintiffs.

308.   The oral promises made by the Defendants were sufficiently clear and unambiguous.

309.   The oral promises made by the Defendants include the value, income, income stream and stability of the investment of the Premises.

310.   The Plaintiffs relied upon the oral promises made by the Defendants.

311.    There was reasonable reliance upon the oral promises made by the Defendants.

312.    The Plaintiffs sustained an injury due to their reliance upon the oral promises made by the Defendants.

313.    The Plaintiffs have been damaged in the amount to be determined at trial but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00).

## FIFTEENTH CAUSE OF ACTION:
### (Tolling)

314.    The Plaintiffs repeat and reallege every allegation contained in Paragraphs "1" through "313" as if fully set forth herein.

315.    The Defendants affirmatively and fraudulently concealed their unlawful acts, scheme, conspiracy and course of conduct from the Plaintiffs.

316.    The Plaintiffs did not know and could not reasonably have known of the Defendants' fraudulent scheme.

317.    The Plaintiffs could not have reasonably discovered the falsity and fraud of the Defendants' representations, advertisements, solicitations and related documents.

318.    The Plaintiffs could not have known the concealed information until July 1, 2008 at the earliest.

319.    The Defendants continue to fraudulently conceal their practices.

320.    The Defendants' conduct is continuing in nature.

321.    There is a substantial nexus between the fraudulent conduct of the Defendants that has occurred within the statute of limitations and the misconduct prior to that time.

322.    The acts of the Defendants involve the same type of illicit practices and are

recurring, continuous events.

323.    The statutes of limitation applicable to any claims brought by the Plaintiffs as a result of the conduct of the Defendants have been tolled as a result of the Defendants' fraudulent concealment.

324.    The Defendants are equitably estopped from asserting any statute of limitation defense.

**WHEREFORE**, the Plaintiffs Rosemarie Ozbakir and Ali Demir demand the following relief:

1.    On its First Cause of Action, damages for breach of contract by Eureka Petroleum, Inc. and Tibarom, Inc. for the failure to pay past rents due in an amount to be determined at trial but believed to exceed the sum of Two Hundred Thousand Dollars and Zero Cents ($200,000.00);

2.    On its Second Cause of Action, damages for breach of contract by Eureka Petroleum, Inc. and Tibarom, Inc. for future rents due in an amount to be determined at trial but believed to exceed the sum of Three Million Five Hundred Thousand Dollars and Zero Cents ($3,500,000.00);

3.    On its Third Cause of Action, damages for breach of contract due to the purported Assignment against Sovereign JF, LLC, Sovereign JF, SPE Manager, Inc., Eureka Petroleum, Inc. and Tibarom, Inc. in an amount to be determined at trial but believed to exceed the sum of Three Million Five Hundred Thousand Dollars and Zero Cents ($3,500,000.00);

4.    On its Fourth Cause of Action, damages for breach of contract due to property damage against Eureka Petroleum, Inc. and Tibarom, Inc. in an amount to be

determined at trial but believed to exceed the sum of Eighty Thousand Dollars and Zero Cents ($80,000.00);

5.    On its Fifth Cause of Action alternatively, damages for breach of contract by Samuel E. Pearson, III and Deborah Pickett for the failure to pay past rents due in an amount to be determined at trial but believed to exceed the sum of Two Hundred Thousand Dollars and Zero Cents ($200,000.00);

6.    On its Sixth Cause of Action, alternatively, damages for breach of contract by Samuel E. Pearson, III and Deborah Pickett for future rents due in an amount to be determined at trial but believed to exceed the sum of Three Million Five Hundred Thousand Dollars and Zero Cents ($3,500,000.00);

7.    On its Seventh Cause of Action, alternatively, damages for breach of contract due to property damage by Samuel E. Pearson, III and Deborah Pickett in an amount to be determined at trial but believed to exceed the sum of Eighty Thousand Dollars and Zero Cents ($80,000.00);

8.    On its Eighth Cause of Action as against all the Defendants, damages for negligent misrepresentation by the Defendants in an amount to be determined at trial, but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00);

9.    On its Ninth Cause of Action as against all the Defendants, damages for deceptive acts or practices by the Defendants Under N.Y. General Business Law §349 in an amount to be determined at trial, but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00);

10.    On its Tenth Cause of Action as against all the Defendants, damages under the Racketeer Influenced and Corrupt Organization Act - RICO as against the Defendants in

an amount to be determined at trial, but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00);

      11.    On its Eleventh Cause of Action as against all the Defendants, damages for fraud by the Defendants in an amount to be determined at trial, but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00);

      12.    On its Twelfth Cause of Action as against all the Defendants, damages for breach of the covenant of good faith and fair dealing by the Defendants in an amount to be determined at trial, but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00);

      13.    On its Thirteenth Cause of Action as against all the Defendants, damages for unjust enrichment to the Defendants in an amount to be determined at trial, but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00);

      14.    On its Fourteenth Cause of Action as against all the Defendants, damages for promissory estoppel by the Defendants in an amount to be determined at trial, but believed to exceed the sum of Four Million Dollars and Zero Cents ($4,000,000.00);

      15.    On its Fifteenth Cause of Action, that the Court finds the Defendants equitably estopped from asserting any statute of limitation defense;

      16.    Pre-judgment and post-judgment interest on all damages awarded;

      17.    An award of reasonable attorneys' fees and costs incurred in this action; and

      18.    Such other and further relief as this Court deems just and proper.

Dated: June 11, 2009                **THE STEELE LAW FIRM, P.C.**
       Oswego, New York.

KIMBERLY A. STEELE, ESQ.
*Attorneys for Plaintiffs Rosemarie Ozbakir and*

43

*Ali Demir*
949 County Route 53
Oswego, New York 13126
Telephone:     (315) 216-4721
Facsimile:     (315) 216-6065
Email:         ksteele@thesteelelawfirm.com

## VERIFICATION

STATE OF NEW YORK        )
COUNTY OF MONROE      )ss.:

     ROSEMARIE OZBAKIR, being duly sworn, deposes and says that:

     I am a Plaintiff in this action. I have read the foregoing **VERIFIED COMPLAINT**, know the contents thereof and the same are true to my knowledge except those matters which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based on the review of the files and records which were maintained in the ordinary course of business.

                                           ROSEMARIE OZBAKIR

STATE OF NEW YORK        )
COUNTY OF MONROE      )   ss:

On the 11th day of June in the year 2009, before me, the undersigned, personally appeared ROSEMARIE OZBAKIR, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                       Notary Public

Kimberly A. Steele
Notary Public State of New York
No. 02ST6186321
Qualified in Oswego County
Commission Expires April 28 20__

45

**VERIFICATION**

STATE OF NEW YORK          )
COUNTY OF MONROE           )ss.:

ALI DEMIR,  being duly sworn, deposes and says that:

I am a Plaintiff in this action.  I have read the foregoing **VERIFIED COMPLAINT**, know the contents thereof and the same are true to my knowledge except those matters which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.  My belief, as to those matters therein not stated upon knowledge, is based on the review of the files and records which were maintained in the ordinary course of business.

_____
ALI DEMIR

STATE OF NEW YORK          )
COUNTY OF MONROE           )     ss:

On the 11th day of June in the year 2009, before me, the undersigned, personally appeared ALI DEMIR, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

Kimberly A. Steele
Notary Public State of New York
No. 02ST6186321
Qualified in Oswego County
Commission Expires April 28 20__

46

EXHIBIT "A"

**MONROE COUNTY CLERK'S OFFICE**

Index   DEEDS

<u>Return To:</u>

Book   09949   Page   0513

    HODGSON RUSS LP
    ONE M&T PLAZA SUITE 2000
    BUFFALO NY   14203-2391
    ATTN SUJATA YALAMANCHILI

No. Pages   0008

Instrument   DEED

Date :   4/29/2004

Time :   2:33:00

Control #   200404290865

WEBSTER
EVELYN              D
WEBSTER
SIDNEY              G                    TT#         TT 0000 018949
EVELYN D WEBSTER REVOCABLE INT
ERVIVOS TRUST                           Employee ID   SG40
COLEMAN
BRUCE              D

<u>MORTGAGE TAX</u>

| | | | |
|---|---|---|---|
| FILE FEE-S | $ | 66.00 | MORTGAGE AMOUNT  $         .00 |
| FILE FEE-C | $ | 11.00 | |
| REC FEE | $ | 24.00 | BASIC MORTGAGE TAX  $         .00 |
| TRANS TAX | $ | 3,360.00 | |
| MISC FEE-C | $ | 5.00 | SPEC ADDIT MTG TAX  $         .00 |
| | $ | .00 | |
| | $ | .00 | ADDITIONAL MTG TAX  $         .00 |
| | $ | .00 | |
| | $ | .00 | Total              $         .00 |

Total:     $     3,466.00

STATE OF NEW YORK                          <u>TRANSFER AMT</u>
MONROE COUNTY CLERK'S OFFICE

WARNING - THIS SHEET CONSTITUTES THE CLERKS      TRANSFER AMT $      839,531.00
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.      TRANSFER TAX $        3,360.00

        Cheryl Dinolfo
        Monroe County Clerk



DD99490513



**Warranty Deed with Lien Covenant**

THIS INDENTURE, made the 26th day of February, Two Thousand Four

BETWEEN Evelyn D Webster and Sidney G Webster, Trustees of The Evelyn D Webster Revocable Intervivos Trust Dated October 22, 1991, with a mailing address of 783 Fairport Road, East Rochester, NY 14445

(the "Grantor"), and

Bruce D. Coleman, with a mailing address of P O Box 10608, Rochester, NY 14610

(the "Grantee"),

WITNESSETH that the Grantor, in consideration of One Dollar ($1.00) lawful money of the United States and other good and valuable consideration, paid by the Grantee, does hereby grant and release unto the Grantee,

ALL THOSE CERTAIN LOTS, PIECE OR PARCELS OF LAND, situate in the Town and Village of East Rochester, County of Monroe, New York State, being the same property acquired by Evelyn D Webster and Sidney W. Webster as Trustees of the Evelyn D Webster Revocable Intervivos Trust, recorded in the Monroe County Clerk's Office in Liber 9013 at page 548 on May 29, 1998, lying and being southerly of Fairport Road (N S Route 31F) (S H 60) with all bearings being referred to true north at the 78 degrees 35 minute meridian of west longitude, bounded and described as follows

Commencing at a found triangle concrete monument on the existing southerly highway boundary of Fairport Road (N Y S Route 31) (S H 60), ROW width varies at its intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustees of the Evelyn D Webster Revocable Intervivos Trust on the southeast and the property now or formerly owned by the Village of East Rochester (Liber 1695 Page 230, Rec April 12, 1935) on the southwest, said point being easterly, measured along said southerly highway boundary of Fairport Road (N.Y.S Route 31) (S.H. 60) a distance of 409 feet more or less from the Town of Pittsford and the Village of East Rochester municipal line, said triangle concrete monument being the point or place of beginning

Running thence South 00 degrees 41 minutes 16 seconds East along the last mentioned division line, a distance of 178 00 feet to a found ½ inch pipe at its intersection with the division line between the said property now or formerly owned by Evelyn D. Webster and Sidney W Webster as Trustees of the Evelyn

5103-3440

D Webster Revocable Intervivos Trust on the northeast and the property now or formerly owned by the Trustees of Evelyn D Webster Trust (Liber 8178 Page 206, Rec February 25, 1992) on the southeast,

Thence South 73 degrees 24 minutes 09 seconds East along the last mentioned division line, a distance of 112 93 feet to a found ½ inch rebar at its intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustees of the Evelyn D Webster Revocable Intervivos Trust on the northwest and the property now or formerly owned by the Trustee of Sidney W Webster Trust (Liber 8178 Page 211, Rec February 25, 1992) on the east,

Thence North 17 degrees 40 minutes 59 seconds East along the last mentioned division line, a distance of 150 98 feet to a point at its intersection with the said southerly highway boundary of Fairport Road (N Y S Route 31) (S H 60);

Thence along the last mentioned highway boundary line the following two (2) courses

1)    North 62 degrees 51 minutes 12 seconds West, a distance of 67.68 feet to a point,

2)    North 69 degrees 41 minutes 46 seconds West, a distance of 102.36 feet to the point or place of beginning, as surveyed by Hawk Land Surveying, P.C., December 12, 2003.

RESERVING, HOWEVER, to Grantor, and Grantor's successors and assigns, easements for ingress and egress and for the erection and placement of signs identifying Grantor's business and those of Grantor's tenants on Grantor's adjoining property (Tax Account Number 152 45-2-2), which easements are described in Schedules A, B, and C, respectively, attached hereto and made a part hereof.

Subject to all covenants, easements and restrictions of record affecting said premises, if any

Being and hereby intending to convey the same premises conveyed to the Grantor by deed recorded in the Monroe County Clerk's Office in Liber 9013 of Deeds, page 548.

Tax Account No ·            152 45-2-1
Property Address          781 Fairport Road, East Rochester, NY    14445
Tax Mailing Address

TOGETHER with the appurtenances and all the estate and rights of Grantor in and to said premises,

TO HAVE AND TO HOLD the premises herein granted unto Grantee, its successors and/or assigns forever

AND said Grantor covenants as follows

FIRST, that Grantee shall quietly enjoy the said premises,

SECOND, that Grantor will forever WARRANT the title to said premises.

THIRD, That in Compliance with Sec 13 of the Lien Law, Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose

IN WITNESS WHEREOF, the Grantor has executed this indenture on the day and year first above written

THE EVELYN D  WEBSTER
REVOCABLE INTERVIVOS TRUST
DATED OCTOBER 22, 1991

By *Evelyn D. Webster Trustee*
Evelyn D  Webster Trustee

By. *[signature] Trustee*
Sidney G  Webster, Trustee

STATE OF NEW YORK
COUNTY OF MONROE   SS

On the 26th day of February, 2004, before me, personally appeared Evelyn D  Webster and Sidney G. Webster personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument

*[signature]*
Notary Public

DUNCAN R FARNEY
Notary Public in the State of New York
MONROE COUNTY
Commission Expires Sept 30, 2006

G \Microsoft\UKW\Webster\E\781FairportRoad\WarrantyDeed doc

Schedule "A"

ACCESS EASEMENT

The Grantor does hereby reserve for itself and its successors and assigns a permanent easement for ingress and egress over the land hereby conveyed to the Grantee for the purpose of gaining access to the lands of the Grantor, said easement being a strip of land and more particularly described as follows

All that tract or parcel of land situate in Town Lot No 57, Township 12, Range 4, in the Town and Village of East Rochester, County of Monroe, State of New York, bounded and described as follows

BEGINNING at a point in the southerly highway boundary line of Fairport Road (N Y S Rte 31 F/R O W varies), said point being located S69 degrees 35'23" E, a distance of 25 00 feet measured in said southerly highway boundary line from a concrete monument located in the division line between a parcel of land owned by the Evelyn D Webster Trust, as recorded in the Monroe County Clerk's Office in Liber 9013 of Deeds, commencing at page 548 on the east, and a parcel of land owned by the Village of East Rochester as recorded in the Monroe County Clerk's Office in Liber 1695 of Deeds, commencing at page 230 on the west,

(1) thence S 69 degrees 35' 23" E in said southerly boundary line of Fairport Road, a distance of 21 42 feet to a point,

(2) thence S 00 degrees 34' 53" E a distance of 127 79 feet to a point,

(3) thence S 73 degrees 17' 56" E a distance of 82 38 feet to a point in the westerly line of a parcel of land owned by the Sidney W Webster Trust, as recorded in the Monroe County Clerk's Office in Liber 8178 of Deeds, commencing at Page 211,

(4) thence S 17 degrees 47' 22" W a distance of 44 95 feet to a point,

(5) thence N 73 degrees 17' 56" W a distance of 31 82 feet to a point,

(6) thence N 13 degrees 40' 37" E a distance of 24 97 feet to a point,

(7) thence N 73 degrees 17 56" W parallel to and 20 feet more or less distant southerly measured at right angle from Course No 3, a distance of 59 30 feet to a point,

(8) thence S 13 degrees 40' 37" W a distance of 24 97 feet to a point,

(9) thence N 73 degrees 17' 56" W a distance of 12 00 feet to a point,

(10) thence N 13 degrees 40' 37" E a distance of 56 74 feet to a point,

G \Microsoft\UKW\WebsterE\781FairportRoad\WarrantyDeed doc

(11) thence N 00 degrees 34' 53" W 20 00 feet distant westerly measured at right angles from Course No 2, a distance of 116 97 feet to the POINT OF BEGINNING.

Being 0 113 acre (5,818 square feet), more or less

EXHIBIT "B"



**MONROE COUNTY CLERK'S OFFICE**

**Return To:**

    HODGSON RUSS LP
    ONE M&T PLAZA SUITE 2000
    BUFFALO NY 14203-2391
    ATTN SUJATA YALAMANCHILI

Index   DEEDS

Book   09949   Page   0528

No. Pages   0003

Instrument   DEED

Date :   4/29/2004

Time :   2:34:00

Control #   200404290878

**COLEMAN**
**BRUCE**                D
**ROCHESTER LUBE LLC**

TT#            TT 0000 018952

Employee ID   SG40

MORTGAGE TAX

| | | | | |
|---|---|---|---|---|
| **FILE FEE-S** | $ | 66.00 | MORTGAGE AMOUNT $ | .00 |
| **FILE FEE-C** | $ | 11.00 | | |
| **REC FEE** | $ | 9.00 | BASIC MORTGAGE TAX $ | .00 |
| **TRANS TAX** | $ | 4,490.00 | | |
| **MISC FEE-C** | $ | 5.00 | SPEC ADDIT MTG TAX $ | .00 |
| | $ | .00 | | |
| | $ | .00 | ADDITIONAL MTG TAX $ | .00 |
| | $ | .00 | | |
| | $ | .00 | Total $ | .00 |

**Total:**        $        4,581.00

**STATE OF NEW YORK**
**MONROE COUNTY CLERK'S OFFICE**

TRANSFER AMT

**WARNING - THIS SHEET CONSTITUTES THE CLERKS**
**ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &**
**SECTION 319 OF THE REAL PROPERTY LAW OF THE**
**STATE OF NEW YORK. DO NOT DETACH OR REMOVE.**

TRANSFER AMT $      1,122,140.00

TRANSFER TAX $        4,490.00

    Cheryl Dinolfo
    Monroe County Clerk



D099490528

Bargain and Sale Deed

/16

**THIS INDENTURE**, Made the *5* day of *MARCH* , 2003,

**BETWEEN**

**BRUCE D. COLEMAN**, P.O. Box 10608, Rochester, NY 14610

party of the first part, and

**ROCHESTER LUBE LLC.**, 668 N. Coast Highway, Suite 517, **Laguna Beach, CA 92651**

party of the second part,

**WITNESSETH** that the party of the first part, in consideration of One Dollar ($1 00) lawful money of the United States, and all other good and valuable consideration, paid by the party of the second part, does hereby grant and release unto the party of the second part, and the successors and assigns of the party of the second part forever,

**ALL THAT TRACT OR PARCEL OF LAND**, as set forth on the attached Schedule A.

**Being the same premises conveyed to the grantor herein by deed of Evelyn D. Webster and Sidney W. Webster, Trustees, dated on even date herewith and to be recorded in the Monroe County Clerk's Office simultaneously with this instrument.**

**Together** with the appurtenances and all the estate and rights of the party of the first part in and to said premises,

**To have and to hold** the premises herein granted unto the party of the second part, the successors and assigns of the party of second part forever.

**And** said party of the first part covenants that the part of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid

**And**, the party of the first part, in Compliance with Sec 13 of the Lien Law, the grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first for the payment of the cost of improvement before using any part of the total of the same for any other purpose

**IN WITNESS WHEREOF**, the party of the first part has duly executed this deed the day and year first above written

**IN PRESENCE OF**

_Bruce D Coleman_
Bruce D Coleman

**STATE OF NEW YORK:**

**COUNTY OF** *ERIE*        : SS.:

    On *MARCH 5* , 2004 before me, the undersigned, personally appeared **Bruce D. Coleman**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument

5103-3440

NOTARY PUBLIC

JOSEPH B MEAGHER
Notary Public, State of New York
Broome County 02ME4974837
Commission Expires Nov. 26, 20__

**SCHEDULE A**    152. 45 2-1

prop/tax

**781 Fairport Road, East Rochester, New York**    14445

ALL THOSE CERTAIN LOTS, PIECES OR PARCELS OF LAND, situate in the Village of East Rochester, County of Monroe, New York State, being the same property acquired by Evelyn D Webster and Sidney W Webster as Trustees of the Evelyn D Webster Revocable Intervivos Trust, recorded in the Monroe County Clerk's Office in Liber 9013 at page 548 on May 29, 1998, lying and being southerly of Fairport Road (N Y S Route 31 F) (S H 60) with all bearings being referred to true north at the 78 degree 35 minute meridian of west longitude, bounded and described as follows

Commencing at a found triangle concrete monument on the existing southerly highway boundary of Fairport Road (N Y S Route 31) (S H 60), ROW width varies, at its intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustee of the Evelyn D Webster Revocable Intervivos Trust on the southeast and the property now or formerly owned by the Village of East Rochester (Liber 1695 Page 230, Rec April 12, 1935) on the southwest, said point being easterly, measured along said southerly highway boundary of Fairport Road (N Y S Route 31) (S H 60) a distance of 409 feet more or less from the Town of Pittsford and the Village of East Rochester municipal line, said triangle concrete monument being the point or place of beginning,

Running thence south 00 degrees 41 minutes 16 seconds east along the last mentioned division line, a distance of 178 00 feet to a found 1/2 inch pipe at its intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustee of the Evelyn D Webster Revocable Intervivos Trust on the northeast and the property now or formerly owned by the Trustee of Evelyn D Webster Trust (Liber 8178 Page 206, Rec February 25, 1992) on the southeast,

Thence south 73 degrees 24 minutes 09 seconds east along the last mentioned division line, a distance of 112 93 feet to a found 1/2 inch rebar at its intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustee of the Evelyn D Webster Revocable Intervivos Trust on the northwest and the property now or formerly owned by the Trustee of Sidney W Webster Trust (Liber 8178 Page 211, Rec February 25, 1992) on the east,

Thence north 17 degrees 40 minutes 59 seconds east along the last mentioned division line, a distance of 150 98 feet to a point at its intersection with the said southerly highway boundary of Fairport Road (N Y S Route 31) (S H 60),

Thence along the last mentioned highway boundary line the following two (2) courses

1    North 62 degrees 51 minutes 12 seconds west, a distance of 67.68 feet to a point;

2    North 69 degrees 41 minutes 46 seconds west, a distance of 102.36 feet to the point or place of beginning, as surveyed by Hawk Land Surveying, P C , December 12, 2003.

GBDOCS 166902v1 (3KS601! DOC)

EXHIBIT "C"



**MONROE COUNTY CLERK'S OFFICE**

<u>Return To:</u>

    HODGSON RUSS LP
    ONE M&T PLAZA SUITE 2000
    BUFFALO NY  14203-2391
    ATTN SUJATA YALAMANCHILI

Index   DEEDS

Book    09949    Page   0542

No. Pages    0004

Instrument   DEED

Date :      4/29/2004

Time :      2:35:00

Control #   200404290891

ROCHESTER LUBE LLC

SOVEREIGN JF LLC

TT#            TT 0000 018956

Employee ID   SG40

MORTGAGE TAX

| | | | |
|---|---|---|---|
| FILE FEE-S | $ | 66.00 | |
| FILE FEE-C | $ | 11.00 | |
| REC FEE | $ | 12.00 | |
| TRANS TAX | $ | 4,724.00 | |
| MISC FEE-C | $ | 5.00 | |
| | $ | .00 | |
| | $ | .00 | |
| | $ | .00 | |
| | $ | .00 | |

| | | |
|---|---|---|
| MORTGAGE AMOUNT | $ | .00 |
| BASIC MORTGAGE TAX | $ | .00 |
| SPEC ADDIT MTG TAX | $ | .00 |
| ADDITIONAL MTG TAX | $ | .00 |
| Total | $ | .00 |

Total:      $     4,818.00

STATE OF NEW YORK
MONROE COUNTY CLERK'S OFFICE

TRANSFER AMT

WARNING - THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

TRANSFER AMT $     1,180,620.00

TRANSFER TAX $     4,724.00

    Cheryl Dinolfo
    Monroe County Clerk



D099490542

# BARGAIN AND SALE DEED

**THIS BARGAIN AND SALE DEED**, made this 5th day of March, 2004, between **ROCHESTER LUBE LLC, a Delaware limited liability company, as agent for Tibarom Inc., a Delaware corporation** ("Grantor") and

**SOVEREIGN JF, LLC**, a California limited liability company (the "Grantees")

*116 Village Blvd*
*Princeton NJ 08540*

# WITNESSETH:

That the Grantor, in consideration of One Dollar ($1 00) and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, does hereby grant and release unto the Grantee, its successors and assigns forever, all right title and interest of the Grantor in and to the following

**ALL THAT TRACT OR PARCEL OF LAND**, situate in the Village of East Rochester, County of Monroe and State of New York, and being further described on <u>Schedule A</u> attached hereto and made a part hereof

**TOGETHER** with the appurtenances and all the estate and rights of the Grantor in and to said premises

**TO HAVE AND TO HOLD** the premises herein granted unto the Grantee, iots successors and assigns forever

**AND THE GRANTOR COVENANTS** that it has not done or suffered anything whereby the said premises have been encumbered in any way whatever  The Grantor covenants further that, in compliance with Section 13 of the Lien Law, the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose

5103 - 3140

781 Fairport Road
East Rochester, New York , 14445

**IN WITNESS WHEREOF**, the Grantor has caused this instrument to be executed and delivered as of the day and year first above written

**ROCHESTER LUBE LLC, as agent for Tibarom, Inc.**

By _[signature]_

Name Jeffrey E Langan

Title VICE PRESIDENT & GENERAL COUNSEL

STATE OF NEW YORK    )

                     .ss  _Buffalo_

COUNTY OF ERIE       )

On the **26** day of February, in the year 2004, before me, the undersigned, a notary public in and for said state, personally appeared Jeffrey E Langan, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument

_[signature]_

Notary Public

SUJATA YALAMANCHILI
Notary Public, State of New York
Qualified in Erie County
My Commission Expires Sept. 27, 2005

of East Rochester municipal line, said triangle concrete monument being the point or place of beginning,

Running thence south 00 degrees 00 minutes 00 seconds along the last mentioned line, a distance of 178 00 feet to a found 1/2 inch pipe at its intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustee of the Evelyn D Webster Revocable Intervivos Trust on the northeast and the property now or formerly owned by the Trustee of Evelyn D Webster Trust (Liber 8178 Page 206, Rec February 25, 1992) on the southeast,

Thence south 73 degrees 24 minutes 09 seconds east along the last mentioned division line, a distance of 112 93 feet to a found 1/2 inch rebar at its intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustee of the Evelyn D Webster Revocable Intervivos Trust on the northwest and the property now or formerly owned by the Trustee of Sidney W Webster Trust (Liber 8178 Page 211, Rec February 25, 1992) on the east,

Thence north 17 degrees 40 minutes 59 seconds east along the last mentioned division line, a distance of 150 98 feet to a point at its intersection with the said southerly highway boundary of Fairport Road (N Y S Route 31) (S H 60),

Thence along the last mentioned highway boundary line the following two (2) courses

1      North 62 degrees 51 minutes 12 seconds west, a distance of 67.68 feet to a point,

2.     North 69 degrees 41 minutes 46 seconds west, a distance of 102 36 feet to the point or place of beginning, as surveyed by Hawk Land Surveying, P C , December 12, 2003

GBDOCS 165726v1 (3JV501¹ DOC)

Acct # 152.45 - 2 - 1

781 Fairport Road
East Rochester, New York

## SCHEDULE A

ALL THOSE CERTAIN LOTS, PIECES OR PARCELS OF LAND. situate in the Village of East Rochester, County of Monroe, New York State, being the same property acquired by Evelyn D Webster and Sidney W Webster as Trustees of the Evelyn D Webster Revocable Intervivos Trust, recorded in the Monroe County Clerk's Office in Liber 9013 at page 548 on May 29, 1998. lying and being southerly of Fairport Road (N Y S Route 31 F) (S H 60) with all bearings being referred to true north at the 78 degree 35 minute meridian of west longitude, bounded and described as follows

Commencing at a found triangle concrete monument on the existing southerly highway boundary of Fairport Road (N Y S Route 31) (S H 60), ROW width varies. at its intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustee of the Evelyn D Webster Revocable Intervivos Trust on the southeast and the property now or formerly owned by the Village of East Rochester (Liber 1695 Page 230. Rec April 12, 1935) on the southwest, said point being easterly, measured along said southerly highway boundary of Fairport Road

EXHIBIT "D"



**MONROE COUNTY CLERK'S OFFICE**

| | |
|---|---|
| **Return To:** | Index   DEEDS |
| | Book     09949     Page   0552 |
| JEFFREY LANGAN ESQ | No. Pages     0006 |
| EUREKA PETROLEUM INC | |
| 668 NORTH COAST HIGHWAY NO 517 | Instrument   MEMO OF LEASE |
| LAGUNA BEACH CA  92651 | Date :     4/29/2004 |
| | Time :     2:36:00 |
| | Control #   200404290948 |

SOVEREIGN JF LLC

EUREKA PETROLEUM INC                        TT#          TT 0000 018958

SOVEREIGN JF LLC                            Employee ID   SG40

EUREKA PETROLEUM INC

### MORTGAGE TAX

| | | | | | |
|---|---|---|---|---|---|
| FILE FEE-S | $ | 19.00 | MORTGAGE AMOUNT | $ | .00 |
| FILE FEE-C | $ | 13.00 | | | |
| REC FEE | $ | 18.00 | BASIC MORTGAGE TAX | $ | .00 |
| TRANS TAX | $ | .00 | | | |
| | $ | .00 | SPEC ADDIT MTG TAX | $ | .00 |
| | $ | .00 | | | |
| | $ | .00 | ADDITIONAL MTG TAX | $ | .00 |
| | $ | .00 | | | |
| | $ | .00 | Total | $ | .00 |
| Total: | $ | 50.00 | | | |

STATE OF NEW YORK
MONROE COUNTY CLERK'S OFFICE

### TRANSFER AMT

WARNING - THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

TRANSFER AMT $                    .00

TRANSFER TAX $                    .00

Cheryl Dinolfo
Monroe County Clerk



D099490552




(4)



## MEMORADUM OF LEASE

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO
Jeffrey E Langan, Esq
Vice President and General Counsel
Eureka Petroleum Inc
668 North Coast Highway, No 517
Laguna Beach, California 92651

### MEMORANDUM OF LEASE

1  Name and address of Lessor
   Sovereign JF LLC
   116 Village Boulevard
   Princeton, NJ 08540
   (609) 524-4090

2  Name and address of Lessee
   Eureka Petroleum Inc
   Tibarom Inc
   668 North Coast Highway, No 517
   Laguna Beach CA 92651

3  Date of execution of lease
   February _5_, 2004
   As of/March

4  Description of leased premises
   See attached Exhibit "A"

5  Term of lease  25 years

6  Renewal Options  one ten (10) year period

### [Signatures Follow]

*Lease viewed @ 3-31-04*

Jiffy Lube Store Number 865
781 Fairport Road, East Rochester, NY 14445

26

IN WITNESS WHEREOF, the parties have executed this Memorandum of Lease ~~on February~~ as of March 5 , 2004

LESSOR

SOVEREIGN JF, LLC,
a California limited liability company

By      SOVEREIGN JF, SPE MANAGER, INC.
        a Delaware corporation, it Managing Member

        By      _Michel_
                Name   Michel R Hardagner
                Title   Assistant Secretary

        By      _Jack Wil_
                Name   Jack Alden
                Title   Aot. Secy

LESSEE·

EUREKA PETROLEUM INC.,
a New York corporation

By      _signature_
Jeffrey E Langan, Esq
Vice President and General Counsel

TIBAROM INC.,
a Delaware corporation

By      _signature_
Jeffrey E Langan, Vice President & General Counsel

Jiffy Lube Store Number 865
781 Fairport Road, East Rochester, NY 14445

## ACKNOWLEDGEMENT OF NOTARY PUBLIC

COUNTY OF _Erie_              )

On _February 26_ before me, _Sujata Yalana_ a notary public in and for said County and State, personally appeared _Jeffery Lange_ personally known to me (or proved to me on the basis of satisfactory evidence) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s), acted, executed the instrument

WITNESS my hand and official seal

SEAL

SUJATA YALAMANCHILI
Notary Public - State of New York
My Commission Expires Sept. 27, 20
My Commission Expires Sept. 27, 20_ 05_

STATE OF _California_              )
COUNTY OF _Santa Clara_              ) .

On _February 19 2004_ before me, _April Piercey_ , a notary public in and for said County and State, personally appeared _Bob Alden and Michel R. Hondagneu_ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s), acted, executed the instrument

WITNESS my hand and official seal

SEAL

APRIL PIERCEY
Commission # 1377742
Notary Public - California
Santa Clara County
My Comm Expires Oct 1, 2006

Jiffy Lube Store Number 865
781 Fairport Road, East Rochester, NY 14445

28

**EXHIBIT "A"**
**LEGAL DESCRIPTION**
**TO MEMORANDUM OF LEASE**
**ADDRESS AND LEGAL DESCRIPTION OF PREMISES**

Jiffy Lube Store Number 865
781 Fairport Road, East Rochester, NY 14445

## SCHEDULE A

### *781 Fairport Road, East Rochester, New York*

ALL THOSE CERTAIN LOTS, PIECES OR PARCELS OF LAND, situate in the Village of East Rochester, County of Monroe, New York State, being the same property acquired by Evelyn D Webster and Sidney W Webster as Trustees of the Evelyn D Webster Revocable Intervivos Trust, recorded in the Monroe County Clerk's Office in Liber 9013 at page 548 on May 29, 1998, lying and being southerly of Fairport Road (N Y S Route 31 F) (S H 60) with all bearings being referred to true north at the 78 degree 35 minute meridian of west longitude, bounded and described as follows

Commencing at a found triangle concrete monument on the existing southerly highway boundary of Fairport Road (N Y S Route 31) (S H 60), ROW width varies, at its intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustee of the Evelyn D Webster Revocable Intervivos Trust on the southeast and the property now or formerly owned by the Village of East Rochester (Liber 1695 Page 230, Rec April 12, 1935) on the southwest, said point being easterly, measured along said southerly highway boundary of Fairport Road (N.Y.S Route 31) (S H 60) a distance of 409 feet more or less from the Town of Pittsford and the Village of East Rochester municipal line, said triangle concrete monument being the point or place of beginning,

Running thence south 00 degrees 41 minutes 16 seconds east along the last mentioned division line, a distance of 178 00 feet to a found 1/2 inch pipe at its intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustee of the Evelyn D Webster Revocable Intervivos Trust on the northeast and the property now or formerly owned by the Trustee of Evelyn D Webster Trust (Liber 8178 Page 206, Rec February 25, 1992) on the southeast,

Thence south 73 degrees 24 minutes 09 seconds east along the last mentioned division line, a distance of 112 93 feet to a found 1/2 inch rebar at its intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustee of the Evelyn D Webster Revocable Intervivos Trust on the northwest and the property now or formerly owned by the Trustee of Sidney W Webster Trust (Liber 8178 Page 211, Rec February 25, 1992) on the east,

Thence north 17 degrees 40 minutes 59 seconds east along the last mentioned division line, a distance of 150 98 feet to a point at its intersection with the said southerly highway boundary of Fairport Road (N Y.S Route 31) (S H 60),

Thence along the last mentioned highway boundary line the following two (2) courses.

1       North 62 degrees 51 minutes 12 seconds west, a distance of 67.68 feet to a point;

2       North 69 degrees 41 minutes 46 seconds west, a distance of 102.36 feet to the point or place of beginning, as surveyed by Hawk Land Surveying, P C , December 12, 2003

EXHIBIT "E"

MONROE COUNTY CLERK'S OFFICE

Index   DEEDS

Book   09991   Page   0072

No. Pages   0006

Instrument   DEED

Date :   7/21/2004

Time :   10:13:00

Control #   200407210184

<u>Return To:</u>

STEWART TITLE INSURANCE COMPANY
707 WESTCHESTER AVE
SUITE 411
WHITE PLAINS NY 10604

SOVEREIGN JF LLC

SCOTTI
DANIEL          J JR

TT#          TT 0000 025462

Employee ID   DA40

<u>MORTGAGE TAX</u>

| | | |
|---|---|---|
| FILE FEE-S | $ | 66.00 |
| FILE FEE-C | $ | 11.00 |
| REC FEE | $ | 18.00 |
| TRANS TAX | $ | 5,300.00 |
| MISC FEE-C | $ | 5.00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |

Total:      $      5,400.00

| | | |
|---|---|---|
| MORTGAGE AMOUNT | $ | .00 |
| BASIC MORTGAGE TAX | $ | .00 |
| SPEC ADDIT MTG TAX | $ | .00 |
| ADDITIONAL MTG TAX | $ | .00 |
| Total | $ | .00 |

STATE OF NEW YORK
MONROE COUNTY CLERK'S OFFICE

<u>TRANSFER AMT</u>

WARNING - THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

TRANSFER AMT $      1,324,529.00

TRANSFER TAX $      5,300.00

Cheryl Dinolfo
Monroe County Clerk



D099910072



*Village East Rochester.*
*Sec 152.45*
*Block 2*

## LIMITED WARRANTY DEED

**THIS INDENTURE,** made on the 2nd day of July, 2004, by *Lot 1*
and between Sovereign JF, LLC, a California limited liability company with offices at
777 California Avenue, Palo Alto, CA 94304 (hereinafter "Grantor"), and Daniel J. Scotti *Jr.*
who resides at 459 Meadow View Drive, Vacaville, CA 95688 (hereinafter "Grantee").

### W I T N E S S E T H :

    **THAT** Grantor, in consideration of the sum of Ten Dollars ($10.00) and
other good and valuable consideration, to it paid by Grantee, the receipt of which
is hereby acknowledged, does by these presents, sell and convey unto the said
Grantee, its successors and assigns, the lots, tracts or parcels of land lying,
being and situated in the Village of East Rochester, County of Monroe, State of New
York, and described on Exhibit "A" attached hereto and incorporation herein by
reference subject to that certain Lease Agreement by and between Grantor, as lessor, and
Eureka Petroleum Inc., a New York corporation, and TIBAROM Inc., a Delaware
corporation, as lessee.

    **TO HAVE AND TO HOLD** the premises aforesaid with all and singular, the
rights, privileges, appurtenances and immunities thereto belonging or in any wise
appertaining unto the said Grantee and unto Grantee's heirs, successor and
assigns forever, the said Grantor hereby covenanting that the premises are free
and clear from any encumbrance done or suffered by Grantor; and that Grantor
will warrant and defend the title to said premises unto the said Grantee and unto
Grantee's heirs, successors and assigns forever, against the lawful claims and
demands of all persons claiming by, under or through Grantor.

    **TOGETHER** with all right, title and interest, if any, of the party of the first part
in and to any streets and roads abutting the above described premises to the center lines
thereof,

    **TO HAVE AND TO HOLD** the premises herein granted unto the party of the
second part, the heirs or successors and assigns of the party of the second part forever.

    **AND** the party of the first part covenants that the party of the first part has not
done or suffered anything whereby the said premises have been encumbered in any way
whatever, except as aforesaid.

    **AND** the party of the first part, in compliance with Section 13 of the Lien Law,
covenants that the party of the first part will receive the consideration for this conveyance
and will hold the right to receive such consideration as a trust fund to be applied first for
the purpose of paying the costs of the improvement and will apply the same first to the
payment of the cost of the improvement before using any part of the total of the same for
any other purpose.

*property address :*   *781 Fairport Rd.*
*E. Rochester, NY 14445*

IN WITNESS WHEREOF, the said Grantor has executed this Limited Warranty Deed the day and year above written.

SOVEREIGN JF, LLC, a California limited
liability company

By:   SOVEREIGN JF, SPE MANAGER, INC.
      a Delaware corporation, its Managing Member


By:   _____
      Name: Jeffrey C. Hoppen
      Title: Chief Investment Officer


By:   _____
      Name: Michael Hedagner
      Title: Asst. Secretary

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**

State of California

County of _Santa Clara_ } ss.

On _6/29/04_ before me, _Celeste E. Friend_,
    Date                              Name and Title of Officer (e.g., "Jane Doe, Notary Public")
personally appeared _Jeffrey G. Hoppen and Michel Hondagneu_,
                        Name(s) of Signer(s)

☒ personally known to me
☐ proved to me on the basis of satisfactory evidence

CELESTE E. FRIEND
Commission # 1432818
Notary Public - California
Santa Clara County
My Comm. Expires Jul 29, 2007

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. _iu_
_Santa Clara CA_
WITNESS my hand and official seal.

_Celeste E. Friend_
                    Signature of Notary Public

——————————— **OPTIONAL** ———————————
*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer**

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.nationalnotary.org          Prod. No. 5907          Reorder: Call Toll-Free 1-800-876-6827



**White Plains Office**
707 Westchester Ave., Suite

**White Plains, NY**
914-993-9393
914-997-1698 fax
800-433-4698
stewart.com
NYSE: STC

## SCHEDULE A DESCRIPTION

*Town of E. Rochester*

Title No: **04-22361-MO**

**ALL** those certain lots, pieces or parcels of land situate in the Village of East Rochester, County of Monroe, New York State, being the same property acquired by Evelyn D. Webster and Sidney W. Webster as Trustees of the Evelyn D. Webster Revocable Intervivos Trust, recorded in the Monroe County Clerk's Office in Liber 9013 at Page 548 on May 29, 1998, lying and being southerly of Fairport Road (N.Y.S. Route 31F) (S.H. 60) with all bearing being referred to true north at the 78 degree 35 minutes meridian of west longitude, bounded and described as follows:

**COMMENCING** at a found triangle concrete monument on the existing southerly highway boundary of Fairport Road (N.Y.S. Route 31F) (S.H. 60) row width varies, at it's intersection with the division line between the said property now or formerly owned by Evelyn D. Webster and Sidney W. Webster as trustees of the Evelyn D. Webster Revocable Intervivos Trust on the southeast and the property now or formerly owned by the Village of East Rochester (Liber 1695 Page 230, Rec. April 12, 1935) on the southwest, said point being easterly, measured along the said southerly highway boundary of Fairport Road (N.Y.S. Route 31F) (S.H. 60) a distance of 409 feet more or less from the Town of Pittsford and the Village of East Rochester municipal line, said triangle concrete monument being the point or place of beginning.

**RUNNING THENCE** South 00 degrees 41 minutes 16 seconds East along the last mentioned division line, a distance of 178.00 feet to a found ½ inch pipe at it's intersection with the division line between the said property now or formerly owned by Evelyn D. Webster and Sidney W. Webster as Trustees of the Evelyn D. Webster Revocable Intervivos Trust on the northeast and the property now or formerly owned by the Trustee of Evelyn D. Webster Trust (Liber 8178 Page 206, Rec. February 25, 1992) on the southeast;

**THENCE** South 73 degrees 24 minutes 09 seconds east along the last mentioned division line, a distance of 112.93 feet to a found ½ inch rebar at it's intersection with the division line between the said property now or formerly owned by Evelyn D. Webster and Sidney W. Webster as Trustees of the Evelyn D. Webster Revocable Intervivos Trust on the northwest and the property now or formerly owned by the trustee of Sidney W. Webster Trust (Liber 8178 Page 211, Rec. February 25, 1992) on the east;

**THENCE** North 17 degrees 40 minutes 59 seconds east along the last mentioned division line, A distance of 150.98 feet to a point at it's intersection with the said southerly highway boundary of Fairport Road (N.Y.S. Route 31F) (S.H. 60);

**THENCE** along the last mentioned highway boundary line the following two (2) courses:

1)  North 62 degrees 51 minutes 12 seconds West, a distance of 67.68 feet to a point;

------------------------------------------------------------

------------------------------------------------------------

**FOR CONVEYANCING ONLY:** TOGETHER with all the rights, title and interest of the party of the first part, if any, of, in and to the land lying in the street in front of and adjoining said premises.

# Stewart Title
# Insurance Company

2)  North 69 degrees 41 minutes 46 seconds West, a distance of 102.36 feet to the point or place of beginning. Containing 22,768 square feet or 0.5227 acre, more or less as surveyed by Hawk Land Surveying, PC, December 12, 2003.

*tax mailing address:*

RFR.

*Daniel J. Scott Jr.*
*450 Meadow View Drive*
*Vacaville CA 95688*

---

**FOR CONVEYANCING ONLY:** TOGETHER with all the rights, title and interest of the party of the first part, if any, of, in and to the land lying in the street in front of and adjoining said premises.

EXHIBIT "F"

MONROE COUNTY CLERK'S OFFICE

Index   DEEDS

**Return To:**

Book   09991   Page   0078

STEWART TITLE INSURANCE COMPANY
707 WESTCHESTER AVE
SUITE 411
WHITE PLAINS NY 10604

No. Pages   0011

Instrument   NON-DISTRB ATTR

Date :   7/21/2004

Time :   10:14:00

Control #   200407210190

SCOTTI
DANIEL          J JR
CITIZENS BANK AND TRUST COMPAN
Y
EUREKA PETROLEUM INC

TT#

TT#          TT 0000 025463

Employee ID   DA40

MORTGAGE TAX

| | | |
|---|---|---|
| FILE FEE-S | $ | 19.00 |
| FILE FEE-C | $ | 8.00 |
| REC FEE | $ | 33.00 |
| MISC FEE-C | $ | .00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |

MORTGAGE AMOUNT   $          .00

BASIC MORTGAGE TAX  $          .00

SPEC ADDIT MTG TAX  $          .00

ADDITIONAL MTG TAX  $          .00

Total          $          .00

Total:          $          60.00

STATE OF NEW YORK
MONROE COUNTY CLERK'S OFFICE

TRANSFER AMT

WARNING - THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

TRANSFER AMT $          .00

TRANSFER TAX $          .00

Cheryl Dinolfo
Monroe County Clerk



D099910078

RECORDED BY:
STEWART TITLE INSURANCE COMPANY
707 WESTCHESTER AVENUE
SUITE 411
WHITE PLAINS, NY 10604

04 - 22361 - NUD

**SUBORDINATION, NON-DISTURBANCE
AND
ATTORNMENT AGREEMENT**

*Village East Rochester*
*Sec 152.45*
*Block 2*
*Lot 1*

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (hereinafter referred to as the "**Agreement**"), dated this __2__ day of __July__, 2004, but effective as of the __2__ day of __July__, 2004, made by and among **Daniel J. Scotti, Jr.**, an unmarried man (hereinafter referred to as the "**Owner**"), having an address of 459 Meadowview Drive, Vacaville, California 95688, **Citizens Bank and Trust Company** (hereinafter referred to as "**Lender**"), having an address of 515 Washington Street, Chillicothe, Missouri 64601, and **Eureka Petroleum Inc.**, a New York corporation, and **Tibarom Inc.**, a Delaware corporation (hereinafter referred to collectively as "**Tenant**"), both having the address of 668 North Coast Highway, No. 517, Laguna Beach, California 92651.

### RECITALS:

A.      The Owner owns or is purchasing and will own all right, title and interest in that certain real property being, lying and situate in East Rochester, Monroe County, New York and more particularly described as set forth on **Exhibit A**, attached hereto and by this reference made a part hereof as (the "**Property**"); and

B.      Tenant is the owner and holder of a lease originally made by Sovereign JF, LLC, a California limited liability company ("**Original Lessor**"), to Tenant dated March 5, 2004 (the "**Lease**"), whereby the Tenant has agreed to lease certain space identified as a Jiffy Lube service station located at 781 Fairport Road, East Rochester, Monroe County, New York (the "**Leased Premises**"); and

C.      Original Lessor has or will be assigning all of its right, title and interest in the Lease to Owner.

D.      A Mortgage, Security Agreement, and Assignment of Leases and Rents has or will be given by Owner to Lender (the "**Mortgage**") for the purpose of securing a loan by Lender to Owner, which Mortgage secures such loan, in part, by the Property; and

E.      It is the desire and intention of the parties hereto to subordinate the operation of the Lease for the full term thereof to the lien and operation of the Mortgage, so that the Mortgage shall and will become a lien upon the Leased Premises and the Lease will be unconditionally subordinated thereto in every manner whatsoever.

NOW, THEREFORE, the parties hereto intending to be legally bound hereby, for and in consideration of the mutual covenants contained herein, the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

1.      Recitals. All of the above Recitals are hereby incorporated herein by reference and are made a part hereof.

2.      Subordination. The Lease, together with all rights, options, liens and charges created thereby, is and shall be junior, inferior, subject and unconditionally subordinate in each and every respect to the lien, operation and effect of the Mortgage (and all other documents executed in conjunction with the loan transaction evidenced thereby) and to any and all advancements made thereunder and to all renewals, modifications, consolidations, replacements, additional advances, future advances and extensions thereof.

3.      Non-Disturbance. Lender does hereby agree with Tenant that, so long as Tenant complies with the terms, conditions and covenants of the Lease and performs its obligations under the Lease, (a) Lender will take no action which will interfere with or disturb Tenant's possession or lawful use

781 Fairport Rd.

of the Leased Premises or other rights under the Lease, and (b) in the event Lender becomes the owner of the Property by foreclosure, conveyance in lieu of foreclosure or otherwise, the Property shall be subject to the Lease and Lender shall recognize Tenant as a tenant on the Property for the remainder of the term of the Lease in accordance with the provisions thereof; provided, however, that Lender shall not be liable for any act or omission of any prior landlord, or subject to any offsets or defenses which Tenant might have against any prior landlord, nor shall Lender be bound by any rent or additional rent which Tenant might have paid for more than the current month to any prior landlord, nor shall it be bound by any amendment or modification of the Lease made without its written consent.

4.  _Attornment_.  Tenant does hereby agree with Lender that, in the event Lender becomes the owner of the Property by foreclosure, conveyance in lieu of foreclosure or otherwise, then Tenant shall attorn to and recognize Lender (its designees, assigns, or successor owner of the Property) as the landlord under the Lease for the remainder of the term thereof, and Tenant shall perform and observe its obligations thereunder, subject only to the terms and conditions of said Lease.  Tenant further covenants and agrees to execute and deliver upon request of Lender, or its successors or assigns, an appropriate agreement of attornment to any subsequent title holder of the Property.

5.  _Notices Under Lease_.  So long as the Mortgage remains outstanding and unsatisfied, Tenant shall deliver to Lender, at the address and in the manner hereinbelow provided, a copy of all notices permitted or required to be given to Owner by Tenant under and pursuant to the terms and provisions of the Lease.  At any time before the rights of Owner shall have been forfeited or adversely affected because of any default of Owner, or within the time permitted Owner for curing any default under the Lease as therein provided, Lender may, but shall have no obligation to, pay any taxes and assessments, make any repairs and improvements, make any deposits or do any other act or thing required of Owner by the terms of the Lease; and all payments so made and all things so done and performed by Lender shall be as effective to prevent the rights of Owner from being forfeited or adversely affected because of any default under the Lease as the same would have been if done and performed by Owner.

6.  _Assignment of Lease_.  Tenant acknowledges that Owner may execute and deliver to Lender an assignment of the Lease and any guaranty thereof as security for the loan which the Mortgage secures, and Tenant hereby expressly consents to any such assignment and agrees to pay any rents under the Lease directly to Lender upon Lender's notice to Tenant to make payments directly to Lender or at the direction of Lender.  Owner hereby authorizes and directs Tenant (upon written direction to Tenant by Lender) to pay the above sums directly to Lender, or at the direction of Lender and agrees to hold Tenant harmless for any monies so paid directly to or at the direction of Lender.  Tenant agrees that neither Owner's demanding or receiving any such payments, nor Lender exercising any other right, remedy, privilege, power, or immunity granted by the Mortgage (or other documents executed in conjunction therewith), will operate to impose any liability upon Lender or performance of any obligation of Owner under the Lease unless and until Lender elects otherwise in writing and for only such period (after such election by Lender) as Lender is in possession.

7.  _Estoppel_.  Owner and Tenant hereby certify to Lender that the Lease is in full force and effect; that the Lease and any modifications and amendments specified herein or therein are a complete statement of the agreement between Owner and Tenant with respect to the leasing of the Premises, and the Lease has not been modified or amended except as specified herein; that to the knowledge of Owner and Tenant, no party to the Lease is in default thereunder; that no rent under the Lease has been paid more than thirty (30) days in advance of its due date; that Tenant, as of this date, as no charge, lien or claim of offset under the Lease, or otherwise, against the rents or other charges due or to become due thereunder; Tenant's interest in the Lease has not been conveyed, assigned, hypothecated or mortgaged and Tenant is not involved in any bankruptcy, reorganization arrangement or insolvency proceedings.

8.  _Notices_.  Any and all notices, elections or demand permitted or required to be made under this Agreement shall be in writing, signed by the party giving such notice, election or demand and will be deemed delivered or made upon the earlier of actual receipt if sent by overnight courier or hand-

delivered or three (3) days after same is mailed by registered or certified mail, return receipt requested, with sufficient postage affixed, and addressed to the parties as follows:

Lender at: CITIZENS BANK AND TRUST COMPANY
     Attn:  Chad Buckwalter
     515 Washington Street
     Chillicothe, Missouri  64601
     Phone:  (800) 634-6203

     with a copy to:

     John M. Keller, Esq.
     DUNN KELLER
     GILLESPIE & LATZ, L.C.
     800 W. 47th Street
     Suite 406
     Kansas City, Missouri  64112-1246
     Phone:  (816) 753-4100
     Fax: (816) 753-6122

Owner at: Daniel J. Scotti, Jr.
     459 Meadowvie Drive,
     Vacaville, California 95688

Tenant at: EUREKA PETROLEUM INC.
     TIBAROM INC.
     668 North Coast Highway, No. 517
     Laguna Beach, California 92651

Such addresses may be changed by notice pursuant to this paragraph, but notice of change of address is effective only upon receipt.  Each party jointly and severally agrees that it will furnish the other parties with copies of all notices relating to the Lease.

   9.  <u>Binding Effect</u>.  This Agreement shall be binding upon all the parties hereto, their heirs, successors and assigns and all of those holding title under any of them, and the pronouns herein shall include, where appropriate, either gender or both, singular or plural.

   10.  <u>Non-Waiver</u>.  No indulgence, waiver, election or non-election by Lender under the Mortgage or any other loan documents associated with the Mortgage shall affect this Agreement.

   11.  <u>Modification of Agreement</u>.  The parties hereby agree that this document contains the entire agreement between the parties, and this Agreement shall not be modified, changed, altered or amended in any way except through written amendments between or among all of the parties hereto.

   12.  <u>Governing Law</u>.  It is agreed that the laws of the State of New York shall govern the construction and interpretation of this Agreement and the rights and obligations set forth herein.

   13.  <u>Attorneys' Fees</u>.  In the event of any legal or equitable action, including any appeals or bankruptcy proceedings, which may arise hereunder between or among the parties hereto, the prevailing party shall be entitled to recover its costs and its reasonable attorneys' fees and paralegal fees.

   14.  <u>Severance</u>.  The invalidity or unenforceability of any portion of this Agreement shall not affect the remaining provisions and portions hereof.

   15.  <u>Exculpation</u>.  In the event Lender or any affiliate of Lender (for purposes of this paragraph, the term "Lender" shall include any corporation or partnership owned or controlled by Lender)

acquires title to the Leased Premises and succeeds to the interest of Owner under the Lease, then, anything in the Lease to the contrary notwithstanding, Lender shall have no personal liability for any damages resulting from its default under the terms of this Lease, and Tenant agrees that it shall look solely to the estate and interest of Lender in the Leased Premises for the collection of any judgment (or other judicial process) requiring the payment of money by Lender in the event of any default or breach by Lender with respect to any of the terms, covenants and conditions of this Lease to be observed and/or performed by Lender, and no other assets of Lender shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

16.   **Prevailing Clause**. Tenant agrees that any and all right of first refusal or rights, if any, to purchase any portion or all of the Property granted to it under the Lease is and are in all manner and respect unconditionally subordinate and inferior to the Mortgage and other Loan Documents in favor of Lender.

17.   **Lender's Consent for Substitution**. Anything in the Lease to the contrary notwithstanding, Tenant and Owner hereby agree that Tenant shall not be entitled to exercise any option or right it may have pursuant to the Lease to substitute the Premises for another property or properties without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

18.   **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. The Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

JIFFY LUBE NNN: UPSTATE NEW YORK
East Rochester, NY

## Confidentiality Agreement

The information contained in the following Marketing Brochure is proprietary and strictly confidential. It is intended to be reviewed only by the party receiving it from Marcus & Millichap and should not be made available to any other person or entity without the written consent of Marcus & Millichap. This Marketing Brochure has been prepared to provide summary, **unverified** information to prospective purchasers, and to establish only a preliminary level of interest in the subject property. The information contained herein is not a substitute for a thorough due diligence investigation. Marcus & Millichap has not made any investigation, and makes no warranty or representation, with respect to the income or expenses for the subject property, the future projected financial performance of the property, the size and square footage of the property and improvements, the presence or absence of contaminating substances, PCB's or asbestos, the compliance with State and Federal regulations, the physical condition of the improvements thereon, or the financial condition or business prospects of any tenant, or any tenant's plans or intentions to continue its occupancy of the subject property. The information contained in this Marketing Brochure has been obtained from sources we believe to be reliable; however, Marcus & Millichap has not verified, and will not verify, any of the information contained herein, nor has Marcus & Millichap conducted any investigation regarding these matters and makes no warranty or representation whatsoever regarding the accuracy or completeness of the information provided. All potential buyers must take appropriate measures to verify all of the information set forth herein.

**ALL PROPERTY SHOWINGS ARE BY APPOINTMENT ONLY. PLEASE CONSULT YOUR MARCUS & MILLICHAP AGENT FOR MORE DETAILS.**

This information has been secured from sources we believe to be reliable, but we make no representations or warranties, expressed or implied, as to the accuracy of the information. References to square footage or age are approximate. Buyer must verify the information and bears all risk for any inaccuracies. © 2005 Marcus & Millichap   M0330304

**Marcus & Millichap**
Real Estate Investment Brokerage Company

**IN WITNESS WHEREOF**, the parties have hereunto caused this Agreement to be duly executed as of the day and year first written above.

**TENANT:**

**Eureka Petroleum Inc.**
a New York corporation

By: _____
Print Name: _____
Title: _____

**Tibarom Inc.**
a Delaware corporation

By: _____
Print Name: _____
Title: _____


**OWNER:**

_Daniel J. Scotti jr._
Daniel J. Scotti, Jr.


**LENDER:**

**Citizens Bank and Trust Company**

By: _____
Print Name: _____
Title: _____

**ACKNOWLEDGEMENT**

State of _____ )
                                      ) ss.
County of _____ )

On the _____ day of _____, in the year 2004, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in _____, _____ County, _____.

_____
Notary Public

**ACKNOWLEDGEMENT**

State of _California_ )
                      ) ss.
County of _Solano_ )

On the _25_ day of _2004_, in the year 2004, before me, the undersigned, personally appeared _Daniel J. Scott, JA._, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in _Vacaville, Ca._ County, _Solano_.

_____
Notary Public

SANDI JOHNSON
Commission # 1385594
Notary Public - California
Solano County
My Comm. Expires Dec 7, 2006

**IN WITNESS WHEREOF**, the parties have hereunto caused this Agreement to be duly executed as of the day and year first written above.

**TENANT:**

**Eureka Petroleum Inc.**
a New York corporation

By: _[signature]_
Print Name: JEFFREY E. LANGAN
Title: V.P. & GENERAL COUNSEL

**Tibarom Inc.**
a Delaware corporation

By: _[signature]_
Print Name: JEFFREY E. LANGAN
Title: V.P. & GENERAL COUNSEL

**OWNER:**

_____
Daniel J. Scotti, Jr.

**LENDER:**

**Citizens Bank and Trust Company**

By: _____
Print Name: _____
Title: _____

**ACKNOWLEDGEMENT**

State of _CALIFORNIA_ )
                                                    ) ss.
County of _ORANGE_ )

On the _22ND_ day of _JUNE_, in the year 2004, before me, the undersigned, personally appeared _JEFFREY E. LANGAN_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in _LAGUNA_, _ORANGE_ County, _CALIFORNIA_ _BEACH_

_Teresa Raquel Rengifo_
Notary Public

> TERESA R. RENGIFO
> Commission # 1321194
> Notary Public - California
> Orange County
> My Comm. Expires Sep 17, 2005

**ACKNOWLEDGEMENT**

State of _____ )
                                                            ) ss.
County of _____ )

On the _____ day of _____, in the year 2004, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in _____, _____ County, _____.

_____
Notary Public



**White Plains Office**
707 Westchester Ave., Suite

White Plains, NY
914-993-9393
914-997-1698 fax
800-433-4698
stewart.com
NYSE: STC

## SCHEDULE A DESCRIPTION

✗Town of E. Rochester

Title No: 04-22361-MC

**ALL** those certain lots, pieces or parcels of land situate in the Village of East Rochester, County of Monroe, New York State, being the same property acquired by Evelyn D. Webster and Sidney W. Webster as Trustees of the Evelyn D. Webster Revocable Intervivos Trust, recorded in the Monroe County Clerk's Office in Liber 9013 at Page 548 on May 29, 1998, lying and being southerly of Fairport Road (N.Y.S. Route 31F) (S.H. 60) with all bearing being referred to true north at the 78 degree 35 minutes meridian of west longitude, bounded and described as follows:

**COMMENCING** at a found triangle concrete monument on the existing southerly highway boundary of Fairport Road (N.Y.S. Route 31F) (S.H. 60) row width varies, at it's intersection with the division line between the said property now or formerly owned by Evelyn D. Webster and Sidney W. Webster as trustees of the Evelyn D. Webster Revocable Intervivos Trust on the southeast and the property now or formerly owned by the Village of East Rochester (Liber 1695 Page 230, Rec. April 12, 1935) on the southwest, said point being easterly, measured along the said southerly highway boundary of Fairport Road (N.Y.S. Route 31F) (S.H. 60) a distance of 409 feet more or less from the Town of Pittsford and the Village of East Rochester municipal line, said triangle concrete monument being the point or place of beginning.

**RUNNING THENCE** South 00 degrees 41 minutes 16 seconds East along the last mentioned division line, a distance of 178.00 feet to a found ½ inch pipe at it's intersection with the division line between the said property now or formerly owned by Evelyn D. Webster and Sidney W. Webster as Trustees of the Evelyn D. Webster Revocable Intervivos Trust on the northeast and the property now or formerly owned by the Trustee of Evelyn D. Webster Trust (Liber 8178 Page 206, Rec. February 25, 1992) on the southeast;

**THENCE** South 73 degrees 24 minutes 09 seconds east along the last mentioned division line, a distance of 112.93 feet to a found ½ inch rebar at it's intersection with the division line between the said property now or formerly owned by Evelyn D. Webster and Sidney W. Webster as Trustees of the Evelyn D. Webster Revocable Intervivos Trust on the northwest and the property now or formerly owned by the trustee of Sidney W. Webster Trust (Liber 8178 Page 211, Rec. February 25, 1992) on the east;

**THENCE** North 17 degrees 40 minutes 59 seconds east along the last mentioned division line, A distance of 150.98 feet to a point at it's intersection with the said southerly highway boundary of Fairport Road (N.Y.S. Route 31F) (S.H. 60);

**THENCE** along the last mentioned highway boundary line the following two (2) courses:

1) North 62 degrees 51 minutes 12 seconds West, a distance of 67.68 feet to a point;

**FOR CONVEYANCING ONLY:** TOGETHER with all the rights, title and interest of the party of the first part, if any, of, in and to the land lying in the street in front of and adjoining said premises.

## Stewart Title
## Insurance Company

2)  North 69 degrees 41 minutes 46 seconds West, a distance of 102.36 feet to the point or place of beginning. Containing 22,768 square feet or 0.5227 acre, more or less as surveyed by Hawk Land Surveying, PC, December 12, 2003.

------------------------------------------------------------

**FOR CONVEYANCING ONLY:** TOGETHER with all the rights, title and interest of the party of the first part, if any, of, in and to the land lying in the street in front of and adjoining said premises.

EXHIBIT "G"



MONROE COUNTY CLERK'S OFFICE

<u>Return To:</u>

    A DEMIR
    8617 VILLA MALLORCA #D
    LA JOLLA CA 92037

Index  DEEDS

Book   10244   Page  0056

No. Pages   0005

Instrument  DEED-OTHER

Date :   1/13/2006

Time :  12:10:00

Control #  200601130455

SCOTTI
DANIEL         J
DEMIR
ALI
OZBAKIR
ROSEMARIE

TT#        TT 0000 012310

Employee ID  DA40

<u>MORTGAGE TAX</u>

| | | | |
|---|---|---|---|
| FILE FEE-S | $ | 156.00 | MORTGAGE AMOUNT $ .00 |
| FILE FEE-C | $ | 9.00 | |
| FILE FEE-S | $ | 19.00 | BASIC MORTGAGE TAX $ .00 |
| FILE FEE-C | $ | 8.00 | |
| REC FEE | $ | 15.00 | SPEC ADDIT MTG TAX $ .00 |
| TRANS TAX | $ | 5,920.00 | |
| MISC FEE-C | $ | 5.00 | ADDITIONAL MTG TAX $ .00 |
| | $ | .00 | |
| | $ | .00 | Total $ .00 |

Total:     $     6,132.00

STATE OF NEW YORK
MONROE COUNTY CLERK'S OFFICE

<u>TRANSFER AMT</u>

WARNING - THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

TRANSFER AMT $   1,480,000.00

TRANSFER TAX $     5,920.00

    Cheryl Dinolfo
    Monroe County Clerk



D102440056

RECORDED

# BARGAIN AND SALE DEED WITH COVENANT AGAINST GRANTOR
## (INDIVIDUAL)

2006 JAN 13 PM 12 10

### STATUTORY FORM C

MONROE COUNTY CLERK

THIS IS A LEGALLY BINDING INSTRUMENT IF NOT FULLY UNDERSTOOD, WE
RECOMMEND ALL PARTIES TO THE INSTRUMENT CONSULT AN ATTORNEY BEFORE
SIGNING

*THIS INDENTURE*, made the 30th day of DECEMBER two thousand and Five , between Daniel J. Scotti, of 459 Meadow View Drive, Vacaville, California 95688, party of the first part, and Ali Demir and Rosemarie Ozbakir , of 8617 Villa Mallorca # D, La Jolla, California 92037, party of the second part

*WITNESSETH*, that the party of the first part, in consideration of one dollar and other good and valuable consideration, lawful money of the United States, paid by the party of the second part, does hereby grant and release unto the party of the second part, their heir, successors and assigns forever, all Schedule A attached hereto;

Subject to all covenants, easements and restrictions of record, if any, affecting said premises,

Being and hereby intending to convey the same premises as conveyed to the parties of the first part by Deed dated July 2, 2004, and recorded in the Monroe County Clerks Office on July 21, 2004, in Liber 9991 at page 72,

*TOGETHER* with the appurtenances and all the estate and rights of the party of the first part in and to said premises,

*TO HAVE AND TO HOLD* the premises herein granted unto the party of the second part, their heir, successors and assigns forever And the party of the first part covenants that he has not done or suffered anything whereby the said premises have been encumbered in any way whatever
*

*IN WITNESS WHEREOF*, the party of the first part has hereunto set his hand and seal the day and year first above written

_____
Seller

In presence of

_____

prop  781 Fairport Rd 14445
      152.45-2-1

mail  8617 Villa Mallorca # D
      LaJolla  CA  92037

* *AND* the party of the first part incompliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose

NYSBA's Residential Real Estate Forms (9/00)        © 2004 Matthew Bender & Co., a member of the LexisNexis Group

Acknowledgment by a Person Outside New York State (RPL § 309-b)

STATE OF CALIFORNIA          )
                             ) ss
COUNTY OF Solano             )

On the 29 day of December in the year 2005, before me, the undersigned, personally appeared Daniel J Scotti personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(ies), and that by his signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument

_____
(signature and office of individual taking acknowledgment)

BUFFY TRINCHERA
COMM #1624899
NOTARY PUBLIC - CALIFORNIA
SOLANO COUNTY
COMM EXPIRES NOV 26, 2009

EXHIBIT "H"

# Marcus & Millichap

**Real Estate Investment Brokerage Company**

9255 Towne Centre Dr.
Suite 700
San Diego, CA 92121
Tel: 858 452 8300
Fax: 858 546 8254

December 9, 2004

Ms. Rosemarie Ozbakir
8617 Via Mallorca #Apt. D
La Jolla, CA 92037

*Offices throughout
the United States*

**RE:  3715-3729 National Ave., San Diego, CA**

Dear Ms. Ozbakir:

Enclosed is a fully executed copy of the Representation Agreement for the above referenced property. The commencement date is December 9, 2004 and the expiration date is June 7, 2005. We are diligently preparing our marketing plan, a marketing brochure and a marketing campaign for your property and will keep you informed of our results.

To better understand the operations of the asset and to be prepared to begin a due diligence period, attached is a list of information we will need. Items we are already in receipt of have been checked.

This information request may seem excessive, but the more complete the information is now, the fewer delays and problems that we will encounter once a buyer has been selected. Additionally, we will be better able to achieve your goals with more knowledge of the asset. Please call us with any questions or comments.

Sincerely,

Chris Zorbas
Associate Director
National Multi Housing Group

Scott Dragos
Associate
National Multi Housing Group

Enc.

# Marcus & Millichap

## REPRESENTATION AGREEMENT

### (EXCLUSIVE AUTHORIZATION TO SELL OR EXCHANGE)

**THIS IS INTENDED TO BE A LEGALLY BINDING AGREEMENT. READ IT CAREFULLY.**

The undersigned ("Seller") hereby employs Marcus & Millichap Real Estate Investment Brokerage Company ("Agent") and grants to Agent, for a period of time (the "Term") commencing on __December 9th__, 20 _04_, and ending at midnight on __June 7th__, 20 _05_, and subject to extension as set forth in paragraph 28 below, the exclusive and irrevocable right and authority to sell that certain real property (the "Property") located in the City of __San Diego__, County of __San Diego__, State of __California__, and more particularly described as follows:

All land and improvements, personal property rights and interests of Seller at 3715-3729 National Ave., San Diego, CA 92113 that certain twelve (12) unit apartment complex. APN: 550-221-33-00; 550-211-09-00

If the Property described above consists of two or more separate legal parcels, Seller agrees to sell all or any combination of such parcels, and the term "Property" as used herein shall refer to any such combination.

1) **TERMS AND CONDITIONS OF SALE:**  Seller agrees to accept an offer containing the following terms and conditions of sale:

    a.  PURCHASE PRICE:          $ _1,630,000_

    b.  CASH DOWN PAYMENT:      $ _570,500_
        (including Deposit)

    c.  FINANCING:               $ _1,059,500_

        Existing Financing:        $ _____

        New Financing:           $ _1,059,500_

        Seller Financing:         $ _____

    d.  DEPOSIT:                 $ _25,000_

2) **ESCROW AND TITLE FEES:** Escrow fees shall be paid by _½ Buyer & ½ Seller_. Title shall be insured by a standard California Land Title Association owner's policy of title insurance in the amount of the purchase price with premium paid by _Seller_. All other closing costs shall be paid in accordance with the custom in the county in which the Property is located. Escrow shall close within _Seventy-Five_ ( _75_ ) calendar days after the Effective Date of an executed purchase agreement.

3) **PRORATIONS:** Rents actually collected, real property taxes, premiums on insurance acceptable to Buyer, interest on any debt being assumed or taken subject to by Buyer, and any other expenses of the Property shall be prorated as of the Closing Date. Security deposits, advance rentals, and the amount of any future lease credits shall be credited to Buyer. The amount of any bond or assessment which is a lien and not customarily paid with real property taxes shall be (select one "X") _X_ paid _____ assumed by _Seller_. Delinquent or unpaid rents and C.A.M. reconciliations shall be handled outside of escrow and neither Agent or escrow shall be responsible for same. Buyer agrees to assume any existing laundry lease, if applicable to the Property, without a laundry lease credit.

, rep ozbakir 120704                    1 of 7         Seller's Initials _A.D_ _B.O_    Agent's Initials _____

CA.1 - Copyright Marcus & Millichap 2004

4) **TITLE:** Seller represents and warrants to Agent that fee title to the Property is now vested as follows <u>Rosemarie Ozbakir & Ali Demir</u> that Seller and the individuals executing this Representation Agreement on behalf of Seller are duly authorized and empowered to execute this Representation Agreement and any subsequent purchase agreement; and that execution hereof shall not result in any breach of, or constitute a default under, any contract or other agreement to which Seller is a party.

5) **COMMISSION:** In consideration of the brokerage services to be rendered by Agent, Seller agrees to pay to Agent a commission equal to <u>Five</u> percent ( <u>5 %</u> ) of the purchase price of the Property upon the occurrence of any of the following events:

   a. Agent procures a buyer during the Term, or any extension thereof, who is ready, willing and able to purchase the Property on the terms and conditions set forth herein or on any other terms and conditions acceptable to Seller; or

   b. The Property is sold, exchanged or otherwise conveyed during the Term, or any extension thereof, whether by Seller or by or through any other person or entity; or

   c. The Property is withdrawn from the market or made unmarketable by Seller during the Term, or any extension thereof, or this Representation Agreement is revoked by Seller, or Seller otherwise prevents or precludes Agent's performance hereunder; or

   d. A sale, exchange or other conveyance of the Property occurs and the applicable contract to transfer, or instrument transferring, the Property was executed within nine (9) months after the expiration of the Term to a person or entity with whom Agent has negotiated, or to whose attention Agent has brought the Property, or who was introduced to Seller by Agent as a prospective purchaser (herein, "Prospective Purchaser"). This section applies only when the name of any such person or entity has been submitted by Agent to Seller by delivery of a written offer to purchase the Property prior to expiration of the Term or by written notice within fifteen (15) calendar days of such expiration. With respect to a sale, exchange or other conveyance to any such person or entity, Agent shall conclusively be deemed to be the procuring cause. The term "Prospective Purchaser" shall include that person or entity to whose attention Agent has brought the Property, as well as any partnership, joint venture, corporation, trust or other similar entity which that person or entity represents or in which it holds an ownership or beneficial interest.

   Except as otherwise set forth herein, this commission shall be paid at closing, and Agent shall be entitled to make demand of any escrow holder or closing attorney for payment from the proceeds of sale. Seller and Agent agree that if completion of a sale of the Property pursuant to a duly executed purchase agreement is prevented by default of the Buyer, Seller shall be obligated to pay to Agent only an amount equal to one-half of any damages or other monetary compensation (including liquidated damages) collected from said Buyer by suit or otherwise as a consequence of Buyer's default, if and when such damages or other monetary compensation are collected; provided, however, that the amount due Agent shall not exceed the brokerage commission set forth above. The term "Property" shall include any interest therein or in its ownership.

6) **FINANCING CONTINGENCIES:**

6.1) **NEW FIRST LOAN:** Buyer agrees to use Buyer's best efforts, at Buyer's expense, to obtain a new first loan in the amount of <u>One Million Fifty Nine Thousand Five Hundred</u> dollars ($ <u>1,059,500</u> ), to bear interest at origination at market rate and terms. Said loan shall be secured by a new first mortgage or deed of trust on the Property. Buyer shall submit a written application to obtain said loan to a bona fide lender within <u>Ten</u> ( <u>10</u> ) calendar days of the Effective Date and shall authorize said lender to confirm in writing to Seller that lender has received said application. Seller and Buyer agree that the lender's production of loan documents shall satisfy the financing contingency.

   If Buyer fails to apply as required hereinabove within <u>Ten</u> ( <u>10</u> ) calendar days of the Effective Date, or if Buyer fails to notify Seller in writing that Buyer has obtained such a loan within <u>Thirty</u> ( <u>30</u> ) calendar days of the Effective Date, than at Seller's option this Agreement shall be null and void, and the entire Deposit shall be returned to Buyer. Seller agrees to pay any prepayment penalties due on the existing loan(s).

7) **PEST CONTROL CONTINGENCIES:**

Seller's Initials _A·D_ _R·O_    Agent's Initials

CA.1 - Copyright Marcus & Millichap  2004

7.1)   The improvements on the Property shall be inspected by a licensed pest control operator, and a termite and fungus inspection report shall be prepared and delivered to Buyer within  Fourteen  ( 14 ) calendar days following the Effective Date.  This inspection and report and any additional inspections by other experts recommended by said report shall be ordered and paid by  Seller .  The cost of any corrective repairs shall be paid by Seller up to a maximum of  Three Thousand Six Hundred  dollars ($ 3,600 ).  The cost of work which is Seller's obligation shall be credited to Buyer in escrow.  In the event the cost of these repairs exceeds the specified maximum, Seller shall have the option to pay the extra costs or cancel the Purchase Agreement, in which event the entire Deposit shall be returned to Buyer and the parties shall have no further obligations thereunder; provided, however, that the Purchase Agreement shall remain in effect if Buyer elects to pay or waive the extra cost and so advises Seller in writing.  Seller shall not be responsible for any work recommended to correct conditions usually deemed likely to lead to infestation or infection by wood-destroying pests or organisms, provided there is no evidence of active infestation or infection found in connection with such conditions.

## 8)   INSPECTION CONTINGENCIES:

8.1)   **BOOKS AND RECORDS:**  Seller agrees to provide Buyer with items  a, b, d, e, f, g, h, l, j, k  listed below within  Three  ( 3 ) calendar days following the Effective Date:

a.   All rental agreements, leases, service contracts, insurance policies, latest tax bill(s) and other written agreements or notices which affect the Property.
b.   The operating statements of the Property for the  2002, 2003 and 2004 year to date.
c.   For **commercial properties**, copies of whatever documents the Seller may have regarding the financial condition, business prospects or prospective continued occupancy of any tenant (including but not limited to financial statements, credit reports, etc.).
d.   All notes and security instruments affecting the Property.
e.   A complete and current rent roll, including a schedule of all tenant deposits and fees.
f.   A written inventory of all items of Personal Property to be conveyed to Buyer and included as part of the purchase price at close of escrow.
g   Title Report:  Within  Three  ( 3 ) calendar days after the Effective Date of a purchase agreement, Seller shall procure and cause to be delivered to Buyer a preliminary title report on the Property.
h.   A report paid for by Seller by a professional provider, containing the Natural Hazard Disclosures (as defined below) concerning the Property.  "Natural Hazard Disclosures" shall mean whether the Property is located within: (1) Special Flood Hazard Area; (2) Dam Failure Inundation Area; (3) Earthquake Fault Zone; (4) Seismic Hazard Zone; (5) High Fire Severity Area; and/or (6) Wildland Fire Area.  Seller represents and warrants that, unless otherwise noted by Seller to Buyer in writing, Seller is unaware of any inaccuracies in the Natural Hazard Disclosures.
i.   Any and all documents, of any type or nature, that in any way reference the existence of mold or mold-related problems with the Property.
j.   Any and all documents, of any type or nature, that in any way reference the existence of lead-based paint or lead-based paint problems with the Property.
k.   The following items, if readily available to Seller:  plans, permits, studies or reports .

Buyer shall acknowledge receipt of these items in writing.  Buyer shall have  Fourteen  ( 14 ) calendar days following receipt thereof to review and approve in writing each of these items.  If Buyer fails to approve these items within the specified time, this Agreement shall be rendered null and void, Buyer's entire deposit shall be returned, and Buyer and Seller shall have no further obligations hereunder.

8.2)   **PHYSICAL INSPECTION:**  Buyer shall have  Fourteen  ( 14 ) calendar days following the Effective Date to inspect the physical condition of the Property, including, but not limited to the soil conditions and the presence or absence of hazardous materials on or about the Property, and to notify the Seller in writing that Buyer approves same.  If Buyer fails to approve the physical condition of the Property within the specified time, this Agreement shall be null and void, Buyer's entire deposit shall be returned, and Buyer and Seller shall have no further obligations thereunder.

8.3)   **STATE AND LOCAL LAWS:**  Buyer shall have  Fourteen  ( 14 ) calendar days following the Effective Date to investigate State and local laws to determine whether the Property must be brought into compliance with minimum energy conservation or safety standards or similar retrofit requirements as a condition of sale or transfer and the cost thereof, and to notify Seller that Buyer approves same.  If approved by Buyer, Buyer shall comply with and pay for these requirements.  If Buyer fails to approve these requirements, if any, within the specified time, the Purchase Agreement shall be rendered null and void, Buyer's entire Deposit shall be returned, and Buyer and Seller shall have no further obligations thereunder.

9)   **DEPOSIT INCREASE:**  Upon removal of the inspection contingencies set forth in paragraph(s)  6.1, 8.1, 8.2, 8.3  hereof, Buyer shall deposit in Escrow sufficient funds to increase the Deposit to  Fifty Thousand  dollars ($ 50,000 ).  The entire Deposit shall be credited to the purchase price at the close of escrow unless otherwise provided herein.

Seller's Initials  R. O.    Agent's Initials

*A- D*

CA.1 - Copyright Marcus & Millichap  2004

10) **DEPOSIT TRANSFER:** Buyer's Deposit shall remain in trust, if held by Agent, or in escrow if previously deposited in escrow, until removal of the inspection contingencies set forth in paragraph(s) 6.1, 8.1, 8.2, 8.3 hereof. Upon removal of said contingencies, Buyer's Deposit shall be delivered to escrow by Agent (if same has been held in trust by Agent); a grant deed duly executed by Seller, sufficient to convey title to Buyer, shall be delivered to escrow by Seller; and Buyer and Seller shall execute escrow instructions directing the Escrow Holder to release immediately from escrow and deliver to Seller Buyer's entire Deposit (including increases, if any). Seller shall hold Buyer's Deposit subject to the remaining terms and conditions of this Agreement. If the Property is made unmarketable by Seller, or acts of God, the Deposit shall be returned to Buyer and deed shall be returned to Seller.

11) **ESTOPPEL CERTIFICATE CONTINGENCY (Leased Properties):**

11.1) **ESTOPPEL CERTIFICATES NOT APPLICABLE**

12) **PERSONAL PROPERTY:** A written inventory of all items of personal property to be conveyed to Buyer in connection with the sale of the Property. Title to these items shall be conveyed to Buyer at close of escrow by Bill of Sale free and clear of all encumbrances. The price of these items shall be included in the Purchase Price for the Property, and Buyer shall accept all such personal property in "as is" condition.

13) **INSPECTION OF PROPERTY:** Seller agrees that Agent and its representatives shall have the right to enter upon and inspect the interior and exterior of the Property with prospective purchasers at all reasonable times.

14) **SELLER EXCHANGE:** Buyer shall agree to cooperate should Seller elect to sell the Property as part of a like-kind exchange under IRC Section 1031. Seller's contemplated exchange shall not impose upon Buyer any additional liability or financial obligation, and Seller agrees to hold Buyer harmless from any liability that might arise from such exchange. An Agreement is not subject to or contingent upon Seller's ability to acquire a suitable exchange property or effectuate an exchange. In the event any exchange contemplated by Seller should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided therein.

15) **BUYER EXCHANGE:** Seller agrees to cooperate should Buyer elect to purchase the Property as part of a like-kind exchange under IRC Section 1031. Buyer's contemplated exchange shall not impose upon Seller any additional liability or financial obligation, and Buyer shall agree to hold Seller harmless from any liability that might arise from such exchange. An Agreement is not subject to or contingent upon Buyer's ability to dispose of its exchange property or effectuate an exchange. In the event any exchange contemplated by Buyer should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided therein.

16) **SELLER'S REPRESENTATIONS AND WARRANTIES:**

   a. **Material defects:** Seller represents and warrants that Seller knows of no material defects of the Property, including, but not limited to, energy conservation and/or safety retrofit(s) required by local ordinance as a condition of transfer. (Note any exceptions:    ).

   b. **Compliance with laws:** Seller represents and warrants that, to the best of Seller's knowledge, the Property and all improvements thereon are in compliance with all applicable laws, codes, regulations and other similar governmental standards and requirements and that no material structural modifications or alterations of the improvements on the Property have been made without appropriate permits. (Note any exceptions:    ).

   c. **Legal units:** Seller represents and warrants that the Property has Twelve ( 12 ) legal units. (This paragraph applies to apartment complexes and mobile home parks only.)

   d. **Special studies zone/flood zone:** Seller represents and warrants that: (i) the Property (select one "X")    is    is not located within a delineated Special Studies Zone as defined by the California Public Resources Code regulating the construction or development of real property in areas found subject to the detrimental effects of earthquakes; and (ii) the Property (select one "X")    is    is not in a flood zone as set forth on H.U.D. "Special Flood Zone Area Maps."

   e. **Hazardous materials:** Seller represents and warrants that, to the best of Seller's knowledge, the Property is not contaminated with any hazardous materials, including, but not limited to, asbestos, PCB transformers, other toxic, hazardous or contaminated substances, and underground storage tanks. (Note any exceptions:    ).

   f. **Lead-based paint hazards:** Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 must be notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards. **(SELLER TO CHECK ONE OF THE FOLLOWING AND INITIAL):**

   SELLER'S DISCLOSURE

          Seller has provided the Agent with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below):

A-1   CA.1 - Copyright Marcus & Millichap 2004

_____Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

SELLER'S INITIALS _R . O . A - D_

g. **Records, financial data and marketing assistance:** Seller agrees to furnish, to certify as true and correct, and to make available to Agent and prospective buyers all financial data, rent statements, leases and other operating records of the Property, and to provide Agent with such assistance as Agent may reasonably request in marketing the Property.  Seller agrees to refer promptly to Agent all inquiries of anyone interested in the Property.

h. **Natural Hazard Disclosures:** Seller acknowledges and agrees that Seller shall provide, at Seller's expense, all Natural Hazard Disclosures (as defined below) required by law to be made to any potential Buyer of the Property.  "Natural Hazard Disclosures" shall mean and include, the obligation to disclose whether the property is located within: (1) Special Flood Hazard Area; (2) Dam Failure Inundation Area; (3) Earthquake Fault Zone; (4) Seismic Hazard Zone; (5) High Fire Severity Area; and/or (6) Wildland Fire Area.  Seller intends to satisfy this obligation by and through the report of a professional provider.

i. **Indemnification:** Seller agrees to indemnify and hold Agent harmless from any and all liability, damages, losses, causes of action, or other claims (including attorneys' fees and other defense costs) arising from or asserted in connection with any incomplete or inaccurate information provided by Seller, or any material information concerning the Property which Seller has failed to disclose.

j. **Seller's Representation:** If Seller is not an individual but a legal entity, Seller's representative signing this Agreement represents that he/she is fully authorized on behalf of the legal entity to sign this Agreement.

17) **DISCLOSURE OF REAL ESTATE LICENSURE:**

17.1) The _____ in this transaction is a licensed real estate Agent acting as a principal, and is associated with _____, a licensed real estate broker.

18) **SCOPE OF AGENT'S AUTHORITY AND RESPONSIBILITY:** Agent shall assist Seller in marketing the Property and in negotiating the terms and conditions of sale with any prospective purchasers.  Agent shall not, however, have authority to bind Seller to any contract or purchase agreement.  Agent shall not be responsible for performing any due diligence or other investigation of the Property, or for providing professional advice with respect to any legal, tax, engineering, construction or hazardous materials issues. Except for confidential information regarding Seller's business or financial condition and the negotiation of the terms of a purchase agreement between Seller and a prospective purchaser, Seller and Agent agree that their relationship is at arm's length and is neither confidential nor fiduciary in nature.

19) **LIMITATION OF LIABILITY:** Except for Agent's gross negligence or willful misconduct, Agent's liability for any breach or negligence in its performance of this Agreement shall be limited to the greater of $50,000 or the amount of compensation actually received by Agent in any transaction hereunder.

20) **AFFILIATED BROKERS/DUAL AGENCY:** Agent is affiliated with other brokerage companies in other states.  Agent shall disseminate information about the Property to such affiliated brokers, inviting the submission of offers on the Property.  Seller authorizes Agent and any affiliated broker to represent any prospective buyer in the acquisition of the Property, and to submit offers on behalf of such buyers.  Seller understands that this authorization may result in Agent's representing both Seller and a prospective buyer, and Seller hereby authorizes and consents to such dual representation.

21) **BROKER CO-OP - SELLER'S OPTION:** Broker co-op is recommended by Marcus & Millichap REIBC.  Seller authorizes broker co-op commencing:
   (1) at the beginning of the marketing period _R.O A.D_ (initials)
   (2) after the first half of the listing _R.O A-D_ (initials)
   (3) other _____ _A.O A-D_ (initials)
   (4) Broker co-op is not authorized _R.O A-D_ (initials)
   Seller agrees that, in the event any broker other than Agent or a broker affiliated with Agent is involved in the disposition of the property, Agent shall have no liability to Seller for the acts or omissions of such other broker, who shall not be deemed to be a subagent of Agent.

Seller's Initials _A.D_ _B.O_   Agent's Initials

CA.1 - Copyright Marcus & Millichap 2004

22) **ARBITRATION OF DISPUTES:** If a controversy arises with respect to the subject matter of this Representation Agreement or the transaction contemplated herein (including but not limited to the parties' rights to the Deposit or the payment of commissions as provided herein), Buyer, Seller and Agent agree that such controversy shall be settled by final, binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

**Notice:** By initialing in the space below you are agreeing to have any dispute arising out of the matters included in the "Arbitration of Disputes" provision decided by neutral arbitration as provided by California law and you are giving up any rights you might possess to have the dispute litigated in court or jury trial. By initialing in the space below you are giving up your judicial rights to discovery and appeal, unless such rights are specifically included in the "Arbitration of Disputes" provision. If you refuse to submit to arbitration after agreeing to this provision, you may be compelled to arbitrate under the authority of the California Code of Civil Procedure. Your agreement to this arbitration provision is voluntary.

We have read and understand the foregoing and agree to submit disputes arising out of the matters included in the "Arbitration of Disputes" provision to neutral arbitration.

Seller's Initials _R.O. A.D_   Agent's Initials _____

23) **ATTORNEYS' FEES:** In any litigation, arbitration or other legal proceeding which may arise between any of the parties hereto, including Agent, the prevailing party shall be entitled to recover its costs, including costs of arbitration, and reasonable attorneys' fees in addition to any other relief to which such party may be entitled.

24) **EXCHANGE:** As used in this Agreement, the terms "sale, "sell" or "purchase" shall be understood to include an exchange of the Property. In the event of an exchange, if no purchase price is identified, the commission described in Paragraph 5 above shall be calculated as a percentage of the exchange value of the Property. Agent is hereby authorized to represent all parties to any such exchange transaction and to collect compensation or commission from them, provided there is full disclosure to all principals of such agency.

25) **TAX WITHHOLDING:** Seller agrees to execute and deliver any instrument, affidavit or statement, or to perform any act reasonably necessary to carry out the provisions of the Foreign Investment in Real Property Tax Act and regulations promulgated thereunder.

26) **ADDENDA:** Any addendum attached hereto, and either signed or initialed by the parties shall be deemed a part hereof. This Agreement, including addenda, if any, expresses the entire agreement of the parties and supersedes any and all previous agreements between the parties with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge its terms, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. Any future modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

27) **GOVERNING LAW:** This Agreement shall be governed by and construed in accordance with the laws of the State of _California_.

28) **EXTENSION OF TERM:** If an agreement or letter of intent for the sale of the Property is executed by all necessary parties, and/or an escrow is opened, and if said agreement or letter of intent is revoked, rescinded or otherwise terminated, and/or the escrow account is subsequently canceled, the Term shall be extended by the number of calendar days during which the sale agreement or letter of intent was in effect or the escrow was open, whichever is longer. The maximum extension permitted hereunder shall be the number of days remaining on the Term from the date the sale agreement or letter of intent was executed, or an escrow opened, whichever event occurred earlier. Notwithstanding the foregoing, this Representation Agreement shall expire in all cases no later than twelve (12) months after the original termination date stated above. The purpose of this extension provision is to allow agent the opportunity to expose the Property to the marketplace for the full period of time contemplated by this Agreement.

29) **OTHER TERMS AND CONDITIONS:**

Seller's Initials _R.O. A.D_   Agent's Initials _____

CA.1 - Copyright Marcus & Millichap  2004

The undersigned Seller and Agent agree to the terms and conditions set forth in this Representation Agreement, and Seller acknowledges receipt of an executed copy hereof.

SELLER: _Rosemarie Ozbakir_                ADDRESS: On File With Agent
        Rosemarie Ozbakir                           _____

DATE: _12-9-2004_                          TELEPHONE: _____

SELLER: _Ali Demir_                        ADDRESS: On File With Agent
        Ali Demir                                   _____

DATE: _12/9/2004_                          TELEPHONE: _____


AGENT: **MARCUS & MILLICHAP REAL ESTATE INVESTMENT BROKERAGE COMPANY**

BY: _____                ADDRESS: 9255 Towne Centre Dr.
        Chris Zorbas                                Suite 700
                                                    San Diego, CA 92121

DATE: _12/9/2004_                          TELEPHONE: 858-452-8300 x227

BY: _____                ADDRESS: 9255 Towne Centre Dr.
        Scott Dragos                                Suite 700
                                                    San Diego, CA 92121

DATE: _12/9/2004_                          TELEPHONE: 858-452-8300 x261

NO REPRESENTATION IS MADE BY AGENT AS TO THE LEGAL EFFECT OR VALIDITY OF ANY PROVISION OF THIS REPRESENTATION AGREEMENT.  A REAL ESTATE BROKER IS QUALIFIED TO GIVE ADVICE ON REAL ESTATE MATTERS.  IF YOU DESIRE LEGAL, FINANCIAL OR TAX ADVICE, CONSULT YOUR ATTORNEY, ACCOUNTANT OR TAX ADVISOR.

Seller's Initials _A.D_ _R.O._  Agent's Initials _____

CA.1 - Copyright Marcus & Millichap  2004

EXHIBIT "I"

# JIFFY LUBE NNN: UPSTATE NEW YORK

East Rochester, NY



# Offering Memorandum



Real Estate Investment Brokerage Company

# JIFFY LUBE NNN: UPSTATE NEW YORK

## East Rochester, NY

## Marcus & Millichap

### Real Estate Investment Brokerage Company

**Manhattan Office**
**270 Madison Avenue**
**19th Floor**
**New York, NY 10016**
**Tel: (212) 832-4500**
**Fax: (212) 685-2230**

JIFFY LUBE NNN: UPSTATE NEW YORK
East Rochester, NY

# Table of Contents

### SECTION 1 - Pricing & Financial Analysis

### SECTION 2 - Property Description

### SECTION 3 - Recent Sales

### SECTION 4 - Demographic Analysis

This information has been secured from sources we believe to be reliable, but we make no representations or warranties, expressed or implied, as to the accuracy of the information. References to square footage or age are approximate. Buyer must verify the information and bears all risk for any inaccuracies. © 2005 Marcus & Millichap  M0330294

Marcus & Millichap
Real Estate Investment Brokerage Company

## JIFFY LUBE NNN: UPSTATE NEW YORK
### East Rochester, NY

# Financial Summary

**SUMMARY**      781 Fairport Road, East Rochester, NY

| | |
|---|---|
| Price | 1,495,386 |
| Down Payment | 100.0% $1,495,386 |
| Rentable Square Feet | 5,695 |
| Price/Square Foot | $262.58 |
| Cap Rate | 7.50% |
| Net Cash Flow After Debt Service | 7.5% $112,154 |
| Year Built | 1991/2004 |
| Lot Size | .84 Acres |
| Type of Ownership | Fee Simple |

**TENANT SUMMARY**

| | |
|---|---|
| Tenant Trade Name | Eureka Petroleum, Inc. |
| Ownership | Private |
| Tenant | Franchisee |
| Lease Guarantor | Local or Regional |
| Lease Type | Triple Net (NNN) |
| Roof and Structure | Tenant Responsible |
| Lease Term | 25 Years |
| Lease Commencement Date | February 5, 2004 |
| Rent Commencement Date | February 5, 2004 |
| Lease Expiration Date | February 4, 2029 |
| Term Remaining on Lease | 23+ Years |
| Increases | 1.6% Annually |
| Options | 1 x 10 |

**FINANCING SUMMARY**

| | |
|---|---|
| Loan Type | All Cash |
| Loan Origination Date | N/A |
| Original Loan Amount | N/A |
| Loan Amount | |
| Interest Rate | |
| Terms | N/A |
| Amortization Period | |

**ANNUALIZED OPERATING DATA**

| Rent Increases | Rent |
|---|---|
| Current Rent | 112,154 |

| | |
|---|---|
| Base Rent ($19.69/SF) | 112,154 |
| **Net Operating Income (NOI)** | **$112,154** |








This information has been secured from sources we believe to be reliable, but we make no representations or warranties, expressed or implied, as to the accuracy of the information. References to square footage or age are approximate. Buyer must verify the information and bears all risk for any inaccuracies. © 2005 Marcus & Millichap   M0330304

**Marcus & Millichap**
Real Estate Investment Brokerage Company

1

**JIFFY LUBE NNN: UPSTATE NEW YORK**
East Rochester, NY

## Investment Overview



The subject property is located on Fairport Road in East Rochester, New York. This Jiffy Lube was constructed in 1991 and renovated in 2004. The building is 5,695 square feet and it sits on an approximate .84 acre parcel of land. This investment is subject to an absolute triple net lease, with 23+ years remaining in a 25 year primary term that commenced on February 4, 2004. The rent increases approximately 1.6% annually in the primary term and through the 10-year option period.

Finally, the tenant, Eureka Petroleum, Inc. has an oil agreement with Shell. It is a 10 year agreement which Shell only signs with Eureka. Shell Oil has a right to cure any lease default under the oil agreement.

Eureka Petroleum, Inc. currently operates approximately 45 locations.

### Investment Highlights

- Rarest Type of NNN Opportunity: New York State

- Fastest Growing Franchisee in Jiffy Lube System

- 7.5 % Initial Return with 1.6% Annual Increases

- Absolute NNN with Zero Landlord Responsibilities

- 10 Year Oil Agreement with Shell Oil

This information has been secured from sources we believe to be reliable, but we make no representations or warranties, expressed or implied, as to the accuracy of the information. References to square footage or age are approximate. Buyer must verify the information and bears all risk for any inaccuracies. © 2005 Marcus & Millichap   M0330394

Marcus & Millichap
Real Estate Investment Brokerage Company

3

JIFFY LUBE NNN: UPSTATE NEW YORK
East Rochester, NY

# Location Overview



The Property is located immediately adjacent to Country Club Plaza, a large Wegman's anchored retail center. Wegman's is the leading grocer in the area. Immediately adjacent and to the east of the Property is Papa John's Pizza, a national fast food franchise. The area surrounding the Property is a well-established and affluent residential neighborhood. The Property is on Fairport Road, which is a major collector road that connects with Interstate 490 approximately two miles to the west of the Property.

## Location Highlights

- Prime New York State Retail Locale
- Commercial Artery in Rochester Area
- Excellent Regional Demographics
- Strong Upstate Demographics
- Heavily Developed Area with Little Room for Growth



This information has been secured from sources we believe to be reliable, but we make no representations or warranties, expressed or implied, as to the accuracy of the information. References to square footage or age are approximate. Buyer must verify the information and bears all risk for any inaccuracies. © 2005 Marcus & Millichap    M0530394

Marcus & Millichap
Real Estate Investment Brokerage Company        4

# Tibarom Inc.

## CONSOLIDATED BALANCE SHEET

### 31-Dec-04

### ASSETS

**CURRENT ASSETS**

| | |
|---|---:|
| Cash and cash equivalents | $5,169,487 |
| Accounts receivable | 196,114 |
| Due from (to) officer | (563,866) |
| Due from affiliates | 3,162,867 |
| Inventories | 937,961 |
| Prepaid expenses | 328,106 |
| Total current assets | 9,230,669 |

| | |
|---|---:|
| **PROPERTY, PLANT & EQUIPMENT, net** | 2,790,446 |
| **INTANGIBLE ASSETS, net** | 4,482,164 |
| **DEPOSITS AND OTHER ASSETS** | 109,402 |
| | $16,612,680 |

### LIABILITIES AND STOCKHOLDER' EQUITY

**CURRENT LIABILITIES**

| | |
|---|---:|
| Accounts payable | $1,749,903 |
| Accrued expenses | 266,922 |
| Tax liabilities | 223,507 |
| Payroll liabilities | 192,957 |
| Notes payable - short term | 58,136 |
| Total current liabilities | 2,491,425 |

| | |
|---|---:|
| **DEFERRED REVENUE** | 3,219,968 |
| **LONG-TERM DEBT, less current maturities** | 3,716,999 |
| **STOCKHOLDERS' EQUITY** | 7,184,288 |
| | $16,612,680 |

The accompanying notes are an integral part of these statements.

## NOTE 1 - STOCKHOLDERS' EQUITY

Retained earnings includes store lube, carwash and smog operating income and related market expenses. These net earnings exclude real estate development net earnings and main office general and administrative expenses, which are material in nature.

# Marcus & Millichap
Real Estate Investment Brokerage Company

**Chris Zorbas**
**Scott Dragos**

*National Multi Housing Group*

3715-3729 National Ave., San Diego, CA

**Due Diligence Document Request**

| Item | Received | Required |
|------|----------|----------|
| **Signed Operating Statements (Income & Expense - including capital expenditures) for:** | | |
| 2002 | ○ | ● |
| 2003 | ○ | ● |
| 2004 Year to Date | ○ | ● |
| **Utility Bills Past 3 Statements for:** | | |
| Water & Sewer Bills | ○ ○ ○ | ● |
| Gas & Electric Bills | ○ ○ ○ | ● |
| Trash Bills | ○ ○ ○ | ● |
| **Signed Rent Roll** | ● | ○ |
| Showing actual rents charged and collected, security deposits, dates of occupancy, names, unit # (address), unit type (Br/Ba, SqFt), concessions, etc. | | |
| **Delinquency List** | ○ | ● |
| **Rental Agreements** | ○ | ● |
| Including Section 8 Agreements, Notice of Rental Increases etc. | | |
| **Copy of insurance policy and premium** | ○ | ● |
| **Property Tax Bill** | ○ | ● |
| **Service Contracts** | | |
| Landscaping | ○ | ● |
| Laundry Lease | ○ | ● |
| On-Site Management | ○ | ● |
| Off-Site Management | ○ | ● |
| Other Leases | ○ | ● |
| Pest Control | ○ | ● |
| Pool | ○ | ● |
| **Inventory of Personal Property** | ○ | ● |
| **Building Plans** | ○ | ● |
| **Copy of Licenses / Permits** | ○ | ● |
| **Reports or surveys** | ○ | ● |
| (pertaining to environmental, termite, roof, structural, mechanical electrical, fire inspection, etc.) that may include work to be done or budgeted, or work that has been completed during the past three years. | | |
| **Existing loan documents** | ○ | ● |
| **House Rules** | ○ | ● |
| **List of all equipment that is inoperable or in need or repair** | ○ | ● |
| **Other Written Agreements, Notices, Reports** | ○ | ● |
| **Transferable Warranties** | ○ | ● |

EXHIBIT "J"

# Marcus & Millichap

*Letter of Intent*

## LETTER OF INTENT

This non-binding **Letter of Intent** dated 10/26/2005, expresses the intention of **Rosemarie Ozbakir & Ali Demir** ("here and after the purchase") through their agent **Scott Dragos** of Marcus & Millichap in acquiring from Eureka Petroleum, Inc a franchisee of Jiffy Lube property located at **781 Fairport Road East Rochester, NY 14445**. Moreover it sets forth some of the basic terms under which the Buyer would be interested in entering into a Real Estate Purchase Agreement.

This letter of intent is much more comprehensive than is generally the case. We have found that addressing business issues in a comprehensive manner at the outset expedites negotiations and therefore, and this letter was intended as the first step in this process. NEVERTHELESS, PLEASE BE ADVISED THAT THIS LETTER IS NOT CONTRACTUALLY BINDING ON THE PARTIES AND IS ONLY AN EXPRESSION OF THE BASIC TERMS AND CONDITIONS TO BE INCORPORATED IN A FORMAL WRITTEN AGREEMENT. THE PARTIES SHALL NOT BE CONTRACTUALLY BOUND UNLESS AND UNTIL THEY EXECUTE A FORMAL PURCHASE AGREEMENT, WHICH MUST BE IN FORM AND CONTENT SATISFACTORY TO EACH PARTY AND ITS COUNSEL IN THEIR SOLE DISCRETION.

PROPERTY:

Jiffy Lube
781 Fairport Road
East Rochester, NY 14445
(hereinafter the "Property")

PURCHASER:

Rosemarie Ozbakir & Ali Demir

SELLER:

Eureka Petroleum, Inc.

PURCHASE PRICE:

The Purchase Price shall be $1,480,000

DOWN PAYMENT:

$445,000 ($440,000)

FINANCING:

*R.O.A.D.*

# Marcus & Millichap

**EARNEST MONEY DEPOSIT:**

Twenty Five Thousand ($25,000) ("Earnest Money") shall be placed in escrow with the Title Company upon the execution of the Purchase and Sale Agreement (defined below). Upon expiration of the Due Diligence Period (defined below) and provided Purchaser does not terminate the Purchase and Sale Agreement before expiration of the Due Diligence Period. The Earnest Money shall become non-refundable, and Purchaser shall increase deposit to **Fifty thousand dollars ($50,000)** ("Additional Earnest Money") with the Title Company. Upon deposit, the Additional Earnest Money shall be non-refundable. At Closing, the Earnest Money and the Additional Earnest Money (and all interest earned thereon) shall be applied toward the Purchase Price.

**TITLE COMPANY:**

Seller's Choice

**DUE DILIGENCE ITEMS:**

Lease and Addendums, Survey, Environmental Reports, Title, Operating and/or Financial Statements and any other available third party reports.

**DUE DILIGENCE PERIOD:**

Purchaser shall have up to **Fourteen (14) days** from the Effective Date (the "Due Diligence Period"), to review the Due Diligence Items and to enter upon the Property to inspect the physical condition of the same, as it shall deem necessary. On or before expiration of the Due Diligence Period, Purchase shall determine whether it is feasible to purchase the Property based on Purchaser's review of the Due Diligence Items and its physical inspection of the Property. If it is not feasible for Purchaser to purchase the Property, Purchaser may terminate the Purchase and Sale Agreement. If Purchaser so terminates, the Earnest Money shall be returned to Purchaser, and the Due Diligence Items shall be returned to Seller

**CONTRACT:**

Upon the mutual execution of this Letter. Seller will promptly prepare a Purchase and Sale Agreement containing the terms and conditions and made a part hereof. Seller shall make a good faith effort to deliver said Purchase and Sale Agreement to Purchaser within five (5) days from the signing of the counter to the LOI. Upon



# Marcus & Millichap

**TRANSFER:**

delivery of said Purchase and Sale Agreement to Purchaser, both parties shall negotiate such said Purchase and Sale Agreement in good faith with the understanding that the Purchase and Sale Agreement is to be executed by both parties within_seven__ **(7)** days from the Effective Date. Special Warranty Deed or the equivalent thereof in the State where the Property is located.

**CLOSING:**

Closing shall occur within __Thirty_ (30)_ days after expiration of the Due Diligence Period.

**CLOSING COSTS:**

Closing Costs shall be paid as follows:
**Seller:**
  a. Title commitment/title policy up to the amount of the Purchase Price.
  b. One-half escrow fees, if any.
  c. Seller's attorney fees.
  d. Any other costs associated with closing and passing of title regardless of custom or practice to the contrary.

**Purchaser:**
  a. Cost of title endorsements or extended or special coverage in an amount over the Purchase Price.
  b. Survey.
  c. Recording.
  d. Transfer Tax assessed (to be reimbursed by Seller per the terms of paragraph B in "Lease Term" above.
  e. One-half escrow fees, if any.
  Purchaser's own attorney fees.

**CONFIDENTIALITY:**

Seller, Purchaser, and their agents shall maintain the confidentiality of the parties, terms, and conditions of this letter and the negotiations that may follow, if any, from this date forth.

The above items are the general business terms and conditions to be covered in the Purchase and Sale Agreement, which would be submitted to the Buyer. Additional remaining terms of the Purchase and Sale Agreement will be negotiated and must be acceptable to both Purchaser and Seller.

This Letter is not intended to be a binding contract.

Page 3 of 4

Seller's Initials

Buyer's Initials

# Marcus & Millichap

If this Letter accurately reflects the general business terms and conditions which may form the basis of a separate written agreement, please confirm in writing no later than **Monday, October 31th, 2005 5pm PST**. This Letter supersedes letters, if any submitted at earlier dates and any and all other communications or discussions whether oral, in writing, or on electronic format.

"Purchaser"

Rosemarie Ozbakir

By: _____   Date: 10-26-05

Ali Demir

By: _____   Date: 10-26-05

Seller hereby agrees to the terms and conditions of the Letter.

By: _____   Date: _____

Name: _____   Title: _____

        Eureka Petroleum, Inc.

Page 4 of 4

EXHIBIT "K"

Yahoo! Mail - rozbakir@yahoo.com                                                    Page 1 of 2

Case 6:09-cv-06460-DGL-JWF    Document 1-3    Filed 09/09/09    Page 124 of 207

Yahoo!  My Yahoo!  Mail  Make Yahoo! your home page
                                                                        Search
                                                                        the Web        [Search]

# YAHOO! MAIL



Welcome, **rozbakir**
[Sign Out, My Account]

Mail Home - Mail Tutorials - Help


REDMOND
SEATTLE        BELLEVUE

GET A FREE
HOME VALUATION
[CLICK HERE]

HOUSE VALUES
.COM
YOUR HOME'S MARKET VALUE ONLINE

| **Mail** ▼ | **Addresses** ▼ | **Calendar** ▼ | **Notepad** ▼ | **What's New** - **Mail For Mobile** - **Upgrades** - **Options** |

[ Check Mail ]   [ Compose ]                              [ Search Mail ▼ ]   [ Search the Web ]

Get VONAGE
& get 1 month FREE!

Previous | Next | Back to Messages                                          Printable

[ Delete ]   [ Reply ▼ ]   [ Forward ▼ ]   [ Spam ]   [ Move... ▼ ]

This message is not flagged. [ Flag Message - Mark as Unread ]

**From:**  "Dragos, Scott" <SDragos@marcusmillichap.com>   📧 Add to Address Book   📱 Add Mobile Aler

**To:**  "'Rosemarie Ozbakir'" <rozbakir@yahoo.com>

**Subject:**  Jiffy lube LEASE

**Date:**  Thu, 27 Oct 2005 15:05:09 -0700

*Loop Net*

Folders        [Add - Edit]

Inbox
Draft
Sent
Bulk              [Empty]
Trash             [Empty]


What's your
Credit Score?


$150,000 loan –
$494/mo. Refi

A Mastercard
in 3 Days*

Alert! $200K loan
for $730/month!

Congrats!!
I sent this to 2 lenders already and you will have your original financial docs tomo
your own quotes as well.
I think it is a wonderful deal for you and we are getting it at a 7.6%  CAP.
Sincerely,
Scott

## ACTIVITY DETAIL

**Property Type:** Net Leased Auto Service - Gas/Conv.
**Property Name:** Jiffy Lube NNN: Upstate New York
**Property ID:**  1417932
**Address:**       781 Fairport Road
                   East Rochester, NY 14445  📍 Map

📄 Representation Agreement



### Summary

| | |
|---|---|
| **Listing Price:** | $1,495,386 |
| **Down:** | $1,495,386 |
| Current CAP: | 7.50% |
| Current GRM: | |
| Rentable Sq Ft: | 5,695 |
| Lot Size: | .84 Acres |

### Operating Data

**Income**

| | |
|---|---|
| Base Rent ($19.69/SF) | |
| Net Operating Income (NOI) | |
| Total Return | |

**Expenses**

Approx Yr Built:                1991
Units:
Current Ownership (Years):  0

Price Per Unit:
Price Per Sq Ft:                $263

Activity ID:
Activity Status:                M0330394   **Internet**
Activity Method:                **Listing-Active New Listing**
Activity Office:                Exclusive
                                Manhattan

Portfolio:

Approved Date:
                                10/19/05

### Investment Highlights

- Rarest Type of NNN Opportunity: New York State
- Fastest Growing Franchisee in Jiffy Lube System
- 7.5 % Initial Return with 1.6% Annual Increases
- Absolute NNN with Zero Landlord Responsibilities
- 10 Year Oil Agreement with Shell Oil Company

### Location Highlights

- Prime New York State Retail Locale
- Commercial Artery in Rochester Area
- Excellent Regional Demographics
- Strong Upstate Demographics
- Heavily Developed Area with Little Room for Growth

### Financing Summary

All Cash, N/A, N/A

Not Available

[1] Rent Roll attached annualized [2] Based
Vacancy

### Activity Description

The subject property is located on Fairpo
East Rochester, New York. This Jiffy Lu
constructed in 1991 and renovated in 200
building is 5,695 square feet and it sits o
approximate .84 acre parcel of land. This
subject to an absolute triple net lease, wi
remaining in a 25 year primary term that
on February 4, 2004. The rent increases :
1.6% annually in the primary term and th
year option period.

Finally, the tenant, Eureka Petroleum, In
agreement with Shell. It is a 10 year agre
Shell only signs with Eureka. Shell Oil h
cure any lease default under the oil agree

Eureka Petroleum, Inc. currently operate
approximately 45 locations.

---

**Attachments**                                    Attachment scanning provided by:

Files:

📎 **Fairport_Lease_Final3.pdf** (95k)          Save to Computer - Save to Yahoo! Briefcase

📎 **Fairport_Lease_signature_pages.pdf** (181k)   Save to Computer - Save to Yahoo! Briefcase

The HTML graphics in this message have been displayed. [Edit Preferences - What's This?]

[ Delete ]  [ Reply ▾ ]  [ Forward ▾ ]  [ Spam ]  [ Move... ▾ ]

Previous | Next | Back to Messages                                          Sa

[ Check Mail ]  [ Compose ]                          [ Search Mail ▾ ]  [ Search the Web ]

Copyright © 1994-2005 Yahoo! Inc. All rights reserved. Terms of Service - Copyright/IP Policy - Guidelines - Ad Feedback
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

EXHIBIT "L"

# Marcus & Millichap
Real Estate Investment Brokerage Company

Office of Scott Dragos

Transmi...

*Executed Counter Offer to Letter of Intent*

11-01-2005 10:57   DANIEL J SCOTT

# M&m

## Counter to Letter of Intent

This Counter to Letter of Intent serves as a counter-proposal to the non-binding letter of Intent ("Letter") from Grewkar & Ali Demir, through their agent Scott Dragos and dated October 26, 2005, in which Purchaser has set forth its interest in acquiring the subject Property. This proposal is in a more comprehensive than is generally the case. We have found that setting its particular terms in a comprehensive manner at the outset facilitates negotiation and execution of this letter is intended as the first step in this process. ACCORDINGLY, PLEASE BE ADVISED THAT THIS LETTER IS NOT PROSPECTIVELY BINDING ON THE PARTIES AND IS ONLY AN EXPRESSION OF THE BASIC TERMS AND CONDITIONS TO BE INCORPORATED IN A FORMAL PURCHASE AGREEMENT. THE PARTIES SHALL NOT BE CONTRACTUALLY BOUND UNLESS AND UNTIL THEY EXECUTE A FORMAL PURCHASE AGREEMENT, WHICH MUST BE IN FORM AND CONTENT SATISFACTORY TO EACH PARTY AND ITS COUNSEL IN THEIR SOLE DISCRETION.

| | |
|---|---|
| PROPERTY: | Jiffy Lube<br>203 Fairport Road<br>Rochester NY<br>(collectively, the "Property") |
| PURCHASER: | Grewkar & Ali Demir |
| SELLER: | Dr. Daniel J. Scott<br>(hereinafter, the "Seller") |
| PURCHASE PRICE: | The Purchase Price shall be $1,480,000 |
| FINANCING: | Purchaser shall have up to Thirty (30) days (the "Financing Contingency Period") from the Effective Date to obtain a commitment for financing of the Property (the "Effective Date" being the date on which the Seller or Purchaser last signs a formal purchase agreement for the Property). |

Page 1

Seller's Initials
R.O.A.D.
Buyer's Initials

11-01-2005 10:57  DANIEL J SCOTTI 7274560992

# M&m

**EARNEST MONEY
DEPOSIT:**

**Twenty Five thousand ($25,000) dollars**
("Earnest Money") shall be placed in escrow
with the Title Company upon the execution of the
Purchase and Sale Agreement (defined below).
Upon expiration of the Due Diligence Period
(defined below) and provided Purchaser does not
terminate the Purchase and Sale Agreement
before expiration of the Due Diligence Period, the
Earnest Money shall become non-refundable, and
Purchaser shall deposit an additional, **Twenty
Five thousand ($25,000) dollars ("Additional
Earnest Money")** with the Title Company. Upon
deposit, the Additional Earnest Money shall be
non-refundable.  At Closing, the Earnest Money
and the Additional Earnest Money (and all interest
earned thereon) shall be applied toward the
Purchase Price.

**TITLE COMPANY:**

Seller's choice.

Re'se based on the following revised term attached
as follows.

**DUE DILIGENCE ITEMS:**

Within five (5) days after the Effective Date
Seller, at its expense, shall provide Purchaser with
the following:

    a. A copy of the most recent title
    commitment for the Property, if any exists
    and if in Seller's possession

    b. A copy of the existing site plans or surveys
    of the property in Seller's possession.

    c. Environmental reports in Seller's
    possession.

    d. Tenant financial information in Seller's
    possession.

Items (a) through (d) above and the updated title
commitment and Updated Survey, if applicable,
are hereinafter referred to as the "Due Diligence
Items".

**DUE DILIGENCE PERIOD**

Purchaser shall have up to **Fourteen (14) days**
from the Effective Date (the "Due Diligence
Period"), to review the Due Diligence Items and to
enter upon the Property to inspect the physical
condition of the same, as it shall deem necessary.
On or before expiration of the Due Diligence
Period, Purchaser shall determine whether it is

Seller's Initials

R.O.A.D.
Buyer's Initials

Page 2 of 7

# M&m

feasible to purchase the property based on Purchaser's review of the Due Diligence Items and its physical inspection of the Property. If it is not feasible for Purchaser to purchase the Property, Purchaser may terminate the Purchase and Sale Agreement. If Purchaser so terminates, the earnest money shall be returned to Purchaser, and the Due Diligence Items shall be returned to Seller.

CONTRACT:

Upon the mutual execution of this Letter, Seller will promptly prepare a Purchaser and Sale Agreement and Seller shall make a good faith effort to deliver said Purchase and Sale Agreement to Purchaser within Two (2) days from the signing of the parties to the LOI. Upon delivery of the Purchase and Sale Agreement to Purchaser, both parties shall negotiate such Purchase and Sale Agreement in good faith with the understanding that the Purchase and Sale Agreement is to be executed by both parties within Five (5) days from the purchase.

CONVEYANCE:

Special Warranty Deed or the equivalent thereof in the State where the Property is located.

CLOSING:

Closing shall occur within Thirty (30) days after expiration of the Due Diligence Period

CLOSING COSTS:

Closing Costs shall be paid as follows:

SALES COMMISSIONS:

Purchaser and Seller each represent that no real estate broker, finder or intermediary has been consulted or used in connection with the purchase and sale of the Property, except Marcus & Millichap who will be compensated upon closing by Seller pursuant to a separate agreement. Marcus & Millichap will compensate any cooperating brokers per separate co-brokerage agreement. Purchaser and Seller shall agree to indemnify and hold each other harmless from and against any other brokerage commissions and finder or intermediary fees claimed or owing by reason of the sale of the Property.

Page 7 of 9

Seller's Initials

B.O.A.D.
Buyer's Initials

# M&m

**TAX DEFERRED EXCHANGE:**    Seller is aware that Purchaser may elect to acquire the property under IRC Section 1031. In such event, Seller will cooperate with Purchaser at no cost or liability to Seller.

**CONFIDENTIALITY:**    Seller, Purchaser, and their agents shall maintain the confidentiality of the parties, terms, and conditions of any letter and the negotiations that may follow, dating from the date forth.

The above items are the general business terms and conditions to be covered in the Purchase and Sale Agreement, which would be submitted by the Seller. Additional remaining terms of the Purchase and Sale Agreement will be negotiated and must be acceptable to both Purchaser and Seller.

**This letter is not intended to be a binding contract.**

If this Letter accurately reflects the general business terms and conditions which may form the basis of a separate written agreement, please confirm by signing and returning before November 5, 2005. This Letter, amendments, options, if any, counter offers and any and all other communications or discussions should be in writing or in electronic format.

Purchaser: *Ali Demir*

*Rosemarie Ozbaky*                               11-5-05
                                                   Date

We hereby agrees to the terms and conditions of this letter

By: _____                         11/7/05
                                                   Date

Title: _____                      Title

Page 4 of 5                                      Seller's initials

                                                Buyer's initials

M & m

R.O.A.D.

EXHIBIT "M"

# Marcus & Millichap

Real Estate Investment Brokerage Company

### *Office of Scott Dragos*

## Fax Transmission

___

To:        Rosemarie                        Fax:

___

From:      Scott Dragos                      Number of Pages to Follow: 1

Phone:     858-362-9348                      Date:     November 5, 2005

___

Subject:  Need Signature and one more inital

___

Comments:

I need you to sign the top of the last page of the Jiffy Lube contract.

I also added in the 30 day extension in section 34. so please initial that as well.

Fax back to my attention at 858-546-8254

Thanks so much, Scott

Scott Dragos
Marcus & Millichap
owne Centre Drive Suite 700
iego, CA 92121

the provisions of this Foreign Investment in Real Property Tax Act and regulations promulgated thereunder.

31) ADDENDA: Any addendum attached hereto and either signed or initialed by the parties shall be deemed a part hereof. This Agreement, including addenda, if any, expresses the entire agreement of the parties and supersedes any and all previous agreements between the parties with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge its terms, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. Any future modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

32) ACCEPTANCE AND EFFECTIVE DATE: Buyer's signature hereon constitutes an offer to Seller to purchase the Property on the terms and conditions set forth herein. Unless acceptance hereof is made by Seller's execution of this Agreement and delivery of a fully executed copy to Buyer, either in person, by mail or facsimile at the address shown below, on or before 5:00 p.m. E.D.T. on November ___, 2005, or this offer shall be null and void, the Deposit shall be returned to Buyer, and neither Seller nor Buyer shall have any further rights or obligations hereunder. Delivery shall be effective upon personal delivery or fax to Buyer or Buyer's agent or, if by mail, on the next business day following the date of postmark. The "Effective Date" of this Agreement shall be the later of (a) the date on which Seller executes this Agreement, or (b) the date of or written acceptance (by either Buyer or Seller) of the final counter-offer submitted by the other party.

33) GOVERNING LAW: This Agreement shall be governed by and construed in accordance with the laws of the State of New York as though the entire agreement were to be performed within New York among persons who are all residents of New York.

34) OTHER TERMS AND CONDITIONS:

    34.1) All parties to this Agreement agree that a facsimile signature and signing in counterpart are legally binding.

    34.2) Buyer to have one (1) Thirty (30) d _ extension *R.O.A.D*

35) COMMISSIONS: Seller agrees to be responsible for all broker commissions relating the purchase and sale of subject property, as expressly set forth under a separate and binding

**THE PARTIES ARE ADVISED TO CONSULT THEIR RESPECTIVE ATTORNEYS WITH REGARD TO THE LEGAL EFFECT AND VALIDITY OF THIS PURCHASE AGREEMENT.**

The undersigned Buyer hereby offers and agrees to purchase the above-described Property for the price and upon the terms and conditions herein stated.

This offer is made by Buyer to Seller on this ___ day of November 2005. The undersigned Buyer hereby acknowledges receipt of an executed copy of this Agreement, including the Agency Disclosure contained above.

Buyer's Initials _A.D._ _B.O._ Seller's Initials ___

*Attention: Scott*

BUYER: OZABAKIR & ALI DEMIR

BY: _Rosemarie Ozakir M.D. Demir_    ADDRESS:

DATE: _11-5-2005_    TELEPHONE.

FAX:

EMAIL.

## SELLER'S ACCEPTANCE AND AGREEMENT TO PAY COMMISSION

The undersigned Seller accepts the foregoing offer and agrees to sell the Property for the price and on the terms and conditions stated herein. Seller acknowledges receipt of an executed copy of this Agreement and authorizes Agent to deliver an executed copy to Buyer.

Seller reaffirms its agreement to pay to Agent a real estate brokerage commission pursuant to the terms of that certain Representation Agreement between Agent and Seller, which shall remain in full force and effect. Said commission is payable in full on the Closing Date and shall be paid in cash through escrow. Escrow Holder is directed to make such payment to Agent from Seller's proceeds of sale. The provisions of this paragraph may not be amended or modified without the written consent of Agent.

SELLER: DR. DANIEL J. SCOTTI

BY: _Daniel J. Scott_    ADDRESS: 459 MEADOWVIEW DR

DATE: _11-2-05_    VACAVILLE, CA 95688

TELEPHONE:

FAX: (707) 455-0302

EMAIL: dscott1@prodigy.net

NO REPRESENTATION IS MADE BY AGENT AS TO THE LEGAL OR TAX EFFECT OR VALIDITY OF ANY PROVISION OF THIS PURCHASE AGREEMENT. A REAL ESTATE BROKER IS QUALIFIED TO GIVE ADVICE ON REAL ESTATE MATTERS. IF YOU DESIRE LEGAL, FINANCIAL OR TAX ADVICE, CONSULT YOUR ATTORNEY, ACCOUNTANT OR TAX ADVISOR.

A.D    Page 10 of 10

Buyer's Initials: R.O.    Seller's Initials: _DS_

EXHIBIT "N"

# Marcus & Millichap

## RECEIPT OF DOCUMENTS

BUYER:      Rosemarie Ozbakir

SELLER:     Eureka Petroleum Inc

DATE:       11/9/2005

SUBJECT:    Purchase Agreement dated    11/5/2005    for the purchase of    E Rochester Jiffy
            Lube    by    Rosemarie Ozbakir & Ali Demir    .

The following documents have been received as per the above referenced Purchase Agreement:

**ITEMS**

1. Executed Contract
2. Executed LOI
3. Marketing Package
4. Phase One Environmental
5. Lease Agreement
6. Lender Information
7. Eureka Petroleum Inc Financials 2004 & 2003    (05)
8. Eureka Consolidated balance Sheet 2004
9. Tibarom Inc (Subsidiary) Financials 2004   05?

(10) site income & expense (04)(05)  ordered Mon from Sellers broker
(11) title comittment            ordered Mon from Escrow

Copyright Marcus and Millichap 2003

EXHIBIT "O"

# MNET
**Welcome Scott Dragos**

Apartmen

| Search | Cap Corp | Reports | Help | MMWeb |

## ACTIVITY DETAIL

**Property Type: Net Leased Auto Service - Gas/Conv.**
Property Name: Jiffy Lube NNN: Upstate New York
Property ID:     1417932
Address:         781 Fairport Road
                 East Rochester, NY 14445   🔍 Map

📄 Representation Agreement



### Summary

| | |
|---|---|
| **Listing Price:** | $1,495,386 |
| **Down:** | $1,495,386 |
| Current CAP: | 7.50% |
| Current GRM: | |
| Rentable Sq Ft: | 5,695 |
| Lot Size: | .84 Acres |
| Approx Yr Built: | 1991 |
| Units: | |
| Current Ownership (Years): | 0 |
| | |
| Price Per Unit: | |
| Price Per Sq Ft: | $263 |
| | |
| Activity ID: | **M0330394  Internet** |
| Activity Status: | **Listing-Active New Listing** |
| Activity Method: | Exclusive |
| Activity Office: | Manhattan |
| | |
| Portfolio: | |
| | |
| Approved Date: | 10/19/05 |

### Listing Agents

📧 Glen Kunofsky
📧 Andrew Dorf

### Investment Highlights

📧 Rarest Type of NNN Opportunity: New York State
📧 Fastest Growing Franchisee in Jiffy Lube System
📧 7.5 % Initial Return with 1.6% Annual Increases
📧 Absolute NNN with Zero Landlord Responsibilities
📧 10 Year Oil Agreement with Shell Oil Company

### Operating Data

| Income | Current[1] |
|---|---|
| Base Rent ($19.69/SF) | 112,154 |
| Net Operating Income (NOI) | $112,154 |
| Total Return | 7.5% $112,154 |

| Expenses | Current[1] |
|---|---|
| Not Available | |

[1] Rent Roll attached annualized  [2] Based on Economic Vacancy

### Activity Description

The subject property is located on Fairport Road in East Rochester, New York. This Jiffy Lube was constructed in 1991 and renovated in 2004. The building is 5,695 square feet and it sits on an approximate .84 acre parcel of land. This investment is subject to an absolute triple net lease, with 23+ years remaining in a 25 year primary term that commenced on February 4, 2004. The rent increases approximately 1.6% annually in the primary term and through the 10-year option period.

Finally, the tenant, Eureka Petroleum, Inc. has an oil agreement with Shell. It is a 10 year agreement which Shell only signs with Eureka. Shell Oil has a right to cure any lease default under the oil agreement.

Eureka Petroleum, Inc. currently operates approximately 45 locations.

Activity Detail

## Location Highlights
- Prime New York State Retail Locale
- Commercial Artery in Rochester Area
- Excellent Regional Demographics
- Strong Upstate Demographics
- Heavily Developed Area with Little Room for Growth

## Financing Summary
All Cash, N/A, N/A

## Property Images
- Image Number 1  Display Photo
- Image Number 2  Property Map
- Image Number 3  Aerial Photo
- Image Number 4  ES Corner Photo
- Image Number 5  Regional Map

---

Documents:
🗎 Executive Summary
Ⓜ Offering Memorandum
$ Financial Summary

Other:
Email Internet Executive Summary Link

---

🖨 Printer Friendly Version Of This Page

This information has been secured from sources we believe to be reliable, but we make no representations or warranties, expressed or implied, as to the accuracy of the information. References to square footage or age are approximate. Buyer must verify the information and bears all risk for any inaccuracies. © Marcus & Millichap, 2004 (ActivityID) M0330394 (PropertyID) 14139923

EXHIBIT "P"

November 14, 2005

**Via E-mail sdragos@marcusmillichap.com**
Scott Dragos
Marcus & Millichap
9255 Towne Center Drive
San Diego, CA 921221

### Re: Jiffy Lube, East Rochester, NY/Due Diligence Receipt of Documents

Dear Scott:

Kindly have the Buyers in the above matter, Rosemarie Ozbakir & Ali Demir,
sign in the appropriate space below and fax back to my attention at
646.722.8371, thereby acknowledging the Buyer's receipt of the due diligence
items previously provided:

*FAX*

1) Existing Survey;
2) Existing Phase I dated February 4, 2004;
3) Existing Title Documents;
4) Lease; and
5) Tenant financials.

Sincerely,

/s/

*Hard Copy Lease*
*with signatures.*

Andrew R. Dorf
Net Leased Properties Group

_____
Buyer          Date

EXHIBIT "Q"

*Attention! SCOTT*

## PURCHASE AGREEMENT

THIS DOCUMENT IS MORE THAN A RECEIPT FOR MONEY. IT IS INTENDED TO BE A
LEGALLY BINDING AGREEMENT. READ IT CAREFULLY.

Stewart Title Company, Attn: Cheryl Snell 704.401.2012 ("Title Company" or "Escrow
Holder"), will receive from Ozbakir & Ali Demir (collectively, "Buyer") the sum of Twenty Five
Thousand Dollars ($25,000) within three (3) three calendar days after the Effective Date, as
defined below, of this Purchase Agreement (the "Agreement") in the form of a check or wire
transfer. This sum is a deposit ("Initial Deposit") to be applied to the purchase price of that
certain real property (referred to as the "Property") located in the City of East Rochester, County
of Monroe, State of New York, and more particularly described as follows:

Jiffy Lube
781 Fairport Road
East Rochester, New York 14445
An approximate 5,695 rentable sq. ft. building and associated approximate .84 acre parcel
of land
Legal Description to follow in Escrow

## TERMS AND CONDITIONS

Dr. Daniel J. Scotti ("Seller") agrees to sell the Property, and Buyer agrees to purchase the
Property, based on the following terms and conditions:

1) **PURCHASE PRICE**: The purchase price for the Property is One Million Four Hundred
Eighty Thousand Dollars ($1,480,000) all cash to Seller. Buyer's Initial Deposit shall be
delivered by Buyer to Escrow Holder upon Seller's execution of the Agreement. The balance
of the purchase price shall be payable at close of escrow pursuant to the terms stated below.
Upon the expiration of the Inspection Period, as defined below, Purchaser shall deposit an
additional sum of Twenty Five Thousand Dollars ($25,000) (together with the Initial Deposit
and all interest accrued thereon, the "Earnest Money Deposit"). The Earnest Money Deposit
shall be placed in an interest-bearing account by the Escrow Holder and shall be held and
applied against the Purchase Price at Closing or disbursed as provided herein.

2) **DOWN PAYMENT**: At Close of Escrow, Buyer shall make a cash down payment of
One Million Four Hundred Eighty Thousand Dollars ($1,480,000) or (100%) of the Purchase
Price, which shall include the Initial Deposit and Deposit Increase referenced herein. The
Buyer's Earnest Money Deposit shall be non-refundable upon expiration of the Inspection
Period.

3) ESCROW: Within three (3) calendar days after the Effective Date, as defined below,
Buyer/Seller shall open escrow with the Escrow Holder by the simultaneous deposit of a copy of
this Agreement and Buyer's Initial Deposit with the Escrow Holder. Seller and Buyer agree to
prepare and execute such escrow instructions as may be necessary and appropriate to close the
transaction. Should said instructions fail to be executed as required, Escrow Holder shall and is
hereby directed to close escrow pursuant to the terms and conditions of this Agreement. Close of
escrow (or the "Closing Date", which shall mean the date on which the deed transferring title is

-Page 1 of 10

Buyer's Initials: *B. O.* Seller's Initials: *DJS*

recorded) shall occur within thirty (30) days after the expiration of the Inspection Contingencies (defined below), Escrow fee shall be paid by ½ Buyer & ½ Seller. Seller shall pay the transfer tax. Buyer pays for owner/loan policy for title and mortgage tax. All other closing costs shall be paid in accordance with the custom in the county in which the Property is located, unless otherwise specified.

4)    PRORATIONS: Rents, real property taxes, and any other expenses of the Property shall be prorated as of the Closing Date. Security deposits, advance rentals, and the amount of any future lease credits shall be credited to Buyer. The amount of any bond or assessment which is a lien and not customarily paid with real property taxes shall be paid by Seller.

5)    TITLE: Within three (3) calendar days after the Effective Date of this Agreement, Seller shall procure and cause to be delivered to Buyer a preliminary title report issued by Title Company on the Property and paid for by Buyer. Seller shall convey by special warranty deed to Buyer (or to such other person or entity as Buyer may specify) marketable fee title subject only to the exceptions approved by Buyer in accordance with this Agreement. Title shall be insured by a standard owner's policy of title insurance issued by the Title Company in the amount of the purchase price with premium paid by Seller.

6)    FINANCING CONTINGENCIES: Buyer is to procure a financing commitment within thirty (30) days after the Effective Date of this Agreement.

7)    INSPECTION CONTINGENCIES:

7.1)   BOOKS AND RECORDS: Seller agrees to provide Buyer with items listed below within three (3) calendar days following the Effective Date:

A complete copy of the lease and addendums, , Seller's Owners Policy of Title Insurance and the legal description of the Property, existing surveys, existing Phase I Environmental report, any other existing surveys, plans or reports in Seller's possession and tenants financials.

Buyer shall have fourteen (14) days from the Effective Date of this Agreement to review and approve these items. Silence will be deemed as approval of the aforementioned items.

7.2)   PHYSICAL INSPECTION: Buyer shall have fourteen (14) days from the Effective Date of this Agreement to inspect the physical condition of the Property, including, but not limited to the soil conditions and the presence or absence of lead-based paint and other hazardous materials on or about the Property. Silence will be deemed as approval of the Property inspection.

7.3)   STATE AND LOCAL LAWS: Buyer shall have fourteen (14) days from the Effective Date of this Agreement to investigate State and local laws to determine whether the Property must be brought into compliance with minimum energy conservation or safety standards or similar retrofit requirements as a condition of sale or transfer and the cost thereof, and to notify Seller that Buyer approves same. If approved by Buyer, Buyer shall comply with and pay for these requirements. Silence will be deemed as approval of these requirements.

A-D                              -Page 2 of 10

Buyer's Initials: R.O. , Seller's Initials: DM

8)    DEPOSIT INCREASE: Upon removal of the inspection contingencies set forth in paragraph(s) 5, 7.1-7.3 hereof, Buyer shall deposit in Escrow sufficient funds to increase the Deposit to Fifty Thousand Dollar ($50,000) ("Deposit Increase"). The entire $50,000 Deposit shall, subject to the provisions of paragraph 2 above, be non-refundable and credited towards the purchase price at the close of escrow unless otherwise provided herein.

9)    ESTOPPEL CERTIFICATE CONTINGENCY: Seller shall use Seller's best efforts to obtain and deliver to Buyer, within ten (10) calendar days after the last contingency set forth in paragraph(s) 5 and 7.1-7.3 are removed, estoppel letters or certificates from each lessee or tenant at the Property stating: a) the date of commencement and the scheduled date of termination of the lease, b) the amount of advanced rentals or rent deposits paid to Seller, c) the amount of monthly (or other periodic) rent paid to Seller, d) that the lease is in full force and effect and that there have been no modifications or amendments thereto, or, if there have been any modifications or amendments, an explanation of same, e) square footage (if set forth in the lease), and f) that there is no default under the terms of the lease by lessor or lessee. Buyer shall have three (3) calendar days after receipt to disapprove in writing, the estoppel certificates. Buyer may only disapprove said certificates, and cancel the Agreement, if the certificates reflect a discrepancy materially affecting the economics of the transaction, or a previously undisclosed material breach of one of the leases. Upon such disapproval, Buyer's entire Deposit shall be returned, and the parties shall have no further obligations hereunder. Silence will be deemed as approval of the estoppel certificates.

10)    LEASED PROPERTY PRORATIONS: Rents actually collected (prior to closing) will be prorated as of the Closing Date and rent collected thereafter applied first to rental payments then owed the Buyer and their remainder paid to the Seller. All free rent due any tenant at the close of escrow for rental periods after the closing shall be a credit against the Purchase Price. Any other income and expenses or fees, etc shall be prorated as the Close of Escrow.

11)    PERSONAL PROPERTY: Title to any personal property to be conveyed to Buyer in connection with the sale of the Property shall be conveyed to Buyer by Bill of Sale on the Closing Date free and clear of all encumbrances (except those approved by Buyer as provided above). The price of these items shall be included in the Purchase Price for the Property, and Buyer agrees to accept all such personal property in "as is" condition.

12)    CONDITION OF PROPERTY: It is understood and agreed that the Property is being sold "as is"; that Buyer has, or will have prior to the Closing Date, inspected the Property; and that neither Seller nor Agent makes any representation or warranty as to the physical condition or value of the Property or its suitability for Buyer's intended use.

Buyer's Initials R.O.      Seller's Initials

13)    RISK OF LOSS: Risk of loss to the Property shall be borne by Seller until title has been conveyed to Buyer. In the event that the improvements on the Property are destroyed or materially damaged between the Effective Date of this Agreement and the date title is conveyed to Buyer, Buyer shall have the option of demanding and receiving back the entire Deposit and being released from all obligations hereunder, or alternatively, taking such improvements as Seller can deliver. Upon Buyer's physical inspection and approval of the Property, Seller shall

-Page 3 of 10

Buyer's Initials: R.O ,  Seller's Initials:

maintain the Property through close of escrow in the same condition and repair as approved, reasonable wear and tear excepted.

14)  REPRESENTATIONS AND WARRANTIES OF BUYER AND SELLER:  Buyer and Seller represent and warrant to each other (which warranties shall survive the closing hereunder) the following, to wit:

That Buyer  and Seller have and at the time of closing will have full power and legal right and authority to enter into and perform their obligations under this Contract and the consummation of the sale and purchase transaction contemplated herein will not result in the breach or constitute a default under any agreement or instrument to which Buyer  or Seller is bound in such manner as to affect Seller's ability to sell and convey or Buyer 's ability to purchase the Subject Property as contemplated herein.  Buyer and Seller agree that at the time of closing they shall furnish to each other appropriate resolutions authorizing Buyer's purchase and Seller's sale of the Subject Property pursuant to this Contract;

That there has not been filed by or against Buyer or Seller any petition in bankruptcy or other insolvency proceedings or for reorganization of Buyer  or Seller or for the appointment of a receiver or trustee for Buyer 's or Seller's property, nor has Buyer  or Seller made any assignment for the benefit of its creditors or filed a petition for an arrangement or entered into an arrangement with creditors, or otherwise admitted in writing their inability to pay their debts as they become due;

That there is no litigation or proceeding pending or threatened against either party hereto that may affect its ability to perform under this Contract, and neither party has any reasonable grounds to know the basis for any such action;

Seller has no knowledge of and has not received notice of any pending or threatened proceeding in eminent domain by any federal, state, or local governmental entity by which the Subject Property or any portion thereof or interest therein is sought to be obtained;

Seller has no knowledge of public improvements, including without limitation, water, sewer, sidewalk, street, alley or curbing, affecting the Subject Property which have been commenced and completed and for which an assessment may be levied after the date on which Seller signs this Contract, and Seller has no knowledge of any planned improvements to be made which may result in an assessment against the Subject Property;

To the best of Seller's knowledge, Seller has received no notice, work order, citation, or complaint from any governmental authority, insurance company or otherwise relating to the violation of any applicable laws or regulation with regard to the condition of or operations upon the Subject Property;

Seller has not received any notice from any tenant or from any governmental or quasi-governmental agency that the Subject Property is in violation of any applicable Environmental Laws.  "Environmental Laws" means any applicable federal, state,

*A-D*                    -Page 4 of 10

Buyer's Initials: B.O.  Seller's Initials: DH

county, or local laws, statutes, rules, regulations, ordinances, orders, decrees and requirements promulgated by governmental or other authorities, including any judicial or administrative interpretations thereof, which may now or at any time hereinafter be in effect relating to the treatment, storage, use, releases, disposal, regulation, or management of Hazardous Substances, including, but not limited, to the Comprehensive Environmental Response, Clean-up and Liability Act, the Resource Conservation and Recovery Act and the Emergency Planning and Community Right to Know Act, together with any amendments thereto, and which may be now or at any time hereinafter in effect. "Hazardous Substances" is defined as any substances defined, listed, or referred to as hazardous substances, hazardous materials, hazardous waste, extremely hazardous substances, toxic substances, toxic chemicals, pollutants, contaminants or any other waste, material, substance, or variation thereof, or determined at any time to be such, pursuant to any applicable federal, state, county, or local laws, statutes, rules, regulations, ordinances, orders, decrees, and requirements promulgated by governmental or other authorities including any judicial or administrative interpretations thereof, which may now or at any time hereinafter be in effect; and Seller has no knowledge of the presence of mold at the subject property.

Seller holds fee simple title to the Subject Property and to the lessor's interest in any leases, and Seller has the full power and authority to convey the Subject Property to Buyer and to assign the lessor's interest in any leases ;

There is no default, nor any event that with the passage of time or the giving of notice would constitute a default, by Seller or, to the best of Seller's knowledge, any other party thereto, relative to any leases , and, as of the Closing tenants shall be paying rent thereunder and shall not have the right to cancel any lease , offset accrued rents, or demand performance of any uncured lessor defaults; .

Seller represents to Buyer that there are no lease brokerage agreements, lease commissions, or other fee agreements with respect to any leases of the Subject Property.

15) POSSESSION: Possession of the Property shall be delivered to Buyer on Closing Date.

16) LIQUIDATED DAMAGES: By placing their initials immediately below, Buyer and Seller agree that it would be impracticable or extremely difficult to fix actual damages in the event of a default by Buyer, that the amount of Buyer's Deposit hereunder (as same may be increased by the terms hereof) is the parties' reasonable estimate of Seller's damages in the event of Buyer's default, and that upon Buyer's default in its purchase obligations under this agreement, not caused by any breach by Seller, Seller shall be released from its obligations to sell the Property and shall retain Buyer's Deposit (as same may be increased by the terms hereof) as liquidated damages, which shall be Seller's sole and exclusive remedy in law or at equity for Buyer's default,

A·D

Buyer's Initials R. O .          Seller's Initials

17) SELLER EXCHANGE: Buyer agrees to cooperate should Seller elect to sell the Property as part of a like-kind exchange under IRC Section 1031. Seller's contemplated exchange shall not impose upon Buyer any additional liability or financial obligation, and Seller

A·D                        =Page 5 of 10

Buyer's Initials: R·O ·  Seller's Initials:

agrees to hold Buyer harmless from any liability that might arise from such exchange. This Agreement is not subject to or contingent upon Seller's ability to acquire a suitable exchange property or effectuate an exchange. In the event any exchange contemplated by Seller should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided herein.

18)   BUYER EXCHANGE: Seller agrees to cooperate should Buyer elect to purchase the Property as part of a like-kind exchange under IRC Section 1031. Buyer's contemplated exchange shall not impose upon Seller any additional liability or financial obligation, and Buyer agrees to hold Seller harmless from any liability that might arise from such exchange. This Agreement is not subject to or contingent upon Buyer's ability to dispose of its exchange property or effectuate an exchange. In the event any exchange contemplated by Buyer should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided herein.

19)   DISCLOSURE OF REAL ESTATE LICENSURE: N/A

20)   AUTHORIZATION: Buyer and Seller authorize Agent to disseminate sales information regarding this transaction, including the purchase price of the Property.

21)   AGENCY DISCLOSURE: EXCLUSIVE LISTING: Marcus & Millichap Real Estate Investment Brokerage Company is the exclusive listing broker of the property that is the subject of this transaction. Marcus & Millichap represents the Seller as the Seller's agent. Marcus & Millichap also has procured the Buyer in this transaction. Marcus & Millichap is not the agent of the Buyer; however, Marcus & Millichap does have the following affirmative legal obligations to the Buyer:

   a)   Diligent exercise of reasonable skill and care in the performance of its duties.

   b)   A duty of honest and fair dealing and good faith.

   c)   A duty to disclose all facts known to it materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Buyer.

22)   OTHER BROKERS: Buyer and Seller agree that, in the event any broker other than Agent or a broker affiliated with Agent is involved in the disposition of the Property, Agent shall have no liability to Buyer or Seller for the acts or omissions of such other broker, who shall not be deemed to be a subagent of Agent.

23)   SCOPE OF AGENT'S AUTHORITY AND RESPONSIBILITY: Agent shall have no authority to bind either Buyer or Seller to any modification or amendment of this Agreement. Agent shall not be responsible for performing any due diligence or other investigation of the Property on behalf of either Buyer or Seller, or for providing either party with professional advice with respect to any legal, tax, engineering, construction or hazardous materials issues. Except for maintaining the confidentiality of any information regarding Buyer or Seller's financial condition and any future negotiations regarding the terms of this Purchase Agreement,

-Page 6 of 10

Buyer's Initials: ___  Seller's Initials: ___

Buyer and Seller agree that their relationship with Agent is at arm's length and is neither confidential nor fiduciary in nature.

24)   BROKER DISCLAIMER: Buyer and Seller acknowledge that, except as otherwise expressly stated herein, Agent has not made any investigation, determination, warranty or representation with respect to any of the following: (a) the financial condition or business prospects of any tenant, or such tenant's intent to continue or renew its tenancy in the Property; (b) the legality of the present or any possible future use of the Property under any federal, state or local law; (c) pending or possible future action by any governmental entity or agency which may affect the Property; (d) the physical condition of the Property, including but not limited to, soil conditions, the structural integrity of the improvements, and the presence or absence of fungi or wood-destroying organisms; (e) the accuracy or completeness of income and expense information and projections, of square footage figures, and of the texts of leases, options, and other agreements affecting the Property; (f) the possibility that lease, options or other documents exist which affect or encumber the Property and which have not been provided or disclosed by Seller; or (g) the presence or location of any hazardous materials on or about the Property, including, but not limited to, asbestos, PCB's, or toxic, hazardous or contaminated substances, and underground storage tanks. Buyer agrees that investigation and analysis of the foregoing matters is Buyer's sole responsibility and that Buyer shall not hold Agent responsible therefore. Buyer further agrees to reaffirm its acknowledgment of this disclaimer at close of escrow and to confirm that it has relied upon no representations of Agent in connection with its acquisition of the Property.

A-D

Buyer's Initials R.O.          Seller's Initials ___

## MOLD / ALLERGEN ADVISORY AND DISCLOSURE

Buyer is advised of the possible presence within properties of toxic (or otherwise illness-causing) molds, fungi, spores, pollens and/or other botanical substances and/or allergens (e.g. dust, pet dander, insect material, etc.). These substances may be either visible or invisible, may adhere to walls and other accessible and inaccessible surfaces, may be embedded in carpets or other fabrics, may become airborne, and may be mistaken for other household substances and conditions. Exposure carries the potential of possible health consequences. Broker strongly recommends that Buyer contact the State Department of Health Services for further information on this topic.

Buyer is advised to consider engaging the services of an environmental or industrial hygienist (or similar, qualified professional) to inspect and test for the presence of harmful mold, fungi, and botanical allergens and substances as part of Buyer's physical condition inspection of the Property, and Buyer is further advised to obtain from such qualified professionals information regarding the level of health-related risk involved and the advisability and feasibility of eradication and abatement.

Buyer is expressly cautioned that Broker has no expertise in this area and is, therefore, incapable of conducting any level of inspection of the Property for the possible presence of mold and botanical allergens.   Buyer acknowledges that Broker has not made any investigation, determination, warranty or representation with respect to the possible presence of mold or other

A-D          -Page 7 of 10

Buyer's Initials: R.O.   Seller's Initials: ___

botanical allergens, and Buyer agrees that the investigation and analysis of the foregoing matters is Buyer's sole responsibility and that Buyer shall not hold Broker responsible therefore.

Buyer's Initials  *A-D*  R. O.        Seller's Initials ____

25)   ARBITRATION OF DISPUTES: If a controversy arises with respect to the subject matter of this Purchase Agreement or the transaction contemplated herein (including but not limited to the parties' rights to the Deposit or the payment of commissions as provided herein), Buyer, Seller and Agent agree that such controversy shall be settled by final, binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Notice: By initialing in the space below you are agreeing to have any dispute arising out of the matters included in the "Arbitration of Disputes" provision decided by neutral arbitration as provided by New York law and you are giving up any rights you might possess to have the dispute litigated in court or jury trial. By initialing in the space below you are giving up your judicial rights to discovery and appeal, unless such rights are specifically included in the "Arbitration of Disputes" provision. If you refuse to submit to arbitration after agreeing to this provision, you may be compelled to arbitrate. Your agreement to this arbitration provision is voluntary.

We have read and understand the foregoing and agree to submit disputes arising out of the matters included in the "Arbitration of Disputes" provision to neutral arbitration.

Buyer's Initials  R. O. A-D      Seller's Initials ____

26)   SUCCESSORS & ASSIGNS: This Agreement and any addenda hereto shall be binding upon and inure to the benefit of the heirs, successors, agents, representatives and assigns of the parties hereto. Buyer shall have the right to assign this Agreement.

27)   ATTORNEYS' FEES: In any litigation, arbitration or other legal proceeding which may arise between any of the parties hereto, including Agent, the prevailing party shall be entitled to recover its costs, including costs of arbitration, and reasonable attorneys' fees in addition to any other relief to which such party may be entitled.

28)   TIME: Time is of the essence of this Agreement.

29)   NOTICES: All notices required or permitted hereunder shall be given to the parties in writing via, mail, email or facsimile (with a copy to Agent) at their respective addresses as set forth below. Should the date upon which any act required to be performed by this Agreement fall on a Saturday, Sunday or holiday, the time for performance shall be extended to the next business day. All parties to this Agreement agree that a facsimile signature and signing in counterpart are legally binding.

30)   FOREIGN INVESTOR DISCLOSURE: Seller and Buyer agree to execute and deliver any instrument, affidavit or statement, and to perform any act reasonably necessary to carry out

*A-D*                           Page 8 of 10
Buyer's Initials: R. O.  Seller's Initials: ____

FROM : ROSEMARIE OZBAKIR          PHONE NO. : 858 4535715          NOV. 05 2005 03:34PM P2
NOV. 5.2005  1 2:25PM    MARCUS & MILLICHAP 8585468254

Attention Scott

the provisions of this foreign Investment in Real Property Tax Act and regulations promulgated thereunder,

31)   ADDENDA: Any addendum attached hereto and either signed or initialed by the parties shall be deemed a part hereof. This Agreement, including addenda, if any, expresses the entire agreement of the parties and supersedes any and all previous agreements between the parties with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge its terms, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. Any future modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

32)   ACCEPTANCE AND EFFECTIVE DATE: Buyer's signature hereon constitutes an offer to Seller to purchase the Property on the terms and conditions set forth herein. Unless acceptance hereof is made by Seller's execution of this Agreement and delivery of a fully executed copy to Buyer, either in person, by mail or facsimile at the address shown below, on or before 5:00 p.m. E.D.T. on November ___, 2005, or this offer shall be null and void, the Deposit shall be returned to Buyer, and neither Seller nor Buyer shall have any further rights or obligations hereunder. Delivery shall be effective upon personal delivery or fax to Buyer or Buyer's agent or, if by mail, on the next business day following the date of postmark. The "Effective Date" of this Agreement shall be the later of (a) the date on which Seller executes this Agreement, or (b) the date of or written acceptance (by either Buyer or Seller) of the final counter-offer submitted by the other party.

33)   GOVERNING LAW: This Agreement shall be governed by and construed in accordance with the laws of the State of New York as though the entire agreement were to be performed within New York among persons who are all residents of New York.

34)   OTHER TERMS AND CONDITIONS:

         34.1) All parties to this Agreement agree that a facsimile signature and signing in counterpart are legally binding.    B.O. 4.D
         34.2) Buyer to have one (1) Thirty (30) day extension
35)   COMMISSIONS: Seller agrees to be responsible for all broker commissions relating the purchase and sale of subject property, as expressly set forth under a separate and binding

THE PARTIES ARE ADVISED TO CONSULT THEIR RESPECTIVE ATTORNEYS WITH REGARD TO THE LEGAL EFFECT AND VALIDITY OF THIS PURCHASE AGREEMENT.

The undersigned Buyer hereby offers and agrees to purchase the above-described Property for the price and upon the terms and conditions herein stated.

This offer is made by Buyer to Seller on this ___ day of November 2005. The undersigned Buyer hereby acknowledges receipt of an executed copy of this Agreement, including the Agency Disclosure contained above.

A-D                                    -Page 9 of 10

Buyer's Initials: B.O.   Seller's Initials: DH

FROM : ROSEMARIE OZBAKIR

PHONE NO. : 858 4535715

NOV. 05 2005 03:33PM P1

MARCUS & MILLICHAP 8585468254

*Attention: Scott*

BUYER: OZABAKIR & ALI DEMIR

BY: _____  ADDRESS:

DATE: 11-5-2005  TELEPHONE:
FAX:

EMAIL:

## SELLER'S ACCEPTANCE AND AGREEMENT TO PAY COMMISSION

The undersigned Seller accepts the foregoing offer and agrees to sell the Property to Buyer for the price and on the terms and conditions stated herein. Seller acknowledges receipt of an executed copy of this Agreement and authorizes Agent to deliver an executed copy to Buyer.

Seller reaffirms its agreement to pay to Agent a real estate brokerage commission pursuant to the terms of that certain Representation Agreement between Agent and Seller, which shall remain in full force and effect. Said commission is payable in full on the Closing Date and shall be paid in cash through escrow. Escrow Holder is directed to make such payment to Agent from Seller's proceeds of sale. The provisions of this paragraph may not be amended or modified without the written consent of Agent.

SELLER: DR. DANIEL J. SCOTTI

BY: Daniel J. Scott  ADDRESS: 459 MEADOWVIEW DR
VACAVILLE, CA 95688
DATE: 11-2-05  TELEPHONE:
FAX: (707) 455-0302
EMAIL:
danscott@prodigy.NET

NO REPRESENTATION IS MADE BY AGENT AS TO THE LEGAL OR TAX EFFECT OR VALIDITY OF ANY PROVISION OF THIS PURCHASE AGREEMENT. A REAL ESTATE BROKER IS QUALIFIED TO GIVE ADVICE ON REAL ESTATE MATTERS. IF YOU DESIRE LEGAL, FINANCIAL OR TAX ADVICE, CONSULT YOUR ATTORNEY, ACCOUNTANT OR TAX ADVISOR.

*A-D*  •Page 10 of 10

Buyer's Initials: R.O.  Seller's Initials: D

EXHIBIT "R"



OZBAKIR
Appraisal
Bill

 **P G P** ✦ **V A L U A T I O N   I N C**
REAL ESTATE APPRAISERS & CONSULTANTS
SUITE A ✦ 550 LAGUNA DRIVE ✦ CARLSBAD CALIFORNIA 92008
877 720 2525 ✦ PHONE ✦ www.pgpinc.com ✦ FAX ✦ 760 730 3372

FOR SERVICES RENDERED — PLEASE REFER TO JOB NUMBER WHEN REMITTING — THANK YOU

# INVOICE

Herb Gonzalez

California Credit Union
701 N Brand Boulevard
Glendale, California 91203

Job No. D050886
December 6, 2005
Federal Tax ID #93-1114929

### COMPLETE APPRAISAL SUMMARY REPORT
Jiffy Lube
781 Fairport Road
East Rochester, New York 14445

Professional Fee
Less Payment Received
Total Due

$3,500.00
(53,500.00)
$0.00

Payment in full within 30 days of service fee of 1.5% per month will be charged on all accounts in arrears over 30 days due.

EXHIBIT "S"

# TENANT ESTOPPEL CERTIFICATE

December 2 , 2005

California Credit Union
701 North Brand Boulevard
7th Floor
Glendale, California 91203
Attn: John Bretthauer

Re: 781 Fairport Road, East Rochester, NY (the "Leased Premises")

Ladies and Gentlemen:

To provide information to California Credit Union, a California state chartered credit union ("Lender"), regarding the Leased Premises described above, in which the undersigned is the tenant ("Tenant") under the lease agreement described below (the "Lease"), Tenant certifies to Lender as follows:

1. Basic Lease Terms:

   (a) Date of Lease:  March 4, 2004

   (b) Name of Landlord on Lease:  SOVEREIGN JF, LLC, a California limited liability company

   (c) Is Landlord on Lease the current Landlord? ☐ Yes; ☒ No.
       If No, provide name of current landlord: Daniel J. Scotti

   (d) Name of Tenant on Lease: EUREKA PETROLEUM INC., a New York corporation

   (e) Is above-named Tenant on Lease the current Tenant? ☒ Yes; ☐ No.
       If No, provide name of current tenant executing this Tenant Estoppel Certificate:

       _____

   (f) Date(s) of any Amendments, Renewals, Modifications or Extensions (if none, so indicate): _____

   (g) Original Length of Term of Lease: 25 years

   (h) Date of Commencement: March 5, 2004

688006

Tenant Estoppel Certificate
Page 2

(i) Date of Expiration: February 28, 2029

(j) Remaining Renewal Options: one (1) ten (10) year period

(k) Annual Base Rent: $9,346.19 /month

(l) Base Rental Escalations: two (2) percent annually

(m) Percentage Rent: _____

(n) Operating Expense Reimbursement: _____-0-_____

(o) Tax Reimbursement: _____-0-_____

(p) Security Deposit: $_____-0-_____

2. The Lease is the legal, valid and binding obligation of Tenant enforceable against Tenant according to its terms and has not been modified either orally or in writing, except as may be specified in paragraph 1(b) above, and the Lease is in full force and effect. The Lease constitutes the entire agreement between Tenant and Landlord.

3. Tenant is a tenant in possession of the Leased Premises under the terms of the Lease. The Lease does not contain, and Tenant has no contract to acquire, purchase option or right of first refusal with respect to the Leased Premises or any part thereof.

4. All rent, charges and other payments due Landlord, under the Lease have been paid as of the date of this certificate; and Tenant has not paid, and will not pay, any such rent, charges or payments more than one month in advance.

5. To the best of Tenant's knowledge, neither Tenant nor Landlord is in default under the Lease nor has any event occurred which would become a default under the Lease.

6. To the best of Tenant's knowledge, Tenant is entitled to no claims, counterclaims, defenses or setoffs against Landlord, arising from the Lease, nor is Tenant entitled to any concession, rebate, allowance or free rent for any period after the date of this certification.

7. Tenant agrees that, in the event of any claimed material breach or default by Landlord under the Lease which, if uncured, could result in termination of the Lease, Tenant shall notify Lender of such claimed breach or default, by certified mail, return receipt requested, at the address set forth on the first page of this Tenant Estoppel Certificate. Tenant agrees that it will not exercise any remedy which would entitle Tenant to terminate the Lease until Lender has been given a reasonable time after such notice to cure such breach or default (but Lender shall not be obligated to cure such breach or default).

688006

Tenant Estoppel Certificate
Page 3

8.  Tenant has no notice of any assignment of pledge of rents of the Lease other than Landlord's assignment of rents to Lender, which assignment Tenant hereby acknowledges.

9.  Tenant acknowledges that Landlord's interest under the Lease is being assigned to Lender as security for Lender's loan to the Landlord and that all rent payments under the Lease shall continue to be paid to Landlord in accordance with the terms of the Lease until the Tenant is notified otherwise in writing by Lender or its successors and assigns.

10.  Tenant agrees that if Lender shall succeed to the interest of Landlord under the Lease, Lender, its successors and assigns, shall not be liable for any prior act or omission of Landlord which is not continuing; or subject to any offsets or defenses which Tenant might have as to Landlord which arose out of any Landlord's default under the Lease and accrued after Tenant has notified Lender and given Lender an opportunity to cure such default pursuant to paragraph 7 above; or obligated to credit Tenant with any rent for any rental period beyond the then current month which Tenant might have paid Landlord; or bound by any material amendments or modifications of the Lease such as those affecting rent, term or permitted use made without Lender's prior written consent, other than exercise of rights, options or elections contained in the Lease; or liable for refund of all or any part of any security deposit to Tenant held by Landlord for any purpose unless such security deposit shall have been actually received by Lender. In such event, Lender's obligation shall be limited to the amount of the security deposit received by Lender and Lender shall be entitled to all rights, privileges and benefits of Landlord set forth in the Lease with respect thereto.

11.  The agreements contained herein shall be binding upon and inure to the benefit of the respective heirs, administrators, executors, legal representatives, successors and assigns of Lender and Tenant.

TENANT:

EUREKA PETROLEUM INC.,

A New York corporation

By: _____

Name: Jeffrey E. Langan

Title: Sr. Vice President & General Counsel

688006

EXHIBIT "T"

APR. 11. 2006 10:45AM    MONROE TITLE CORPORATE            NO. 7975   P. 7

MONROE COUNTY CLERK'S OFFICE    ▬▬▬▬▬▬▬

Return To:

    CALIFORNIA CREDIT
    701 NORTH BRAND BOULEVARD
    GLENDALE CA 91209

Index  MORTGAGES

Book   20326   Page   0269

No. Pages   0024

Instrument  MORTGAGE-OTH

Date :   3/06/2006

Time :   12:40:00

Control #   200603060431

MTG#         M# CW   039760

OZBAKIR
ROSEMARIE
DEMIR
ALI
CALIFORNIA CREDIT UNION

Employee ID   BZ40

## MORTGAGE TAX

| | | |
|---|---|---|
| FILE FEE-S | $ | 19.00 |
| FILE FEE-C | $ | 8.00 |
| REC FEE | $ | 72.00 |
| MISC FEE-C | $ | .00 |
| B MTG TAX | $ | 3,500.00 |
| SA MTG TAX | $ | 1,750.00 |
| S MTG TAX | $ | 1,750.00 |
| | $ | .00 |
| | $ | .00 |
| Total: | $ | 7,099.00 |

| | | |
|---|---|---|
| MORTGAGE AMOUNT | $ | 700,000.00 |
| BASIC MORTGAGE TAX | $ | 3,500.00 |
| SPEC ADDIT MTG TAX | $ | 1,750.00 |
| ADDITIONAL MTG TAX | $ | 1,750.00 |
| Total | $ | 7,000.00 |

STATE OF NEW YORK
MONROE COUNTY CLERK'S OFFICE

### TRANSFER AMT

WARNING - THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

| | | |
|---|---|---|
| TRANSFER AMT $ | | .00 |
| TRANSFER TAX $ | | .00 |

Cheryl Dinolfo
Monroe County Clerk



M20326D269

*PREPARED BY, AND AFTER RECORDING*
*RETURN TO*

CALIFORNIA CREDIT UNION
701 North Brand Blvd
Glendale, CA 91209
Attn Commercal Loan Department

Tax Parcel Number(s)   152 45-2-1

LOCATION OF PREMISES

| | |
|---|---|
| Street Address | 761 Fairport Road |
| County of | Monroe |
| State of | New York |
| Section | 152 450 |
| Block | 02 |
| Lot | 001 |

## MORTGAGE, ASSIGNMENT OF RENTS
## AND SECURITY AGREEMENT

### (NEW YORK)

THIS MORTGAGE, ASSIGNMENT OF RENTS, AND SECURITY AGREEMENT (the "Instrument") is made to be effective January 20, 2006, between ROSEMARIE OZBAKIR and ALI DEMIR, whose addresses are 6917 D Via Mallorca, La Jolla, CA 92037, as mortgagor (jointly and severally referred to herein in the singular as "Borrower") and CALIFORNIA CREDIT UNION, a California state chartered credit union, whose address is 701 North Brand Blvd., Glendale, CA 91209, Attn Commercial Loan Department, as mortgagee ("Lender")

Borrower is indebted to Lender in the principal amount of SEVEN HUNDRED THOUSAND AND 00/100 DOLLARS (US.$700,000 00), as evidenced by Borrower's Promissory Note payable to Lender, dated as of the date of this Instrument, and maturing on February 1, 2016 (the "Maturity Date")

TO SECURE TO LENDER the repayment of the Indebtedness, and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in the Loan Documents. Borrower mortgages, warrants, grants, conveys and assigns to Lender, the Mortgaged Property, including the Land located in Monroe County, State of New York and described in Exhibit A attached to this Instrument

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered except as shown on the schedule of exceptions to coverage in the title policy issued to and accepted by Lender contemporaneously with the execution and recordation of this Instrument and insuring Lender's interest in the Mortgaged Property (the "Schedule of Title Exceptions") Borrower covenants that Borrower will warrant and defend generally the title to the Mortgaged Property against all claims and demands, subject to any easements and restrictions listed in the Schedule of Title Exceptions

Covenants   In consideration of the mutual promises set forth in this Instrument, Borrower and Lender covenant and agree as follows

1   DEFINITIONS  The following terms, when used in this Instrument (including when used in the above recitals), shall have the following meanings

(a)   "Assignment" means, collectively, the provisions of Sections 3 and 4 of this Instrument relating to the assignment of rents and leases affecting the Mortgaged Property

(b)   "Attorneys' Fees and Costs" means (i) fees and out-of-pocket costs of Lender's and Loan Servicer's attorneys, as applicable, including costs of Lender's and Loan Servicer's in-house counsel, support staff costs, costs of preparing for litigation, computerized research, telephone and facsimile transmission expenses, mileage, deposition costs, postage,

Prepared by RoboDocs™
New York Secunty Instrument
Loan No   6110114

duplicating, process service, videotaping and similar costs and expenses, (ii) costs and fees of expert witnesses, including appraisers, and (iii) investigatory fees

(c)       "Borrower" means all persons or entities identified as "Borrower" in the first paragraph of this Instrument, together with their successors and assigns

(d)       "Borrower Certificate" means that certain Borrower Certificate dated the same date as this Instrument, executed by Borrower in favor of Lender

(e)       "Collateral Agreement" means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing a fund to assure the completion of repairs or improvements specified in that agreement, or assuring reduction of the outstanding principal balance of the Indebtedness if the occupancy of or income from the Mortgaged Property does not increase to a level specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account

(f)       "Controlling Entity" means an entity which owns, directly or indirectly through one or more intermediaries, (A) a general partnership interest or a Controlling Interest of the limited partnership interests in Borrower (if Borrower is a partnership or joint venture), (B) a manager's interest in Borrower or a Controlling Interest of the ownership or membership interests in Borrower (if Borrower is a limited liability company), or (C) a Controlling Interest of any class of voting stock of Borrower (if Borrower is a corporation)

(g)       "Controlling Interest" means (i) 51 percent or more of the ownership interests in an entity, or (ii) a percentage ownership interest in an entity of less than 51 percent, if the owner(s) of that interest actually direct(s) the business and affairs of the entity without the requirement of consent of any other party

(h)       [Intentionally Omitted]

(i)       "Environmental Permit" means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property

(j)       "Event of Default" means the occurrence of any event listed in Section 22

(k)       "Fixtures" means all property owned by Borrower which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including machinery, equipment, engines, boilers, incinerators, installed building materials, systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light, antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals, telephone systems and equipment, elevators and related machinery and equipment, fire detection, prevention and extinguishing systems and apparatus, security and access control systems and apparatus, plumbing systems, water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances, light fixtures, awnings, storm windows and storm doors, pictures, screens, blinds, shades, curtains and curtain rods, mirrors, cabinets, paneling, rugs and floor and wall coverings, fences, trees and plants, swimming pools, and exercise equipment

(l)       "Governmental Authority" means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property

(m)       "Hazard Insurance" is defined in Section 19

(n)       "Hazardous Materials" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil, explosives, flammable materials, radioactive materials, polychlorinated biphenyls ("PCBs") and compounds containing them, lead and lead-based paint, asbestos or asbestos-containing materials in any form that is or could become friable, underground or above-ground storage tanks, whether empty or containing any substance, any substance the presence of which on the Mortgaged Property is prohibited by any federal, state or local authority, any substance that requires special handling, and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law

(o)       "Hazardous Materials Laws" means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to Hazardous Materials or the protection of human health or the environment and apply to Borrower or to the Mortgaged Property Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U S C  Section 9601, et seq , the Resource Conservation and Recovery Act, 42 U S C  Section 6901, et seq , the Toxic Substance Control Act, 15 U S C  Section 2601, et seq , the Clean Water Act, 33 U S C  Section 1251, et seq , the Emergency Planning and Community Right-to-Know Act of 1986, as amended, the Solid Waste Disposal Act, as amended, the Clean Air Act, as amended, the Safe Drinking Water Act, as amended, the Occupational Safety and Health Act, as amended, and the Hazardous Materials Transportation Act, 49 U S C  Section 5101, and their state analogs

(p)    "Impositions" and "Imposition Deposits" are defined in Section 7(a)

(q)    "Improvements" means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions

(r)    "Indebtedness" means the principal of, interest at the fixed or variable rate set forth in the Note on, and all other amounts due at any time under, the Note, this Instrument or any other Loan Document, including prepayment premiums, late charges, default interest. and advances as provided in Section 12 to protect the security of this Instrument

(s)    "Initial Owners" means, with respect to Borrower or any other entity, the person(s) or entity(ies) that (i) on the date of the Note, or (ii) on the date of a Transfer to which Lender has consented. own in the aggregate 100% of the ownership interests in Borrower or that entity

(t)    "Land" means the land described in Exhibit A

(u)    "Leases" means all present and future leases, subleases. licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property. and all modifications, extensions or renewals

(v)    "Lender" means the entity identified as "Lender" in the first paragraph of this Instrument, or any subsequent holder of the Note

(w)    "Loan Documents" means the Note, this Instrument, the Assignment, the Borrower Certificate, all guaranties, all indemnity agreements, all Collateral Agreements, O&M Programs, and any other documents now or in the future executed by Borrower, any guarantor or any other person in connection with the loan evidenced by the Note, as such documents may be amended from time to time

(x)    "Loan Servicer" means the entity that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, this Instrument and any other Loan Document, and otherwise to service the loan evidenced by the Note for the benefit of Lender  Unless Borrower receives notice to the contrary, the Loan Servicer is the entity identified as "Lender" in the first paragraph of this Instrument

(y)    "Mortgaged Property" means all of Borrower's present and future right, title and interest in and to all of the following (1) the Land, (2) the Improvements, (3) the Fixtures, (4) the Personalty, (5) all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads. sewer rights, waters. watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and  all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated, (6) all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirement, (7)  all awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof, (8) all contracts, options and other agreements for the sale of the Land. the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations, (9) all proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims. and the right to collect such proceeds, (10) all Rents and Leases, (11) all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the loan secured by this Instrument and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents, (12) all Imposition Deposits, (13) all refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Instrument is dated), (14) all tenant security deposits which have not been forfeited by any tenant under any Lease and any bond or other security in lieu of such deposits, and  (15) all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property

(z)    "Note" means the Promissory Note described on page 1 of this Instrument, including all schedules, riders. allonges and addenda, as such Promissory Note may be amended from time to time

(aa)    "O&M Program" shall have the meaning as defined in Section 18 of this Instrument

(bb)    "Personalty" means all (i)  accounts (including deposit accounts), (ii) equipment and inventory owned by Borrower, which are used now or in the future in connection with the ownership, management or operation of the Land or Improvements or are located on the Land or Improvements, including furniture, furnishings, machinery, building materials, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software), (iii) other tangible personal property including ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances (other than Fixtures), (iv) any operating agreements relating to the Land or the Improvements, (v) any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land

or the Improvements, (vi) all other intangible property, general intangibles and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land and including subsidy or similar payments received from any sources, including a governmental authority, and (vii) any rights of Borrower in or under letters of credit

(cc)    "Property Jurisdiction" is defined in Section 30(a)

(dd)    "Rents" means all rents, revenues and other income of the Land or the Improvements, including parking fees and vending machine income and fees and charges for other services provided at the Mortgaged Property, whether now due, past due, or to become due, and deposits forfeited by tenants

(ee)    "Taxes" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements

(ff)    "Transfer" is defined in Section 21

2    UNIFORM COMMERCIAL CODE SECURITY AGREEMENT

(a)    This Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subjected to a security interest under the Uniform Commercial Code, whether such Mortgaged Property is owned now or acquired in the future, and all products and cash and non-cash proceeds thereof (collectively, "UCC Collateral"), and Borrower hereby grants to Lender a security interest in the UCC Collateral   Borrower hereby authorizes Lender to prepare and file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest and Borrower agrees, if Lender so requests, to execute and deliver to Lender such financing statements, continuation statements and amendments   Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements and/or amendments that Lender may require   Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the UCC Collateral   Unless Borrower gives Notice to Lender within 30 days after the occurrence of any of the following, and executes and delivers to Lender modifications or supplements of this Instrument (and any financing statement which may be filed in connection with this Instrument) as Lender may require, Borrower shall not (i) change its name, identity, structure or jurisdiction of organization, (ii) change the location of its place of business (or chief executive office if more than one place of business), or (iii) add to or change any location at which any of the Mortgaged Property is stored, held or located   If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code   In addition to all remedies provided by this Instrument or existing under applicable law   In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies   This Instrument constitutes a financing statement with respect to any part of the Mortgaged Property that is or may become a Fixture, if permitted by applicable law

3    ASSIGNMENT OF RENTS, APPOINTMENT OF RECEIVER, LENDER IN POSSESSION

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents   It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower   Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require   Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only   For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the "Mortgaged Property" as that term is defined in Section 1   However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of the Borrower that in this circumstance this Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Instrument

(b)    After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender   However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures   So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Instrument   From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license

to collect Rents shall automatically terminate and Lender shall without notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid  Borrower shall pay to Lender upon demand all Rents to which Lender is entitled  At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender, no tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a notice  Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit  Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents

(c)  Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents (other than an assignment of Rents securing indebtedness that will be paid off and discharged with the proceeds of the loan evidenced by the Note), that Borrower has not performed, and Borrower covenants and agrees that it will not perform, any acts and has not executed, and shall not execute, any instrument which would prevent Lender from exercising its rights under this Section 3, and that at the time of execution of this Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents  Borrower shall not collect or accept payment of any Rents more than one (1) month prior to the due dates of such Rents

(d)  If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of waste, enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable  Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence  If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver ex parte if permitted by applicable law  Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property  Immediately upon appointment of a receiver or immediately upon the Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including computer files and other records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents  In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property  Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under this Section 3 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements

(e)  If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received  Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under this Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law

(f)  If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 12

(g)  Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Instrument

4    ASSIGNMENT OF LEASES, LEASES AFFECTING THE MORTGAGED PROPERTY

(a)  As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease  It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases  Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only  For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the "Mortgaged Property" as

that term is defined in Section 1   However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention of the Borrower that in this circumstance this Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Instrument

(b)   Until Lender gives notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section or any other provision of this Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease   Upon the occurrence of an Event of Default, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate   Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits

(c)   Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and the Improvements   The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under the Instrument or to expend any money or to incur any expenses   Lender shall not be liable in any way for any injury or damage to person or property sustained by any person or persons, firm or corporation in or about the Mortgaged Property   Prior to Lender's actual entry into and taking possession of the Mortgaged Property, Lender shall not (i) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease), (ii) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property, or (iii) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property   The execution of this Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession

(d)   Upon delivery of notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease

(e)   Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each Lease then in effect

(f)   Borrower further covenants with Lender that (i) all Leases shall be written on a standard form of lease that has been or will be approved in writing in advance by Lender, (ii) upon request, Borrower shall furnish Lender with executed copies of all Leases and all amendments thereto, (iii) no material changes may be made to the Lender-approved standard lease without the prior written consent of Lender, (iv) all renewals of Leases and all proposed Leases shall provide for rental rates comparable to existing local market rates and shall be arm's-length transactions, (v) all Leases shall provide that (A) they are subordinate to this Security Instrument and any other indebtedness now or hereafter secured by the Mortgaged Property, (B) Lessees agree to attorn to Lender (such attornment to be effective upon Lender's acquisition of title to the Mortgaged Property), (C) Lessees agree to execute such further evidences of attornment as Lender may from time to time request, (D) the attornment of Lessees shall not be terminated by foreclosure, (E) Lender may, at Lender's option, accept or reject such attornment, and (F) Lessees agree to execute and acknowledge a subordination, attornment and non-disturbance agreement in form and content acceptable to Lender, and, two times in any calendar year, as Lender may request, a certificate signed by Lessee confirming and containing such factual certifications and representations deemed appropriate by Lender, (vi) Borrower shall not grant any purchase options without the prior written approval of Lender, and (vii) all new Leases shall be subject to the prior written approval of Lender

(g)   Borrower shall not receive or accept Rent under any Lease for more than one (1) month in advance

5   **PAYMENT OF INDEBTEDNESS, PERFORMANCE UNDER LOAN DOCUMENTS, PREPAYMENT PREMIUM**   Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and the other Loan Documents and shall perform, observe and comply with all other provisions of the Note and the other Loan Documents   Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note

6   **FULL RECOURSE PERSONAL LIABILITY**   Borrower shall have full recourse personal liability under the Note, this Instrument and all other Loan Documents for the repayment of the Indebtedness and for the performance of any and all other obligations of Borrower under the Note, this Instrument and all other Loan Documents

7      DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES
      (a)      Borrower shall deposit with Lender on the day monthly installments of principal or interest, or both, are due under the Note (or on another day designated in writing by Lender), until the Indebtedness is paid in full, an additional amount sufficient to accumulate with Lender the entire sum required to pay, when due (1) any water and sewer charges which, if not paid, may result in a lien on all or any part of the Mortgaged Property, (2) the premiums for fire and other hazard insurance, rent loss insurance and such other insurance as Lender may require under Section 19, (3) Taxes, and (4) amounts for other charges and expenses which Lender at any time reasonably deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's interests, all as reasonably estimated from time to time by Lender, plus one-sixth of such estimate  The amounts deposited under the preceding sentence are collectively referred to in this instrument as the "Imposition Deposits"  The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this instrument as "Impositions"  The amount of the Imposition Deposits shall be sufficient to enable Lender to pay each Imposition before the last date upon which such payment may be made without any penalty or interest charge being added  Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, insurance premiums and each other obligation of Borrower for which Imposition Deposits are required  Any waiver by Lender of the requirement that Borrower remit Imposition Deposits to Lender may be revoked by Lender, in Lender's discretion, at any time upon notice to Borrower

      (b)      Imposition Deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency  Lender shall not be obligated to open additional accounts or deposit Imposition Deposits in additional institutions when the amount of the Imposition Deposits exceeds the maximum amount of the federal deposit insurance or guaranty  Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing  Unless applicable law requires, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits  Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits as additional security for all of Borrower's obligations under this Instrument and the other Loan Documents  Any amounts deposited with Lender under this Section 7 shall not be trust funds, nor shall they operate to reduce the Indebtedness, unless applied by Lender for that purpose under Section 7(e)

      (c)      If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender  Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender  Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition

      (d)      If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender plus one-sixth of such estimate, the excess shall be credited against future installments of Imposition Deposits  If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by Lender to be necessary plus one-sixth of such estimate, Borrower shall pay to Lender the amount of the deficiency within 15 days after written request by Lender

      (e)      If an Event of Default has occurred and is continuing, Lender may apply any Imposition Deposits, in any amounts and in any order as Lender determines, in Lender's discretion, to pay any Impositions or as a credit against the Indebtedness  Upon payment in full of the Indebtedness, Lender shall refund to Borrower any Imposition Deposits held by Lender

      8      COLLATERAL AGREEMENTS  Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement

      9      APPLICATION OF PAYMENTS  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion  Neither Lender's acceptance of an amount which is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Instrument and the Note shall remain unchanged

      10      COMPLIANCE WITH LAWS  Borrower shall comply with all laws, ordinances, regulations and requirements of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, regulations, requirements and covenants pertaining to health and safety, construction of improvements on the Mortgaged Property, fair housing, zoning and land use, and Leases  Borrower also shall comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits  Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 10  Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially

impair the lien created by this Instrument or Lender's interest in the Mortgaged Property. Borrower represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

11.     USE OF PROPERTY.   Unless required by applicable law, Borrower shall not (a) except for any change in use approved by Lender, allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Instrument was executed, or (b) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property, or (c) establish any condominium or cooperative regime with respect to the Mortgaged Property.

12.     PROTECTION OF LENDER'S SECURITY.

(a)     If Borrower fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out of pocket expenses of attorneys, accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 19, and (4) payment of amounts which Borrower has failed to pay under Sections 15 and 17.

(b)     Any amounts disbursed by Lender under this Section 12, or under any other provision of this Instrument that treats such disbursement as being made under this Section 12, shall be added to, and become part of, the principal component of the Indebtedness, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the "Default Rate", as defined in the Note.

(c)     Nothing in this Section 12 shall require Lender to incur any expense or take any action.

13.     INSPECTION.   Lender, its agents, representatives, and designees may make or cause to be made entries upon and inspections of the Mortgaged Property (including environmental inspections and tests) during normal business hours, or at any other reasonable time.

14.     BOOKS AND RECORDS, FINANCIAL REPORTING.

(a)     Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property. The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)     Borrower shall furnish to Lender all of the following:

(1)     within 120 days after the end of each fiscal year of Borrower, a statement of income and expenses for Borrower's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of that fiscal year;

(2)     within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a rent schedule for the Mortgaged Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender;

(3)     within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(4)     within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Borrower and any Controlling Entity and the interest held by each, if Borrower or a Controlling Entity is a corporation, all officers and directors of Borrower and the Controlling Entity, and if Borrower or a Controlling Entity is a limited liability company, all managers who are not members;

(5)     upon Lender's request, quarterly income and expense statements for the Mortgaged Property;

(6)     upon Lender's request at any time when an Event of Default has occurred and is continuing, monthly income and expense statements for the Mortgaged Property;

      (7)    upon Lender's request, a monthly property management report for the Mortgaged Property, showing the number of inquiries made and rental applications received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender;

      (8)    upon Lender's request, a balance sheet, a statement of income and expenses for Borrower and a statement of changes in financial position of Borrower for Borrower's most recent fiscal year, and

      (9)    within thirty (30) days after filing, copies of all federal and state income tax returns filed by Borrower

    (c)    Each of the statements, schedules, documents, items and reports required by Section 14(b) shall be certified to be complete and accurate by an individual having authority to bind Borrower, and shall be in such form and contain such detail as Lender may reasonably require  Lender also may require that any statements, schedules or reports be audited at Borrower's expense by independent certified public accountants acceptable to Lender

    (d)    In the event Borrower fails to deliver such statements, schedules, documents, items and reports within the time frames provided in Section 14(b) above, then such failure shall constitute an Event of Default and, in addition to any other remedies which may be available to Lender as a result of such Event of Default, Borrower shall pay a late charge equal to five percent (5%) of the monthly payment amount for each late submission of financial reports to compensate Lender or its servicer for the additional administrative expense caused by such failure or delay whether or not Borrower is entitled to any notice and opportunity to cure such failure prior to the exercise of any of the remedies  Failure to provide any reports as required by this Section 14 shall constitute an Event of Default hereunder  Such late charge shall be charged each month that any financial statements remain delinquent  The late charge shall be immediately payable from Borrower upon demand by Lender and, until paid, shall be added to and constitute a part of the Indebtedness as provided in Section 12  The financial statement late charge shall be in addition to any other remedies available to Lender as a result of Borrower's default  In no event shall the financial statement late charge constitute a cure of Borrower's default in failing to provide financial statements, nor limit Lender's remedies as a result of such default  In addition, if Borrower fails to provide in a timely manner the statements, schedules and reports required by Section 14(b), then such failure shall constitute an Event of Default and, in addition to any other remedies which may be available to Lender as a result of such Event of Default, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness as provided in Section 12

    (e)    If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation

    (f)    Borrower authorizes Lender to obtain a credit report on Borrower at any time

    15    TAXES, OPERATING EXPENSES

    (a)    Subject to the provisions of Section 15(c) and Section 15(d), Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment

    (b)    Subject to the provisions of Section 15(d), Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added

    (c)    As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notices that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition  If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable  Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notices as provided above

    (d)    Borrower, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition

    (e)    Borrower shall promptly deliver to Lender a copy of all notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments

    16    LIENS; ENCUMBRANCES  Borrower acknowledges that the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance (a "Lien") on the Mortgaged Property (other than the lien of this Instrument) or on certain ownership interests in Borrower, whether voluntary, involuntary or by operation of

law, and whether or not such Lien has priority over the lien of this Instrument, is a "Transfer" which constitutes an Event of Default under Section 21 of this Instrument;

17.    PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY   Borrower (a) shall not commit waste or permit impairment or deterioration of the Mortgaged Property, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, (e) shall provide for professional management of the Mortgaged Property by a property manager satisfactory to Lender under a contract approved by Lender in writing, and (f) shall give notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument  Borrower shall not (and shall not permit any tenant or other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except in connection with the replacement of tangible Personalty

18    ENVIRONMENTAL HAZARDS

(a)    Except for matters covered by a written program of operations and maintenance approved in writing by Lender (an "O&M Program") or matters described in Section 18(b), Borrower shall not cause or permit any of the following

(1)    the presence, use, generation, release, treatment, processing, storage (including storage in above ground and underground storage tanks), handling, or disposal of any Hazardous Materials on or under the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property,

(2)    the transportation of any Hazardous Materials to, from, or across the Mortgaged Property,

(3)    any occurrence or condition on the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws, or

(4)    any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property

The matters described in clauses (1) through (4) above are referred to collectively in this Section 18 as "Prohibited Activities or Conditions"

(b)    Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) pre-packaged supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable multifamily properties, (2) cleaning materials, personal grooming items and other items sold in pre-packaged containers for consumer use and used by tenants and occupants of residential dwelling units in the Mortgaged Property, and (3) petroleum products used in the operation and maintenance of motor vehicles from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws

(c)    Borrower shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions  Borrower shall not lease or allow the sublease or use of all or any portion of the Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition

(d)    If an O&M Program has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other persons present on the Mortgaged Property to comply with the O&M Program  All costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Lender  Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 12

(e)    Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing

(1)    Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions,

(2)    to the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed,

(3)    except to the extent previously disclosed by Borrower to Lender in writing, the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past  If there is an underground storage tank located on the Property which

has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws,

(4) Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials  Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect,

(5) no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of notice would constitute, noncompliance with the terms of any Environmental Permit,

(6) there are no actions, suits, claims or proceedings pending or, to the best of Borrower's knowledge after reasonable and diligent inquiry, threatened  that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition, and

(7) Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property

The representations and warranties in this Section 18 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the loan evidenced by the Note, until the Indebtedness has been paid in full

(f) Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events

(1) Borrower's discovery of any Prohibited Activity or Condition,

(2) Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, and

(3) any representation or warranty in this Section 18 becomes untrue after the date of this Agreement

Any such notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Instrument, the Note, or any other Loan Document

(g) Borrower shall pay promptly the costs of any environmental inspections, tests or audits ("Environmental Inspections") required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any Transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist  Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 12  The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to Borrower or any other party such results or any other information obtained by Lender in connection with its Environmental Inspections  Lender hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property  Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections  Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale  Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections

(h) If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("Remedial Work") is necessary to comply with any Hazardous Materials Law or order of any Governmental Authority that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property under any Hazardous Materials Law, Borrower shall, by the earlier of (1) the applicable deadline required by Hazardous Materials Law or (2) 30 days after notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law  If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option,

cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so Any reimbursement due from Borrower to Lender shall become part of the Indebtedness as provided in Section 12

(i)  Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition

(j)  Borrower shall indemnify, hold harmless and defend (i) Lender, (ii) any prior owner or holder of the Note, (iii) the Loan Servicer, (iv) any prior Loan Servicer, (v) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (vi) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, the "Indemnitees") from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out of pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following

(1)  any breach of any representation or warranty of Borrower in this Section 18,

(2)  any failure by Borrower to perform any of its obligations under this Section 18,

(3)  the existence or alleged existence of any Prohibited Activity or Condition,

(4)  the presence or alleged presence of Hazardous Materials on or under the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property, and

(5)  the actual or alleged violation of any Hazardous Materials Law

(k)  Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at the Borrower's expense

(l)  Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (a "Claim"), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender, or (2) may materially and adversely affect Lender, as determined by Lender in its discretion

(m)  Borrower's obligation to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any guarantor to receive notice of or consideration for any of the following

(1)  any amendment or modification of any Loan Document,

(2)  any extensions of time for performance required by any Loan Document,

(3)  any provision in any of the Loan Documents limiting Lender's recourse to property securing the Indebtedness, or limiting the personal liability of Borrower or any other party for payment of all or any part of the Indebtedness,

(4)  the accuracy or inaccuracy of any representations and warranties made by Borrower under this Instrument or any other Loan Document,

(5)  the release of Borrower or any other person, by Lender or by operation of law, from performance of any obligation under any Loan Document,

(6)  the release or substitution in whole or in part of any security for the Indebtedness, and

(7)  Lender's failure to properly perfect any lien or security interest given as security for the Indebtedness

(n)  Borrower shall, at its own cost and expense, do all of the following

(1)  pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 18,

(2)  reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 18, and

(3)  reimburse Indemnitees for any and all expenses, including fees and out of pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 18, or in monitoring and participating in any legal or administrative proceeding

(o)  In any circumstances in which the indemnity under this Section 18 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned) may settle or compromise any action or legal or administrative proceeding  Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys and consultants

(p)  The provisions of this Section 18 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee shall be entitled to

indemnification under this Section 18 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any guarantor, or pursued any other rights available under the Loan Documents or applicable law  If Borrower consists of more than one person or entity, the obligation of those persons or entities to indemnify the Indemnitees under this Section 18 shall be joint and several  The obligation of Borrower to indemnify the Indemnitees under this Section 18 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Instrument

19    PROPERTY AND LIABILITY INSURANCE

(a)    Borrower shall keep the Improvements insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, and business income coverage  Lender's insurance requirements may change from time to time throughout the term of the Indebtedness  If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage  If any of the Improvements is located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, and if flood insurance is available in that area, Borrower shall insure such Improvements against loss by flood  All insurance required pursuant to this Section 19(a) shall be referred to as "Hazard Insurance."

(b)    All premiums on insurance policies required under Section 19(a) shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment  All such policies shall also be in a form approved by Lender  All policies of property damage insurance shall include a non-contributing, non-reporting mortgage clause in favor of, and in a form approved by Lender  Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 19(a)  Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums  At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender the original (or a duplicate original) of a renewal policy in form satisfactory to Lender

(c)    Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require

(d)    All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time require, shall be in such form and contain such endorsements as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender

(e)    Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Instrument requires Borrower to maintain

(f)    In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender  Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds  This power of attorney is coupled with an interest and therefore is irrevocable  However, nothing contained in this Section 19 shall require Lender to incur any expense or take any action  Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender (the "Restoration"), or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due  To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar properties

(g)    Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met  (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing, (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration, (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property, and (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty

(h)    If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, Lender shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition

20    CONDEMNATION

(a)    Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect (a "Condemnation")

Borrower shall appear in and prosecute or defend any action or proceeding relating to any Condemnation unless otherwise directed by Lender in writing. Borrower authorizes and appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action. Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation

(b)     Lender may apply such awards or proceeds, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, to the restoration or repair of the Mortgaged Property or to the payment of the Indebtedness, with the balance, if any, to Borrower. Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness shall not extend or postpone the due date of any monthly installments referred to in the Note, Section 7 of this Instrument or any Collateral Agreement, or change the amount of such installments. Borrower agrees to execute such further evidence of assignment of any awards or proceeds as Lender may require

21     TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER [NO RIGHT TO TRANSFER]

(a)     "Transfer" means (A) a sale, assignment, transfer or other disposition (whether voluntary, involuntary or by operation of law), (B) the granting, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law), (C) the issuance or other creation of an ownership interest in a legal entity, including a partnership interest, interest in a limited liability company or corporate stock, (D) the withdrawal, retirement, removal or involuntary resignation of a partner in a partnership or a member or manager in a limited liability company, or (E) the merger, dissolution, liquidation, or consolidation of a legal entity or the reconstitution of one type of legal entity into another type of legal entity. For purposes of defining the term "Transfer," the term "partnership" shall mean a general partnership, a limited partnership, a joint venture and a limited liability partnership, and the term "partner" shall mean a general partner, a limited partner and a joint venturer

(b)     "Transfer" does not include  (i) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under this Instrument, (ii) the Mortgaged Property becoming part of a bankruptcy estate by operation of law under the United States Bankruptcy Code, or (iii) a lien against the Mortgaged Property for local taxes and/or assessments not then due and payable

(c)     The occurrence of any of the following events shall not constitute an Event of Default under this Instrument, notwithstanding any provision of Section 21(a) to the contrary

(i)     a Transfer to which Lender has consented,

(ii)     a Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person (unless such death itself is an Event of Default under Section 22(k) of this Instrument),

(iii)     the grant of a leasehold interest approved in writing by Lender,

(iv)     the creation of a mechanic's, materialmen's, or judgment lien against the Mortgaged Property which is released of record or otherwise remedied to Lender's satisfaction within 60 days of the date of creation, and

(v)     if Borrower is a housing cooperative, any Transfer of the shares in the housing cooperative or any assignment of the occupancy agreements or leases relating thereto by tenant shareholders of the housing cooperative

(d)     The occurrence of any of the following Transfers shall not constitute an Event of Default under this Instrument, provided that Borrower has notified Lender in writing within 30 days following the occurrence of any of the following, and such Transfer does not constitute an Event of Default under any other Section of this Instrument

(i)     a change of the Borrower's name, provided that UCC financing statements and/or amendments sufficient to continue the perfection of Lender's security interest have been properly filed and copies have been delivered to Lender,

(ii)     a change of the form of the Borrower not involving a transfer of the Borrower's assets and not resulting in any change in liability of any Initial Owner, provided that UCC financing statements and/or amendments sufficient to continue the perfection of Lender's security interest have been properly filed and copies have been delivered to Lender,

(iii)     the merger of the Borrower with another entity when the Borrowing entity is the surviving entity,

(iv)     [intentionally omitted],

(v)     the grant of an easement, if before the grant Lender determines that the easement will not materially affect the operation or value of the Mortgaged Property or Lender's interest in the Mortgaged Property, and Borrower pays to Lender, upon demand, all costs and expenses,

including Attorneys' Fees and Costs, incurred by Lender in connection with reviewing Borrower's request

    (c)    The occurrence of any of the following events shall constitute an Event of Default under this instrument

        (i)    a Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property (including without limitation the creation or existence of any Lien as provided in Section 16 of this instrument),

        (ii)    if Borrower is a limited partnership, a Transfer of (A) any general partnership interest, or (B) limited partnership interests in Borrower that would cause the Initial Owners of Borrower to own less than a Controlling interest of all limited partnership interests in Borrower,

        (iii)    if Borrower is a general partnership or a joint venture, a Transfer of any general partnership or joint venture interest in Borrower,

        (iv)    if Borrower is a limited liability company, (A) a Transfer of any membership interest in Borrower which would cause the Initial Owners to own less than a Controlling interest of all the membership interests in Borrower, (B) a Transfer of any membership or other interest of a manager in Borrower that results in a change of manager, or (C) a change of a nonmember manager,

        (v)    if Borrower is a corporation, (A) the Transfer of any voting stock in Borrower which would cause the Initial Owners to own less than a Controlling interest of any class of voting stock in Borrower or (B) if the outstanding voting stock in Borrower is held by 100 or more shareholders, one or more transfers by a single transferor within a 12-month period affecting an aggregate of 5% or more of that stock,

        (vi)    if Borrower is a trust, (A) a Transfer of any beneficial interest in Borrower which would cause the Initial Owners to own less than a Controlling interest of all the beneficial interests in Borrower, or (B) the termination or revocation of the trust, or (C) the removal, appointment or substitution of a trustee of Borrower, and

        (vii)    a Transfer of any interest in a Controlling Entity which, if such Controlling Entity were Borrower, would result in an Event of Default under any of Sections 21(e)(i) through (vi) above

Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default in order to exercise any of its remedies with respect to an Event of Default under this Section 21

    22    EVENTS OF DEFAULT   The occurrence of any one or more of the following shall constitute an Event of Default under this Instrument

    (a)    any failure by Borrower to pay or deposit when due any amount required by the Note, this Instrument or any other Loan Document,

    (b)    any failure by Borrower to maintain the insurance coverage required by Section 18,

    (c)    [Intentionally Omitted ]

    (d)    fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners or managers or any guarantor in connection with (A) the application for or creation of the Indebtedness, (B) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (C) any request for Lender's consent to any proposed action, including a request for disbursement of funds under any Collateral Agreement,

    (e)    any Event of Default under Section 21,

    (f)    the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property,

    (g)    any failure by Borrower to perform any of its obligations under this Instrument (other than those specified in Sections 22(a) through (f)), as and when required, which continues for a period of 30 days after notice of such failure by Lender to Borrower  However, no such notice or grace period shall apply in the case of any such failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Instrument, result in harm to Lender, impairment of the Note or this Instrument or any other security given under any other Loan Document,

    (h)    any failure by Borrower to perform any of its obligations as and when required under any Loan Document other than this Instrument which continues beyond the applicable cure period, if any, specified in that Loan Document,

    (i)    any exercise by the holder of any debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable,

    (j)    Borrower makes a general assignment for the benefit of creditors, voluntarily files for bankruptcy protection under the United States Bankruptcy Code or voluntarily becomes subject to any reorganization, receivership, insolvency proceeding or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights, or an involuntary case is commenced against Borrower by any creditor (other than Lender) of Borrower pursuant to the United States

Bankruptcy Code or other federal or state law affecting debtor and creditor rights and is not dismissed or discharged within 60 days after filing, and

(k)      Borrower (if Borrower is a natural person) or any general partner or trustee or guarantor who is a natural person dies, or becomes incompetent, or purports to revoke or dispute the validity of, or liability under, any of the Loan Documents or any guaranty, provided, however, that in the event of a death, Lender, in its sole, absolute and unfettered discretion, may permit the deceased Borrower's, general partner's, or guarantor's estate or the successor trustee or beneficiaries of the trust to assume unconditionally the obligations of such deceased person under the Loan Documents and/or guaranty, in a manner satisfactory to Lender, and, in doing so, cure such Event of Default

23      REMEDIES CUMULATIVE  Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order

24      FORBEARANCE

(a)      Lender may (but shall not be obligated to) agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, any guarantor or other third party obligor, to take any of the following actions  extend the time for payment of all or any part of the Indebtedness, reduce the payments due under this Instrument, the Note, or any other Loan Document, accept a renewal of the Note, modify the terms and time of payment of the Indebtedness, join in any extension or subordination agreement, release any Mortgaged Property, take or release other or additional security, modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note, and otherwise modify this Instrument, the Note, or any other Loan Document

(b)      Any forbearance by Lender in exercising any right or remedy under the Note, this Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender  Lender's receipt of any awards or proceeds under Sections 19 and 20 shall not operate to cure or waive any Event of Default

25      LOAN CHARGES  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any charge provided for in any Loan Document, whether considered separately or together with other charges levied in connection with any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that charge is hereby reduced to the extent necessary to eliminate that violation  The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness which constitutes interest, as well as all other charges levied in connection with the Indebtedness which constitute interest, shall be deemed to be allocated and spread over the stated term of the Note  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note

26      WAIVER OF STATUTE OF LIMITATIONS  Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce any Loan Document

27      WAIVER OF MARSHALLING  Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument, the Note, any other Loan Document or applicable law  Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies  Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument

28      FURTHER ASSURANCES  Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Instrument and the Loan Documents

29      ESTOPPEL CERTIFICATE  Within 10 days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (i) that the Loan Documents are unmodified and in full force and effect  (or, if there have been

modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications), (ii) the unpaid principal balance of the Note, (iii) the date to which interest under the Note has been paid, (iv) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Instrument or any of the other Loan Documents (or, if the Borrower is in default, describing such default in reasonable detail), (v) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents, and (vi) any additional facts requested by Lender

**30      GOVERNING LAW, CONSENT TO JURISDICTION AND VENUE**

(a)      This Instrument, and any Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (the "Property Jurisdiction")

(b)      Borrower agrees that any controversy arising under or in relation to the Note, this Instrument, or any other Loan Document shall be litigated exclusively in the Property Jurisdiction  The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the Indebtedness, or any other Loan Document  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise

**31      NOTICE**

(a)      All notices, demands and other communications ("notice") under or concerning this Instrument shall be in writing  Each notice shall be addressed to the intended recipient at its address set forth in page one of this Instrument, and shall be deemed given on the earliest to occur of (1) the date when the notice is received by the addressee, (2) the first Business Day after the notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery, or (3) the third Business Day after the notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested  As used in this Section 31, the term "Business Day" means any day other than a Saturday, a Sunday or any other day on which Lender is not open for business

(b)      Any party to this Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 31  Each party agrees that it will not refuse or reject delivery of any notice given in accordance with this Section 31, that it will acknowledge, in writing, the receipt of any notice upon request by the other party and that any notice rejected or refused by it shall be deemed for purposes of this Section 31 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U S Postal Service or the courier service

(c)      Any notice under the Note and any other Loan Document which does not specify how notices are to be given shall be given in accordance with this Section 31

**32      SALE OF NOTE, CHANGE IN SERVICER**  The Note or a partial interest in the Note (together with this Instrument and the other Loan Documents) may be sold one or more times without prior notice to Borrower  A sale may result in a change of the Loan Servicer  There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note  If there is a change of the Loan Servicer, Borrower will be given notice of the change

**33      [Intentionally Omitted ]**

**34      SUCCESSORS AND ASSIGNS BOUND**  This Instrument shall bind, and the rights granted by this Instrument shall inure to, the respective successors and assigns of Lender and Borrower  However, a Transfer not permitted by Section 21 shall be an Event of Default

**35      JOINT AND SEVERAL LIABILITY**  If more than one person or entity signs this Instrument as Borrower, the obligations of such persons and entities under this Instrument, the Note and other Loan Documents shall be joint and several

**36.      RELATIONSHIP OF PARTIES, NO THIRD PARTY BENEFICIARY**

(a)      The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Instrument shall create any other relationship between Lender and Borrower

(b)      No creditor of any party to this Instrument and no other person shall be a third party beneficiary of this Instrument or any other Loan Document  Without limiting the generality of the preceding sentence, (1) any arrangement (a "Servicing Arrangement") between the Lender and any Loan Servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third party beneficiary of any Servicing Arrangement, and (3) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness

**37      SEVERABILITY, ENTIRE AGREEMENT, AMENDMENTS**  The parties intend that the provisions of this Instrument and all other Loan Documents shall be legally severable  If any term or provision of this Instrument, or any other Loan Document, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Instrument or of such other Loan Document shall not be affected thereby, and each term and provision shall be valid and be enforceable to the fullest extent permitted by law  This Instrument contains the entire agreement among the parties as to the

rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

38      CONSTRUCTION   The captions and headings of the sections of this Instrument are for convenience only and shall be disregarded in construing this Instrument. Any reference in this Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Instrument or to a Section of this Instrument. All Exhibits attached to or referred to in this Instrument are incorporated by reference into this Instrument. Any reference in this Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this Agreement includes the plural and use of the plural includes the singular. As used in this Instrument, the term "including" means "including, but not limited to."

39      LOAN SERVICING   All actions regarding the servicing of the loan evidenced by the Note, including the collection of payments, the giving and receipt of notice, inspections of the Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary. If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such notice from Lender shall govern.

40      DISCLOSURE OF INFORMATION   Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including but not limited to trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of similar mortgage loans. Borrower irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including but not limited to any right of privacy.

41      NO CHANGE IN FACTS OR CIRCUMSTANCES   All information in the application for the loan submitted to Lender (the "Loan Application") and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects. There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate.

42      SUBROGATION   If, and to the extent that, the proceeds of the loan evidenced by the Note are used to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a "Prior Lien"), such loan proceeds shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

43      [Intentionally Omitted.]

44.      ACCELERATION; REMEDIES   At any time after the occurrence of an Event of Default, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may foreclose this Instrument by judicial proceeding or by non-judicial foreclosure, shall be entitled to the appointment of a receiver, without notice, and may invoke any other remedies permitted by New York law or provided in this Instrument or in any other Loan Document. Lender may, at Lender's option, also foreclose this Instrument for any portion of the Indebtedness which is then due and payable, subject to the continuing lien of this Instrument for the balance of the Indebtedness. Lender shall be entitled to collect all costs and expenses allowed by New York law, including attorneys' fees, costs of documentary evidence, abstracts, title reports, statutory costs and any additional allowance made pursuant to Section 8303 of the Civil Practice Law and Rules. The rights and remedies of Lender specified in this Instrument shall be in addition to Lender's rights and remedies under New York law, specifically including Section 254 of the Real Property Law. In the event of any conflict between the provision of this Instrument and the provisions of Section 254 of the Real Property Law, the provisions of this Instrument shall control. Without limiting the foregoing, Lender may institute a proceeding or proceedings, judicial or non-judicial under Article 14 of the Real Property Actions and Proceedings code, by advertisement or otherwise, for the complete foreclosure of this Instrument in which case the Mortgaged Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner. Borrower expressly consents to a non-judicial foreclosure by power of sale pursuant to Article 14 of the Real Property Actions and Proceedings code.

45      SATISFACTION OF DEBT   Upon payment of the Indebtedness, Lender shall discharge this Instrument. Borrower shall pay Lender's reasonable costs incurred in discharging this Instrument.

46      LIEN LAW   Borrower will receive advances under this Instrument subject to the trust fund provisions of Section 13 of the Lien Law.

47      MAXIMUM PRINCIPAL AMOUNT   Notwithstanding any provision set forth in this Instrument to the contrary, the maximum amount of principal indebtedness secured by this Instrument at execution, or which under any contingency may become secured by this Instrument, at any time hereafter, is SEVEN HUNDRED THOUSAND AND 00/100 DOLLARS (US $700,000.00), plus all interest payable under the Note and all amounts expended by Lender after an Event of Default (a) for the payment of taxes, charges or assessments which may be imposed by legal requirements upon the Mortgaged Property.

(b) to maintain the insurance required under this Instrument, (c) for any expenses incurred in maintaining the Mortgaged Property and upholding the lien of this Instrument, including the expense of any litigation to prosecute or defend the rights and lien created by this Instrument, and (d) for any amount, cost or charge to which Lender becomes subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority, together with interest on all of the foregoing amounts at the Default Rate (as defined in the Note)

48    SECTION 291-f OF THE REAL PROPERTY LAW  In addition to any other right or remedy contained in this Instrument or in any other Loan Document, Lender shall have all the rights against lessees of all or any part of the Mortgaged Property as are set forth in Section 291-f of the Real Property Law of New York

49    TRANSFER TAX PROVISIONS  Borrower covenants and agrees that
(a)    In the event of a sale of the Mortgaged Property or other Transfer, Borrower will duly complete, execute and deliver to Lender, contemporaneously with the submission to the applicable taxing authority or recording officer, all forms and supporting documentation required by such taxing authority or recording officer to estimate and fix any and all applicable state and local real estate transfer taxes (collectively "Transfer Taxes") assessable by reason of such sale or other Transfer or recording of the deed evidencing such sale or other Transfer, and
(b)    Borrower shall pay all Transfer Taxes that may hereafter become due and payable with respect to any Transfer, and if Borrower fails to pay any such Transfer Taxes, Lender may pay such Transfer Taxes and the amount of such payment shall be added to the Indebtedness and, unless incurred in connection with a foreclosure of this Instrument, be secured by this Instrument

The provisions of this Section shall survive any Transfer and the delivery of the deed in connection with any Transfer

50    INTERPRETATION  It is the intention of Borrower and Lender that if any provision of this Instrument or any other Loan Document is capable of two (2) constructions, one of which would render the provision void, and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid  Borrower acknowledges that Lender has attempted in good faith to assure that this Instrument, the Note and all other Loan Documents are in compliance with applicable laws of the Property Jurisdiction and federal laws  Nevertheless, in the event that any provision of this Instrument, the Note or any other Loan Document is not in compliance with any such laws, then the non-complying provision shall be deemed to be deleted or modified to the extent necessary to assure legal compliance  Similarly, in the event any language or disclosure required by applicable laws of the Property Jurisdiction is not contained in the Loan Documents, then the Loan Documents shall be deemed to have been supplemented to add such language or disclosure, or, at Lender's option, Lender may provide such additional language or disclosure  In either event, such legal requirement shall thereby be satisfied and such noncompliance shall be deemed to have been cured for all purposes  Within ten (10) days after written request by Lender, Borrower agrees to execute such documentation as Lender may require to cure any legal compliance issues or deficiencies in the Loan Documents

51    FUTURE ADVANCES  In addition to the Indebtedness, this Instrument shall (to the extent allowed by applicable law) also secure payment of the principal, interest and other charges due on all other future loans or advances made by Lender to Borrower (or any successor in interest to Borrower as the owner of all or any part of the Mortgaged Property) when the promissory note evidencing such loan or advance specifically states that it is secured by this Instrument ("Future Advances"), including all extensions, renewals and modifications of any such Future Advances

52    AGREEMENT TO PROVIDE ADDITIONAL DOCUMENTS  Borrower agrees to execute and acknowledge such additional documents as may be necessary or desirable in order to carry out the intent and purpose of this Instrument and the other Loan Documents, to confirm or establish the lien hereof, or to correct any clerical errors or legal deficiencies  Without limiting the foregoing, Borrower agrees to execute a replacement Note in the event the Note is lost or destroyed and to execute an amended and restated substitute Note to correct any clerical or other errors which may be discovered in the original Note  Failure of Borrower to comply with any request by Lender pursuant to this Section or under Section 28 above within ten (10) days after written request by Lender shall constitute a material Event of Default hereunder

[The balance of this page is intentionally left blank ]

53    EXECUTION IN COUNTERPARTS.  This Instrument may be executed in multiple counterparts, and the separate signature pages and notary acknowledgments may then be combined into a single original document for recordation

54    PAYMENT OF CLOSING COSTS   If for any reason the escrow or closing agent fails to reserve and pay for all of Lender's fees, legal, documentation, appraisal, title, recording and other closing costs incurred in connection with the closing and funding of the Loan, then Borrower shall pay or reimburse Lender for any such unpaid fees or costs within ten (10) days after written demand by Lender itemizing the unpaid fees and costs   Failure of Borrower to so pay or reimburse Lender for any such unpaid fees and costs within ten (10) days after written demand by Lender shall constitute an Event of Default and, without limiting any other remedies of Lender, Lender may immediately instate the Default Rate under the Note until such amounts are received by Lender

55    WAIVER OF TRIAL BY JURY   BORROWER AND LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE   THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL

ATTACHED EXHIBIT   The following Exhibit is attached to this Instrument

Exhibit "A"        Description of the Land

THIS MORTGAGE SECURES A FIXED RATE PROMISSORY NOTE   THIS MORTGAGE IS A FIRST MORTGAGE   NO FURTHER ENCUMBRANCES MAY BE RECORDED AGAINST THE REAL PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF LENDER   FAILURE TO COMPLY WITH THIS PROVISION SHALL CONSTITUTE AN EVENT OF DEFAULT AND AT THE LENDER'S OPTION THE LOAN SHALL IMMEDIATELY BECOME DUE AND PAYABLE   CONSENT TO ONE FURTHER ENCUMBRANCE SHALL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO REQUIRE SUCH CONSENT TO FUTURE OR SUCCESSIVE ENCUMBRANCES

IN WITNESS WHEREOF, Borrower has signed and delivered this Instrument or has caused this Instrument to be signed and delivered by its duly authorized representative

BORROWER

ROSEMARIE OZBAKIR

ALI DEMIR

State of _CALN_ ) ss
County of _SanDiego_ )

On the 26th day of _Jan_, 2006 in the year 2006, before me, the undersigned, a Notary Public in and for said state, personally appeared ROSEMARIE OZBAKIR, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the city of _La Mesa_ and the state of _Calif_

Signature of Notary Public

JANELLE BROWN-CLAY
Commission # 1388660
Notary Public - California
San Diego County
My Comm Expires Dec 6 2006

Prepared by RoboDocs®
New York Security Instrument
Loan No  6119114

State of _____CaUf_____  )
County of _____San Diego_____  )  ss

On the 26th day of Jan, 2006 in the year 2006, before me, the undersigned, a Notary Public in and for said state, personally appeared ALI DEMIR, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the city of _____La Mesa_____ and the state of _____Calif_____

JANELLE BROWN-CLAY
Commission # 1388660
Notary Public - California
San Diego County
My Comm Expires Dec 6 2006

_____Janelle Brown-Clay_____
Signature of Notary Public

EXHIBIT "A"

DESCRIPTION OF THE LAND

THE LAND REFERRED TO HEREIN IS SITUATED IN MONROE COUNTY, STATE OF NEW YORK, AND IS DESCRIBED AS FOLLOWS

AMENDED 12/23/05
ALL those certain lots, pieces or parcels of land situate in the Village of East Rochester, County of Monroe, New York State, being the same property acquired by Evelyn D Webster and Sidney W Webster as Trustees of the Evelyn D Webster Revocable Intervivos Trust recorded in the Monroe County Clerk's Office in Liber 9013 at Page 549 on May 28, 1998, lying and being Southerly of Fairport Road (N Y S Route 31 F) (S H 60) with all bearing being referred to true North at 78 degree 35 minutes meridian of West longitude, bounded and described as follows

COMMENCING at a found triangle concrete monument on the existing Southerly highway boundary of Fairport Road (N Y S Route 31F) (S H 60) row width varies, at it's intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as trustees of the Evelyn D Webster Revocable Intervivos Trust on the Southeast and the property now or formerly owned by the Village of East Rochester (Liber 1695 Page 230, Rec April 12, 1935) on the Southwest, said point being Easterly, measured along the said Southerly highway boundary of Fairport Road (N Y S Route 31F) (S H 60) a distance of 409 feet more or less from the Town of Pittsford and Village of East Rochester municipal line, said triangle concrete monument being the point or place of beginning,

RUNNING THENCE South 00 degrees 41 minutes 16 seconds East along the last mentioned division line, a distance of 178 00 feet to a found ½ inch pipe at it's intersection with the division line between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustees of the Evelyn D Webster Revocable Intervivos Trust on the Northeast and the property now or formerly owned by the Trustee of Evelyn D Webster Trust (Liber 8178 Page 206, Rec February 25, 1992) on the Southeast,

THENCE South 73 degrees 24 minutes 09 seconds East along the last mentioned division line, a distance of 112 93 feet to a found ½ inch rebar at it's intersection with the division between the said property now or formerly owned by Evelyn D Webster and Sidney W Webster as Trustees of the Evelyn D Webster Revocable Intervivos Trust on the Northeast and the property now or formerly owned by the trustee of Sidney W Webster Trust (Liber 8178 Page 211, Rec February 25, 1992) on the East,

THENCE North 17 degrees 40 minutes 59 seconds East along the last mentioned division line, A distance of 150 98 feet to a point at it's intersection with the said Southerly highway boundary of Fairport Road (N Y S Route 31F) (S H 60),

THENCE along the last mentioned highway boundary line the following two (2) courses

1) North 82 degrees 51 minutes 12 seconds West, a distance of 87 68 feet to a point,

2) North 69 degrees 41 minutes 46 seconds West, a distance of 102 36 feet to the point or place of BEGINNING

PROPERTY ADDRESS  781 Fairport Road, East Rochester, New York 14445

Prepared by RoboDocs©
New York Security Instrument
Exhibit "A" –Legal Description

EXHIBIT "U"

MONROE COUNTY CLERK'S OFFICE 

Return To:

CALIFORNIA CREDIT
701 NORTH BRAND BOULEVARD
GLENDALE CA 91209

Index  DEEDS

Book   10265   Page   0198

No. Pages   0013

Instrument  SUBORD LEASES

Date :   3/06/2006

Time :   12:41:00

Control #   200603060438

OZBAKIR
ROSEMARIE
DEMIR
ALI
EUREKA PETROLEUM INC

CALIFORNIA CREDIT UNION

TT#

Employee ID   BZ40

| | | | MORTGAGE TAX | | |
|---|---|---|---|---|---|
| FILE FEE-S | $ | 19.00 | MORTGAGE AMOUNT | $ | .00 |
| FILE FEE-C | $ | 8.00 | BASIC MORTGAGE TAX | $ | .00 |
| REC FEE | $ | 39.00 | SPEC ADDIT MTG TAX | $ | .00 |
| | $ | .00 | ADDITIONAL MTG TAX | $ | .00 |
| | $ | .00 | Total | $ | .00 |
| | $ | .00 | | | |
| | $ | .00, | | | |
| | $ | .00 | | | |
| | $ | .00 | | | |
| Total: | $ | 66.00 | | | |

STATE OF NEW YORK
MONROE COUNTY CLERK'S OFFICE

TRANSFER AMT

WARNING - THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

TRANSFER AMT $   .00

TRANSFER TAX $   .00

Cheryl Dinolfo
Monroe County Clerk



0102650198

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

CALIFORNIA CREDIT UNION
701 North Brand Boulevard, 7th Floor
Glendale, California 91203
Attn: Commercial Loan Department
Loan No:  _6110114_

---

## LEASE SUBORDINATION,
## NON-DISTURBANCE AND
## ATTORNMENT AGREEMENT

NOTICE:  THIS SUBORDINATION AGREEMENT RESULTS IN THE LEASEHOLD
ESTATE IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY
THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.

THIS LEASE SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
AGREEMENT ("Agreement") is dated as of December  _9_, 2005, by and among
_Rose marie  Ozbakir  and  Ali  Demir_
("Landlord"), EUREKA PETROLEUM INC., a New York corporation ("Tenant"), and
CALIFORNIA CREDIT UNION, a California state chartered credit union ("Lender"), with
respect to the following facts:

   A.    Lender intends to make a loan to Landlord (the "Loan") to be evidenced by a
Promissory Note executed by Landlord in favor of Lender ("Note"). The Note shall be secured
by a mortgage, deed of trust, or deed to secure debt of even date therewith ("Mortgage"),
recorded prior to or concurrently herewith and which encumbers Landlord's ownership interest
in the real property in Monroe County, State of New York, described on Exhibit A attached
hereto and made a part hereof (the "Property").

   B.    Tenant and Landlord (or Landlord's predecessor-in-interest) entered into a lease
dated March 4, 2004, (the "Lease"), by which Tenant leased certain premises (the "Leased
Premises") constituting all or a portion of the Property.

   C.    Lender is willing to make the Loan to Landlord provided the Mortgage is a lien
on the Leased Premises prior and superior to the Lease and provided that Tenant specifically
subordinates the Lease to the lien of the Mortgage subject to the terms below

781 Fairport Rd. - SNDA

D.    Tenant wants assurance regarding its right to continued occupancy of the Leased Premises under the terms of the Lease and subject to the terms of the Mortgage, subject to the terms hereof.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants and conditions set forth herein below, and in order to induce Lender to make the loan referred to above, the parties hereto agree as follows:

1.    As used in this Agreement, the term "Lease" includes, without limitation, all right, title and interest that Tenant may have in all or any portion of the Leased Premises, whether granted by the terms of the Lease, by a separate written or oral agreement or otherwise, including all options, purchase rights, and rights of first refusal provided for in the Lease or by separate agreement between Landlord and Tenant.

2.    Lender hereby consents to the Lease and all the provisions thereof.

3.    Except as permitted by the Lease, Tenant shall not assign the Lease nor sublet any portion of the Leased Premises, and Landlord shall not consent to any such assignment or subletting other than as permitted by the terms of the Lease, without the prior written consent of Lender, which consent shall not be unreasonably withheld.

4.    The Mortgage (and any amendments, modifications, renewals and extensions thereof) shall be and remain at all times a lien on the Property prior and superior to the Lease, the leasehold estate created by the Lease, and all rights and privileges of Tenant or any other tenant thereunder, subject to the terms hereof; and the Lease, the leasehold estate created by the Lease, and all rights and privileges of Tenant or any other tenant thereunder are hereby made subordinate to the lien of the Mortgage, subject to the terms hereof.

5.    Lender has no obligation or duty to, nor has Lender represented that it will, see to the application of the proceeds of the loan by Landlord or any other persons to whom Lender disburses the proceeds of the loan. Any application or use of such proceeds shall not defeat the subordination made in this Agreement.

6.    Tenant intentionally subordinates the Lease, the leasehold estate created by the Lease, and all rights and privileges of Tenant or any other tenant thereunder to the lien of the Mortgage on the Property, subject to the terms hereof.

7.    Tenant understands that Lender shall make loans and advances to Landlord and specific monetary and other obligations are being made which would not be made in reliance upon this lease subordination.

8.    In the event of foreclosure, deed in lieu of foreclosure or exercise of any other right asserted under the Mortgage by the holder thereof, the Lease and the rights of Tenant

2

thereunder shall continue in full force and effect and shall not be terminated or disturbed unless Tenant is in default under the Lease beyond any applicable notice and cure period.

9.    If Lender or any subsequent holder of the Mortgage, or any person claiming under said holder, including any purchaser upon foreclosure (any of which being referred to as a "Successor"), acquires or otherwise succeeds to the fee estate of Landlord, whether by a foreclosure, deed in lieu of foreclosure or otherwise, then such Successor shall succeed to the interest of the Landlord in the Lease. Tenant shall recognize and attorn to Successor as its landlord under the terms of the Lease and be bound to Successor under the terms of the Lease for the balance of the term thereof, including any extensions or renewals thereof. Such attornment is to be effective and self-operative without the execution of any other instruments on the part of either party hereto immediately upon Successor's succeeding to the interest of the Landlord under the Lease; provided, however, Tenant shall provide written confirmation of its attornment within ten (10) days after receipt of a written request therefor by Successor. In any event as described above, the Lease shall continue in accordance with its terms between Tenant as tenant and Successor as landlord; provided that Successor shall not be:

(i)    Liable for any act or omission of any prior landlord (including Landlord) under the Lease (without limiting any rights of Tenant under the Lease for non-monetary defaults of any prior landlord which continues and which Successor fails to cure within a reasonable time after Successor acquires Landlord's interest under the Lease);

(ii)    Subject to any offsets or abatements against rent which Tenant may have against any prior landlord (including Landlord) except for the exercise of rights expressly set forth in the Lease;

(iii)    Bound by any rent or other charges which Tenant might have paid for more than the current month to any prior landlord (including Landlord) except as expressly required under the Lease;

(iv)    Bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed; or

(v)    Successor shall only be liable for the landlord's obligations under the Lease accruing during the period of time that Successor is the owner of the Property.

10.    This Agreement does not constitute a waiver by Lender of any of its rights under the Mortgage or related documents, and the Mortgage and any related documents remain in full force and effect.

11.    Tenant will not terminate or seek to terminate the Lease by reason of any act or omission of the Landlord thereunder or for any other reason until Tenant shall have given written notice, by registered or certified mail, return receipt requested, of said act or omission to Lender, which notice shall be addressed to:

3

California Credit Union
701 North Brand Boulevard, 7th Floor
Glendale, California 91203
Attn: Commercial Loan Department

and the lapse of a period of time which not less than the greater of (i) the applicable cure period allowed Landlord under the Lease, or (ii) thirty (30) days ("Lender's Cure Period"), during which period Lender may (but shall not be obligated to) cure such act, omission or other matter.

12.    This Agreement is the complete agreement among the parties with regard to the subordination of the Lease and other matters addressed herein, and shall supersede any prior agreements affecting the Parties as to subordination of the Lease, including, without limitation, any provisions contained in the Lease which provide for the subordination of the Lease to a deed or deeds of trust or to a mortgage or mortgages.

13.    This Agreement shall inure to the benefit of and shall be binding upon each of Tenant, Landlord and Lender, and it and their respective heirs, personal representatives, successors and assigns. This Agreement may not be materially altered, modified or amended except in writing signed by all of the parties hereto. In the event any one or more of the provisions contained in this Agreement shall be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

14.    This Agreement shall be governed by, and construed and enforced in accordance with the internal laws of the State where the Property is located.

15.    This instrument may be executed in multiple counterparts, and the separate signature pages and notary acknowledgments may then be combined into a single original document for recordation.

[instrument continues next page]

4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first written above.

NOTICE: THIS SUBORDINATION AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON YOUR LEASE TO OBTAIN A LOAN A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND.

TENANT:

EUREKA PETROLEUM INC.,
a New York corporation

By: _____

Printed Name: Jeffrey K. Dangan
Title: Sr. Vice President and General Counsel

[signatures continued next page]

5

APR. 11. 2006 11:19AM   MONROE TITLE CORPORATE                    NO. 7984   P. 8/14

State of California         ) ss.
County of Orange            )

On Dec 9 , 2005 , before me, Anna Lisa Lom , Notary
Public, personally appeared

Jeffry Langan

☒ personally known to me
☐ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

Signature of Notary Public

ANNA-LISA LONIER
Commission # 1400595
Notary Public - California
Orange County
My Comm. Expires Feb 14, 2007

Place Notary Seal Above

EXHIBIT "V"

**Kimberly A. Steele**

| | |
|---|---|
| **From:** | Sheryl.Curtin@shell.com |
| **Sent:** | Monday, June 22, 2009 2:31 PM |
| **To:** | Kimberly A. Steele |
| **Cc:** | Barry.B.Wood@shell.com; thomas.lane@shell.com; John.Greene@shell.com |
| **Subject:** | RE: Jiffy Lube |

Kimberly,

Thank you for your email. JLI will not exercise its option with respect to 781 Fairport Road, East Rochester, NY 14445. Please call if you have any questions!

Sheryl Curtin
(713) 241-7433

# Tab 2 to Exhibit B
## Affidavits of Service Filed 8/20/09

Supreme Court of the State of New York
County of Monroe

_____

Rosemarie Ozbakir and Ali Demir
          Plaintiff

AFFIDAVIT OF SERVICE
Index #11124-09
Date Filed:  8-4-09

Mac Properties, Inc., et al
         Defendants,

_____

State of New York     )
                   : ss:

County of Albany     )

David Dombroski,  being duly sworn, deposes and says:

Deponent is over the age of 18 years, is not a party to this action and is a resident of New York State. That on  August 7,  2009  at approximately 11:00am  deponent served the following specific papers pursuant to 306 of the Business Corporation Law.  Summons, Verified Complaint, Index # and date of filing endorsed thereon with exhibits.  Upon: Tibarom, Inc.  A corporation authorized to do business in the State of New York  One of the defendants in this action, by personally serving two copies of the aforesaid papers at the office of  the Department of State, located in the City of Albany, New York by delivering to and leaving the papers with Donna Christie,  White Female with Blonde hair,  being approximately 35-45  years of age; height of 5'5"-5'7",  weight of 135-155 lbs., being an Authorized Agent  in the Corporation Division of the Department of State and empowered to receive such service. 99 Washington Ave., 6th Fl. Albany, NY  That at the time of making such service deponent paid the Secretary of State the fee prescribed by Law in the amount of $40.00.

                                   David Dombroski

Sworn to before me this
_____ day of August, 2009

MATTHEW KETCHAM
Notary Public, State of New York
Qualified in Albany County
Reg. No. 01KE6034262
Commission Expires December 6, 2009

Supreme Court of the State of New York
County of Monroe

_____

Rosemarie Ozbakir and Ali Demir
       Plaintiff

                                       AFFIDAVIT OF SERVICE
                                       Index #11124-09
                                       Date Filed:  8-4-09

Mac Properties, Inc., et al
       Defendants,

_____

State of New York    )
                    : ss:

County of Albany    )

David Dombroski,  being duly sworn, deposes and says:

Deponent is over the age of 18 years, is not a party to this action and is a resident of New York State. That on  August 7,  2009  at approximately 11:00am  deponent served the following specific papers pursuant to 306 of the Business Corporation Law.  Summons, Verified Complaint, Index # and date of filing endorsed thereon with exhibits.   Upon: Eureka Petroleum, Inc. . A corporation authorized to do business in the State of New York  One of the defendants in this action, by personally serving two copies of the aforesaid papers at the office of  the Department of State, located in the City of Albany, New York by delivering to and leaving the papers with Donna Christie,  White Female with Blonde hair,  being approximately 35-45  years of age; height of 5'5"-5'7",  weight of 135-155 lbs., being an Authorized Agent  in the Corporation Division of the Department of State and empowered to receive such service. 99 Washington Ave., 6th Fl. Albany, NY  That at the time of making such service deponent paid the Secretary of State the fee prescribed by Law in the amount of $40.00.


                                      _____
                                      David Dombroski

Sworn to before me this
\_\_\| day of August, 2009

MATTHEW KETCHAM
Notary Public, State of New York
Qualified in Albany County
Reg. No. 01 ....
Commission Expires December 5, 2009

Supreme Court of the State of New York
County of Monroe

_____

Rosemarie Ozbakir and Ali Demir
       Plaintiff

                                          AFFIDAVIT OF SERVICE
                                          Index #11124-09
                                          Date Filed:  8-4-09

Mac Properties, Inc., et al
       Defendants,

_____

State of New York     )
                      : ss:

County of Albany     )

David Dombroski,  being duly sworn, deposes and says:

Deponent is over the age of 18 years, is not a party to this action and is a resident of New York State. That on  August 7,  2009  at approximately 11:00am  deponent served the following specific papers pursuant to 303 of the Limited Liability Company Law. Summons, Verified Complaint, Index # and date of filing endorsed thereon with exhibits. Upon: Rochester Lube, LLC.   A LLC authorized to do business in the State of New York One of the defendants in this action, by personally serving two copies of the aforesaid papers at the office of the Department of State, located in the City of Albany, New York by delivering to and leaving the papers with Donna Christie,  White Female with Blonde hair,  being approximately 35-45  years of age; height of 5'5"-5'7",  weight of 135-155 lbs., being an Authorized Agent  in the Corporation Division of the Department of State and empowered to receive such service. 99 Washington Ave., 6th Fl. Albany, NY   That at the time of making such service deponent paid the Secretary of State the fee prescribed by Law in the amount of $40.00.

                                             David Dombroski

Sworn to before me this
____ day of August, 2009

MATTHEW KETCHAM
Notary Public, State of New York
Qualified in Albany County
Reg. No. 01KE6034262
Commission Expires December 6, 2009

Supreme Court of the State of New York
County of Monroe

_____

Rosemarie Ozbakir and Ali Demir
                    Plaintiff

                                              AFFIDAVIT OF SERVICE
                                              Index #11124-09
                                              Date Filed:  8-4-09

Mac Properties, Inc., et al
                    Defendants,

_____

State of New York      )
                       : ss:
County of Albany       )

David Dombroski,  being duly sworn, deposes and says:

Deponent is over the age of 18 years, is not a party to this action and is a resident of New
York State. That on  August 7,  2009  at approximately 11:00am deponent served the
following specific papers pursuant to 303 of the Limited Liability Company Law.
Summons, Verified Complaint, Index # and date of filing endorsed thereon with exhibits.
Upon:  Sovereign JF, LLC.  A LLC authorized to do business in the State of New York
One of the defendants in this action, by personally serving two copies of the aforesaid
papers at the office of  the Department of State, located in the City of Albany, New York
by delivering to and leaving the papers with Donna Christie,  White Female with Blonde
hair,  being approximately 35-45  years of age; height of 5'5"-5'7",  weight of 135-155
lbs., being an Authorized Agent  in the Corporation Division of the Department of State
and empowered to receive such service. 99 Washington Ave., 6th Fl. Albany, NY  That at
the time of making such service deponent paid the Secretary of State the fee prescribed
by Law in the amount of $40.00.

                                              _____
                                              David Dombroski

Sworn to before me this
___ day of August, 2009

MATTHEW KETCHAM
Notary Public, State of New York
Qualified in Albany County
Reg. No. 01KE6034262
Commission Expires December 6, 2009

Supreme Court of the State of New York
County of Monroe

---

Rosemarie Ozbakir and Ali Demir
      Plaintiff

AFFIDAVIT OF SERVICE
Index #11124-09
Date Filed: 8-4-09

Mac Properties, Inc., et al
      Defendants,

---

State of New York    )
                : ss:
County of Albany    )

David Dombroski, being duly sworn, deposes and says:

Deponent is over the age of 18 years, is not a party to this action and is a resident of New York State. That on August 7, 2009 at approximately 11:00am deponent served the following specific papers pursuant to 303 of the Limited Liability Company Law. Summons, Verified Complaint, Index # and date of filing endorsed thereon with exhibits. Upon: **Sovereign JF, LLC s/h/a Sovereign JF, LLC SPE Manager, Inc. A LLC authorized to do business in the State of New York** One of the defendants in this action, by personally serving two copies of the aforesaid papers at the office of the Department of State, located in the City of Albany, New York by delivering to and leaving the papers with Donna Christie, White Female with Blonde hair, being approximately 35-45 years of age; height of 5'5"-5'7", weight of 135-155 lbs., being an Authorized Agent in the Corporation Division of the Department of State and empowered to receive such service. 99 Washington Ave., 6th Fl. Albany, NY That at the time of making such service deponent paid the Secretary of State the fee prescribed by Law in the amount of $40.00.

David Dombroski

Sworn to before me this
11 day of August, 2009

MATTHEW KETCHAM
Notary Public, State of New York
Qualified in Albany County
Reg. No. 01KE6034262
Commission Expires December 6, 2009

2009 AUG 20 PM 1:45

Supreme Court of the State of New York
County of Monroe

---

Rosemarie Ozbakir and Ali Demir
        Plaintiff

AFFIDAVIT OF SERVICE
Index #11124-09
Date Filed:  8-4-09

Mac Properties, Inc., et al
        Defendants,

---

State of New York    )
                : ss:
County of Albany    )

David Dombroski,  being duly sworn, deposes and says:

Deponent is over the age of 18 years, is not a party to this action and is a resident of New
York State. That on  August 7,  2009  at approximately 11:00am  deponent served the
following specific papers pursuant to 306 of the Business Corporation Law.  Summons,
Verified Complaint, Index # and date of filing endorsed thereon with exhibits.  Upon:
Marcus & Millichap Real Estate Investment Brokerage Company of New York s/h/a
Marcus & Millichap Real Estate Investment Brokerage Company.  A corporation
authorized to do business in the State of New York  One of the defendants in this action,
by personally serving two copies of the aforesaid papers at the office of  the Department
of State, located in the City of Albany, New York by delivering to and leaving the papers
with Donna Christie, White Female with Blonde hair,  being approximately 35-45  years
of age; height of 5'5"-5'7",  weight of 135-155 lbs., being an Authorized Agent  in the
Corporation Division of the Department of State and empowered to receive such service.
99 Washington Ave., 6th Fl. Albany, NY  That at the time of making such service
deponent paid the Secretary of State the fee prescribed by Law in the amount of $40.00.


                                David Dombroski

Sworn to before me this
_11_ day of August, 2009

MATTHEW KETCHAM
Notary Public, State of New York
Qualified in Albany County
Reg. No. 01KE6134262
Commission Expires December 6, 2009

Supreme Court of the State of New York
County of Monroe

Rosemarie Ozbakir and Ali Demir
        Plaintiff

                                AFFIDAVIT OF SERVICE
                                Index #11124-09
                                Date Filed:  8-4-09

Mac Properties, Inc., et al
        Defendants,

State of New York     )
                  : ss:
County of Albany     )

David Dombroski,  being duly sworn, deposes and says:

Deponent is over the age of 18 years, is not a party to this action and is a resident of New York State. That on  August 7, 2009  at approximately 11:00am  deponent served the following specific papers pursuant to 307 of the Business Corporation Law.  Summons, Verified Complaint, Index # and date of filing endorsed thereon with exhibits.  Upon: Sovereign JF, LLC, SPE Manager, Inc.  A corporation not authorized to do business in the State of New York  One of the defendants in this action, by personally serving one copy of the aforesaid papers at the office of the Department of State, located in the City of Albany, New York by delivering to and leaving the papers with Donna Christie,  White Female with Blonde hair,  being approximately 35-45  years of age; height of 5'5"-5'7", weight of 135-155 lbs., being an Authorized Agent  in the Corporation Division of the Department of State and empowered to receive such service. 99 Washington Ave., 6th Fl. Albany, NY  That at the time of making such service deponent paid the Secretary of State the fee prescribed by Law in the amount of $40.00. 1 copy mailed via registered mail to: 5796 Armada Dr. Suite 210, Carlsbad, CA 92008 on August 13, 2009. Registered mail # RE494959347US.

                                David Dombroski

Sworn to before me this
_13_ day of August, 2009

MATTHEW KETCHAM
Notary Public, State of New York
Qualified in Albany County
Reg. No. 01KE6034252
Commission Expires December 6, 2009

Supreme Court of the State of New York
County of Monroe

_____

Rosemarie Ozbakir and Ali Demir
        Plaintiff

                                            AFFIDAVIT OF SERVICE
                                            Index #11124-09
                                            Date Filed:  8-4-09

Mac Properties, Inc., et al
        Defendants,

_____

State of New York    )
                     : ss:

County of Albany    )

David Dombroski,  being duly sworn, deposes and says:

Deponent is over the age of 18 years, is not a party to this action and is a resident of New
York State. That on  August 7,  2009  at approximately 11:00am  deponent served the
following specific papers pursuant to 307 of the Business Corporation Law.  Summons,
Verified Complaint, Index # and date of filing endorsed thereon with exhibits.   Upon:
**PGP Valuation, Inc.**  A corporation not authorized to do business in the State of New
York  One of the defendants in this action, by personally serving one copy of the
aforesaid papers at the office of  the Department of State, located in the City of Albany,
New York by delivering to and leaving the papers with Donna Christie,  White Female
with Blonde hair,  being approximately 35-45  years of age; height of 5'5"-5'7",  weight
of 135-155 lbs., being an Authorized Agent  in the Corporation Division of the
Department of State and empowered to receive such service. 99 Washington Ave., 6th Fl.
Albany, NY   That at the time of making such service deponent paid the Secretary of
State the fee prescribed by Law in the amount of $40.00. 1 copy mailed via registered
mail to: 5796 Armada Dr. Suite 210, Carlsbad, CA 92008 on August 13, 2009.
Registered mail # RE494959355US.

                                            David Dombroski

Sworn to before me this
13th day of August, 2009

           MATTHEW KETCHAM
        Notary Public, State of New York
          Qualified in Albany County
           Reg. No. 01KE6034262
     Commission Expires December 6, 2009

Supreme Court of the State of New York
County of Monroe

Rosemarie Ozbakir and Ali Demir
        Plaintiff

AFFIDAVIT OF SERVICE
Index #11124-09
Date Filed: 8-4-09

Mac Properties, Inc., et al
        Defendants,

State of New York     )
                : ss:
County of Albany     )

David Dombroski,  being duly sworn, deposes and says:

Deponent is over the age of 18 years, is not a party to this action and is a resident of New York State. That on August 7, 2009 at approximately 11:00am deponent served the following specific papers pursuant to 307 of the Business Corporation Law.  Summons, Verified Complaint, Index # and date of filing endorsed thereon with exhibits.  Upon: **Marcus & Millichap Real Estate Investment Brokerage Company.**  A corporation not authorized to do business in the State of New York  One of the defendants in this action, by personally serving one copy of the aforesaid papers at the office of the Department of State, located in the City of Albany, New York by delivering to and leaving the papers with Donna Christie,  White Female with Blonde hair,  being approximately 35-45  years of age; height of 5'5"-5'7", weight of 135-155 lbs., being an Authorized Agent in the Corporation Division of the Department of State and empowered to receive such service. 99 Washington Ave., 6th Fl. Albany, NY  That at the time of making such service deponent paid the Secretary of State the fee prescribed by Law in the amount of $40.00. 1 copy mailed via registered mail to: 2626 Hanover St., Palo Alto, CA 94304 on August 13, 2009. Registered mail # RE494959364US.

                                   David Dombroski

Sworn to before me this
13th day of August, 2009

MATTHEW KETCHAM
Notary Public, State of New York
Qualified in Albany County
Reg. No. 01KE6034262
Commission Expires December 6, 2009

# Tab 3 to Exhibit B
## Affidavit of Service Tibarom Inc.
## Filed 8/25/09

Supreme Court of the State of New York
County of Monroe

_____

Rosemarie Ozbakir and Ali Demir
        Plaintiff

                                         AFFIDAVIT OF SERVICE
                                         Index #11124-09
                                         Date Filed: 8-4-09

Mac Properties, Inc., et al
        Defendants,

_____

State of New York    )
                   : ss:
County of Albany    )

David Dombroski,  being duly sworn, deposes and says:

Deponent is over the age of 18 years, is not a party to this action and is a resident of New York State. That on August 7, 2009 at approximately 11:00am deponent served the following specific papers pursuant to 306 of the Business Corporation Law.  Summons, Verified Complaint, Index # and date of filing endorsed thereon with exhibits.  Upon: Tibarom, Inc.  A corporation authorized to do business in the State of New York  One of the defendants in this action, by personally serving two copies of the aforesaid papers at the office of the Department of State, located in the City of Albany, New York by delivering to and leaving the papers with Donna Christie,  White Female with Blonde hair,  being approximately 35-45 years of age; height of 5'5"-5'7",  weight of 135-155 lbs., being an Authorized Agent in the Corporation Division of the Department of State and empowered to receive such service. 99 Washington Ave., 6th Fl. Albany, NY  That at the time of making such service deponent paid the Secretary of State the fee prescribed by Law in the amount of $40.00.

                                           _____
                                         David Dombroski

Sworn to before me this
___ day of August, 2009

MATTHEW KETCHAM
Notary Public, State of New York
Qualified in Albany County
Reg. No. 01KE6034262
Commission Expires December 6, 2009