UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROSEMARIE OZBAKIR, et al.,

                                        Plaintiffs,

                                                            <u>DECISION AND ORDER</u>

                                                            09-CV-6460L

                        v.

DANIEL J. SCOTTI, JR.,
et al.,

                                        Defendants.
_____

        This action was commenced in New York Supreme Court, Monroe County, by plaintiffs

Rosemarie Ozbakir and Ali Demir, against sixteen defendants, alleging various claims arising out

of the sale and lease of certain commercial real property ("premises" or "property") in East

Rochester, New York.  The action was removed to this Court by one of the defendants, Sovereign

JF, SPE Manager, Inc. ("Sovereign SPE"), on the basis of federal question jurisdiction under 28

U.S.C. § 1331, because plaintiffs have asserted a claim under the federal Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*  The RICO claims, and the other state

law claims, are generally based on plaintiffs' allegations that defendants engaged in a scheme to

defraud plaintiffs in connection with the sale of the property to them.

        Ten of the defendants have moved to dismiss the complaint, on a number of grounds.  These

defendants are:  Sovereign SPE; Sovereign JF, LLC ("Sovereign JF"); Marcus & Millichap Real

Estate Investment Brokerage Company ("M&M"); PGP Valuation, Inc. ("PGP"); Daniel J. Scotti,

Jr.;  Glen Kunofsky; Andrew R. Dorf, Scott Dragos, Chris Zorbas; and Paul Morabito.  Five

defendants–Eureka Petroleum, Inc. ("Eureka"), Tibarom, Inc., Rochester Lube, LLC, Samuel E.

Pearson, III, and Deborah Pickett–have not appeared in the action.  Sovereign SPE alleges in the

notice of removal that Eureka, Tibarom and Rochester Lube are believed to be defunct or inactive. *See* Dkt. #1 ¶ 10.

The other defendant, Bruce D. Coleman, has answered the complaint and filed cross-claims against the other defendants. Dkt. #87. Defendants Sovereign SPE, Sovereign JF, Paul Morabito, PGP, and Glen Kunofsky have moved to dismiss Coleman's cross-claims against them. Coleman has also moved for leave to amend his answer to the complaint. All of those motions, however, have been ordered held in abeyance pending a decision on the motions to dismiss the complaint. Dkt. #116.

## BACKGROUND

The following facts are taken from the allegations of the complaint, unless otherwise noted. Ozbakir is a resident of California, and Demir is a resident of New York who lives in Rochester. In late 2005, plaintiffs purchased the premises at issue from defendant Scotti for $1,480,000. Complaint (Dkt. #1-3) ¶ 99 and at 98, 145. At the time, the property, which is located at 781 Fairport Road in East Rochester, was the site of a Jiffy Lube franchise.

Plaintiffs allege, in short, that defendants conspired to sell them the premises at an inflated price. To facilitate this scheme, plaintiffs allege, defendants engaged in a series of transactions involving the property over a relatively short period, prior to the sale of the property to plaintiffs, in order to inflate the apparent value of the property.

According to the complaint, on February 26, 2004, the property was transferred from Evelyn and Sidney Webster (who are not parties to this action, and who are not alleged to have been a part of the scheme) to defendant Bruce Coleman, for a sale price of about $840,000. (Dkt. #1-3 at 53, 54.) On March 5, 2004, Coleman sold the property to defendant Rochester Lube for around $1,122,000. (Dkt. #1-3 at 60, 61.)

On or about the same day that it received ownership of the property from Coleman, Rochester Lube transferred the property to Sovereign JF for about $1,180,000, and shortly thereafter, Sovereign JF executed a lease with defendants Eureka and Tibarom as tenants. (Dkt. #1-3 at 64, 65, 71.) On July 21, 2004, for a purchase price of about $1,300,000, Sovereign JF transferred ownership of the property to defendant Scotti, who in turn sold the property to plaintiffs on December 30, 2005. (Dkt. #1-3 ¶ 105, and at 77, 98, 145.)

Plaintiffs allege that in December 2004, they entered into an agreement with M&M, whereby plaintiffs granted M&M an exclusive authorization to sell certain property owned by plaintiffs in San Diego, California. Dkt. #1-3 Ex. H. According to plaintiffs, this sale was intended to be part of a property exchange pursuant to section 1031 of the Internal Revenue Code, which

> allows a seller of 'property held for productive use in a trade or business or for investment' to avoid capital gains on the sales proceeds if they are used to purchase a replacement property meeting the same criteria. In order to qualify, the seller must complete the exchange within 180 days of the original sale and must not take control of the proceeds in the interim, § 1031(a)(3). Accordingly, property owners typically entrust their sales proceeds to a qualified intermediary until they purchase replacement property ... .

*United States v. Carpenter*, 494 F.3d 13, 15 (1st Cir. 2007), *cert. denied*, 552 U.S. 1230 (2008). Plaintiffs, then, intended to "exchange" the California property for the East Rochester property, using M&M as their intermediary.

Plaintiffs contend that they decided to acquire the East Rochester property in part based on an offering memorandum describing the property, which was prepared by M&M. Plaintiffs allege that M&M, along with defendants Glen Kunofsky, Andrew Dorf, Scott Dragos, and Chris Zorbas, marketed the premises to plaintiffs both orally and in writing, representing it to be an excellent, safe investment offering steady rental income from its then-tenant, Eureka Petroleum, Inc., which at the time was operating a Jiffy Lube franchise at the premises. Dkt. #1-3 ¶¶ 69-84.

After plaintiffs executed a letter of intent, but before the transfer of the property, M&M provided plaintiffs with an "activity detail" containing a number of representations concerning the property, including a physical description, and a summary of the existing lease. The activity detail

stated, in part, that the property was "subject to an absolute triple net lease, with 23+ years remaining in a 25 year primary term that commenced on February 4, 2004." Dkt. #1-3 Ex. O. It also stated that "the tenant, Eureka Petroleum, Inc. has an oil agreement with Shell. It is a 10 year agreement which Shell only signs with Eureka. Shell Oil has a right to cure any lease default under the oil agreement." *Id.*

Plaintiffs purchased the property from Scotti in late December 2005. Plaintiffs then became the landlords, with Eureka and Tibarom as tenants.[1] Eureka and Timarom both paid rent to plaintiffs, in the amount of about $9346 monthly, but in late 2006 the lease was transferred to defendants Samuel Pearson and Deborah Pickett, and nonparties DDS Management, LLC ("DDS") and Peanut Oil, LLC (collectively "assignees"). Plaintiffs allege that this transfer took place "on a date unknown to the Plaintiffs, and without the written consent of the Plaintiffs ... ."

Beginning in December 2006, the assignees began paying rent to plaintiffs, but in or around August 2007, they stopped paying rent, taxes, and other charges associated with the property that they were obligated to pay under the terms of the lease. Dkt. #1-3 ¶ 114. In December 2007, the assignees abandoned the premises. Dkt. #1-3 ¶ 116. The assignees allegedly caused damage to the property, and wrongfully removed some equipment from the property as well. Dkt. #1-3 ¶¶ 117, 118.

After the assignees vacated the premises, plaintiffs took possession, and discovered that the premises contained only 0.52 acre, not 0.84 acre as defendants had represented. Dkt. #1-3 ¶ 122. Plaintiffs also demanded that Shell Oil cure the tenants' default, but Shell elected not to cure. *See* Dkt. #1-3 ¶¶ 120, 121 and Ex. V.

Plaintiffs filed the complaint in this action in state court in August 2009. They allege a complex web of relationships among the various defendants as well as DDS and Peanut Oil, both of which allegedly filed for Chapter 7 bankruptcy protection in 2008. Dkt. #1-3 ¶ 123. They allege

---

[1] It is not entirely clear why the tenants are at various places listed as either Eureka, or both Eureka and Tibarom. *Cf.*, *e.g.*, Complaint (Dkt. #1-3) ¶¶ 71, 104, 110 *with* ¶¶ 62, 107, 111.

that several of the corporate defendants, as well as DDS and Peanut Oil, are alter egos of several of the individual defendants, and that all of the defendants participated in a scheme to artificially inflate and misrepresent the value of the premises, with the aim of inducing plaintiffs to purchase the property for far more than its true market value.

The complaint asserts 15 causes of action. Counts 1, 2, and 4 through 7 assert claims for breach of contract, seeking damages for lost rent, against Eureka, Tibarom, Pearson and Pickett. Count 3 asserts a claim against Sovereign SPE and Sovereign JF, alleging that defendants' "purported assignment" of the lease to DDS and Peanut Oil constituted a material breach of the lease.

The remaining claims are asserted against all the defendants. The eighth cause of action asserts a claim of negligent misrepresentation, based on various alleged misrepresentations and wrongdoing by defendants (*e.g.*, the use of "dummy or shell corporations," tenants who "had no intentions in [sic] fulfilling their obligations under the Leases," misrepresenting the anticipated income from and value of the property, etc.), to induce plaintiffs to purchase the premises at an inflated price. Dkt. #1-3 ¶¶ 210-38.

The ninth cause of action alleges that defendants engaged in deceptive acts or practices in violation of N.Y. Gen. Bus. L. § 349. The tenth cause of action asserts a claim under RICO, based on the allegation that defendants were engaged in a mail and wire fraud scheme regarding the premises and ten other Jiffy Lube locations in New York State. Though the complaint identifies the addresses of those other locations, it does not clearly spell out exactly what the scheme was, other than to say that defendants "employed the same scheme and fraudulent actions" as alleged with respect to the East Rochester property, and that defendants' "actions ... yielded the same results, had similar participants, employed similar methods and are otherwise interrelated." Dkt. #1-3 ¶¶ 249, 251. Plaintiffs do not appear to allege that they were victims of the alleged scheme with respect to any of those other properties, or that they were in any way involved in any events concerning those properties.

The eleventh cause of action asserts a fraud claim, based on the allegation that defendants intentionally misrepresented and concealed material information concerning the property and its actual value. The twelfth cause of action asserts a claim for breach of the implied covenant of good faith and fair dealing. The thirteenth and fourteenth causes of action allege unjust enrichment and promissory estoppel, respectively.

What is denominated the fifteenth cause of action does not really set forth an independent claim, but simply alleges that defendants concealed their wrongdoing and that plaintiffs could not have learned of defendants' fraudulent scheme until July 1, 2008 at the earliest. Plaintiffs allege that the applicable statutes of limitations have therefore been tolled as a result of defendants' actions. Dkt. #1-3 ¶¶ 314-24.

For relief, plaintiffs seek money damages in amounts ranging from $80,000 to $4 million. The complaint also requests pre- and post-judgment interest, and an award of attorney's fees.

## DISCUSSION

### I. RICO Claim

### A. Pleading Standards

As stated, ten of the defendants have moved to dismiss, in seven separate motions. While defendants' motions advance a number of reasons why the complaint is subject to dismissal, I begin with the RICO claim, since that is the only claim brought under federal law, and it therefore provides the ostensible basis for jurisdiction in this case.[2]

The RICO statute makes it unlawful "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's

---

[2]Diversity jurisdiction is not alleged here, and according to the allegations of the complaint, many of the defendants are residents of New York or California, the same states in which plaintiffs reside.

affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c); *see also United States v. Indelicato*, 865 F.2d 1370, 1373 (2d Cir. 1989) (en banc). "'Enterprise' is defined to 'include[ ] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (quoting 18 U.S.C. § 1961(4); additional internal quotes and alteration omitted). As the Supreme Court has explained, a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

A "plaintiff asserting a civil RICO claim must be able to support allegations of (1) a RICO violation, (2) injury, and (3) transaction and loss causation." *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008). With respect to causation, the Court of Appeals for the Second Circuit has recently set forth the applicable standard as follows:

> To show injury by reason of a RICO violation, a plaintiff must demonstrate that the violation caused his injury in two senses. First, he must show that the RICO violation was the proximate cause of his injury, meaning "there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994). Second, he must show that the RICO violation was the but-for (or transactional) cause of his injury, meaning that but for the RICO violation, he would not have been injured.

*UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 132 (2d Cir. 2010) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). *See also Hemi Group, LLC v. City of New York*, ___ U.S. ___, 130 S.Ct. 983, 989-91 (2010) (plaintiff city could not show proximate cause on RICO claim alleging that city had lost tax revenue because of defendant business's failure to file cigarette sale customer lists with the State of New York, since business's fraudulent conduct was directed at a third party, *i.e.*, the state, and the city was only indirectly injured as a result).

In addition to these principles concerning RICO claims, certain other general considerations regarding pleading standards must be kept in mind. First, to the extent that a RICO claim is based

upon allegations of fraud, the complaint must satisfy the particularity requirement of Rule 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See Fresh Meadow Food Services, LLC v. RB 175 Corp.*, 282 Fed.Appx. 94, 97 (2d Cir. 2008) ("Where ... a RICO claim's predicate acts include allegations of fraud, the circumstances constituting the alleged fraud must be pled with particularity"); *Curtis & Associates, P.C. v. The Law Offices of David M. Bushman, Esq.*, ___ F.Supp.2d ___, 2010 WL 5186795, at *8 (E.D.N.Y. 2010) ("where ... a plaintiff alleges RICO predicate acts based upon fraudulent activities such as mail or wire fraud, a plaintiff must additionally satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b)"); *Taitz v. Obama*, 707 F.Supp.2d 1, 6 (D.D.C. 2010) ("To the degree a RICO complaint sounds in fraud, the plaintiff must meet Rule 9(b)'s particularity requirements") (citing *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 989 (10th Cir. 1992)). Thus, "[i]n addition to alleging the particular details of a fraud, 'the plaintiffs must allege facts that give rise to a *strong* inference of fraudulent intent.'" *First Capital*, 385 F.3d at 178.

Regardless of the nature of their claims, plaintiffs must also comply with the general pleading requirements under the Federal Rules of Civil Procedure. While Rule 8 requires only that a pleading set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To state a facially valid claim, a complaint must allege facts giving rise to a claim that is not merely "conceivable," but "plausible." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1950; *Twombly*, 550 U.S. at 570.

**B. Application to this Case**

Applying these principles here, it is clear that there are several defects with plaintiffs' RICO claim. For one thing, the claim, which is based on allegations of fraud, is not pleaded with sufficient particularity.

As to most of the defendants, the complaint generally alleges, in broad, nonspecific terms, only that they "marketed the Premises to the Plaintiffs both orally and in writing" as a sound investment. *See id.* ¶¶ 77-84. Such vague allegations are completely inadequate to comply with Rule 9(b). *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (to satisfy pleading requirements of Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent").

The complaint does allege that M&M and Dragos made certain statements and representations to plaintiffs about the property, some of which opined that the property would be a good investment for plaintiffs. *See* Dkt. #1-3 ¶¶ 69-76, 88, 97. The complaint also pleads some particulars of the various transactions involving the property, including the dates, the parties involved, and the various prices paid. *See* Dkt. #1-3 ¶¶ 57-63. It further alleges that the tenants later abandoned the premises, and that the property turned out to have been a poor investment.

What the complaint fails to allege, however, are facts indicating that M&M's and Dragos's statements–which mostly consisted of descriptions of the property and the terms of the accompanying lease–were false, and that M&M and Dragos knew that they were false when they made the statements. Plaintiffs allege, for example, that each time one defendant sold the property to another defendant, the price rose, but that alone does not tend to show that the defendants knowingly and intentionally acted in concert to inflate the price beyond the property's true market value. Likewise, there are no facts alleged indicating that defendants knew that the tenants of the property would stop paying rent, or that they would abandon the premises.

It is not enough simply to allege that defendants' sanguine forecasts turned out to have been inaccurate. Plaintiffs must allege some facts making it plausible that defendants knew, when they

made those statements, that their optimism was unfounded. *ACA Financial Guaranty Corp. v. Advest, Inc.*, 512 F.3d 46, 68 (1ˢᵗ Cir. 2008) (complaint failed to meet Rule 9(b) standard for pleading allegations of fraud with specificity, since there were no allegations showing that at the time that defendant made statements in question, it was aware of certain documentary materials at variance with its statements); *Jones v. AIG Risk Mgmt., Inc.*, 726 F.Supp.2d 1049, 1057 (N.D.Cal. 2010) ("Ms. Jones has failed to state a facially plausible claim for fraud because she has not included in her complaint any factual allegations supporting her contention that Defendants knew that their representations were false at the time they were made").

As the Second Circuit has explained,

[t]he purpose of Rule 9(b) is threefold–it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit. Thus, although Rule 9(b) permits knowledge to be averred generally, we have repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent. Essentially, while Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. An ample factual basis must be supplied to support the charges.

*O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal citations omitted). Such a basis is utterly lacking here.

I recognize that the Supreme Court has stated that Rule 11(b)(3) allows some "flexibility," in that it "allow[s] pleadings [to be] based on evidence *reasonably anticipated* after further investigation or discovery," particularly where the plaintiff lacks access to all facts necessary to detail claim at pleading stage. *Rotella v. Wood*, 528 U.S. 549, 560 (2000) (emphasis added). That does not mean, however, that Rule 11(b)(3) grants plaintiffs a license to assert generalized fraud claims in the hope that discovery will turn up evidence supporting those claims. Indeed, the Court in *Rotella* acknowledged that despite this flexibility, "Rule 9(b) will exact some cost" in RICO cases in which the underlying fraud is not pleaded with particularity. As the Second Circuit has recognized, "[o]ne of the ... purposes of Rule 9(b) is to discourage the filing of complaints as a pretext for discovery of unknown wrongs." *Wood ex rel. U.S. v. Applied Research Associates, Inc.*,

328 Fed.Appx. 744, 747 (2d Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 1285 (2010). Therefore, a plaintiff's "contention, that discovery will unearth information tending to prove his contention of fraud, is precisely what Rule 9(b) attempts to discourage." *Id.* (quoting *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989)).

Aside from these general failures to plead an adequate fraud claim, the complaint also fails to allege the necessary elements of a RICO claim. Again, there are numerous flaws in this claim.

In their RICO Case Statement submitted in accordance with Local Rule 5.1(h) of this district, plaintiffs state that defendants' "unlawful conduct is in violation of 18 U.S.C. §§ 1962(a), (b), (c) and (d)." Dkt. #8 at 1. A review of the complaint and the RICO Case Statement, however, plainly shows that plaintiffs have *not* alleged a claim under subsections (a) or (b).

Section 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." This "provision was primarily directed at halting the investment of racketeering proceeds into legitimate businesses ... ." *Brittingham v. Mobil Corp.*, 943 F.2d 297, 303 (3d Cir. 1991). *See also Ammirato v. Duraclean Intern., Inc.*, 687 F.Supp.2d 210, 222 (E.D.N.Y. 2010) ("The basic purpose of section 1962(a) is to prevent racketeers from using their ill gotten gains to operate, or purchase a controlling interest in, legitimate businesses") (internal quote omitted).

Subsection (b), which makes it "unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce," was intended by Congress "to prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking." *Ammirato*, 687 F.Supp.2d at 222 (internal quote omitted).

No such acts are alleged here.  This case has nothing to do with using racketeering proceeds to operate or take over a legitimate business.  Plaintiffs' claims are based instead on allegations of a straightforward fraud scheme, the object of which was simply to induce plaintiffs to part with their money.

Plaintiffs' RICO Case Statement itself further demonstrates the inapplicability of §§ 1962(a) and (b).  It states, with respect to the income derived by defendants as a result of the alleged scheme, that "[i]t is not known at this time the use or investment of such income." Dkt. #8 at 26.  Concerning the § 1962(b) claim, plaintiffs likewise state that "[i]t is not known at this time in detail the acquisition or maintenance of any interest in or control of the enterprise," adding only that "the individual Defendants are for the most part employees, agents and officers of the corporate Defendants, who participated in every level of the enterprise from landowner, to tenant, to real estate broker and to real estate appraiser." *Id.*

Such allegations are plainly insufficient.  With good reason, Local Rule 5.1 requires a RICO plaintiff to "describe in detail" the basis for claims under each RICO subsection.  Plaintiffs' glib response to these inquiries that "[s]uch information will most likely be known through discovery," *id.*, is not an acceptable answer.  The purpose of discovery is to flesh out a claim that is facially valid, meaning that it states a plausible claim for relief based on allegations of *fact*, not to rummage around in the hopes of unearthing evidence that will shore up a purely conclusory claim based on nothing more than conjecture.  At the very least, plaintiffs must demonstrate that they have a reasonable basis for anticipating that discovery will yield evidence to support their allegations. *Rotella*, 528 U.S. at 560.  They have not done so.

With respect to subsection (c), which makes it "unlawful for any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity," plaintiffs have again failed to plead the requisite elements.  To plead a facially valid claim under § 1962(c), plaintiffs must allege four elements:  (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *City of N.Y. v.*

*Smokes-Spirits.com, Inc.*, 541 F.3d 425, 439 (2d Cir. 2008), *rev'd on other grounds*, ___ U.S. ___, 130 S.Ct. 983 (2010); *accord In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 362 (3d Cir. 2010).

To make out a "pattern" of racketeering activity, plaintiffs must allege, and ultimately prove, two or more acts of such activity by the defendants. *United States v. Basciano*, 599 F.3d 184, 200 (2d Cir. 2010). Alleging two or more acts of racketeering activity, however, is not necessarily sufficient to meet the pattern requirement.

"Beyond setting forth the minimum number of predicate acts required to establish a pattern, § 1961(5) [which provides that "'pattern of racketeering activity' requires at least two acts of racketeering activity" within a ten-year period] 'assumes that there is something to a RICO pattern beyond simply the number of predicate acts involved.'" *Brown v. Cassens Transport Co.*, 546 F.3d 347, 354 (6th Cir. 2008) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238 (1989)). The acts must also be related to each other, and they must "amount to or pose a threat of continued criminal activity." *United States v. Burden*, 600 F.3d 204, 216 (2d Cir.) (quoting *H.J. Inc.*, 492 U.S. at 239), *cert. denied*, ___ U.S. ___, 131 S.Ct. 251 (2010). Although "Congress intended to take a flexible approach" to satisfying whatever is required beyond the minimum number of predicate acts, then, *H.J. Inc.*, 492 U.S. at 238, it is clear "two elements must be shown: 'that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.'" *Brown*, 546 F.3d at 354 (quoting *H.J. Inc.*, 492 U.S. at 239).

In the case at bar, plaintiffs have alleged various acts by defendants, particularly the transactions involving this property. They have also alleged, in conclusory terms, that defendants have engaged in a similar scheme in connection with ten other Jiffy Lube locations. Those allegations, however, do not show a pattern of racketeering activity.

First, on the facts alleged here, the alleged scheme to defraud plaintiffs cannot in itself satisfy the "pattern" requirement. Although a pattern of racketeering activity *can* be based on "multiple racketeering predicates [that are] part of a single 'scheme,'" *United States v. Daidone*, 471 F.3d 371,

375 (2d Cir. 2006), it is still necessary to show that the acts "amount to, or threaten the likelihood of, continued criminal activity." *Id.* (quoting *United States v. Reifler*, 446 F.3d 65, 91 (2d Cir. 2006)). *See also Certilman v. Hardcastle, Ltd.*, 754 F.Supp. 974, 979 (E.D.N.Y. 1991) ("Although the predicates may be part of a single 'scheme', the plaintiff must show continuity of the racketeering activity").

> As the Second Circuit has explained,

> [t]he latter so-called "continuity" requirement can be satisfied either by showing a "closed-ended" pattern–a series of related predicate acts extending over a substantial period of time–or by demonstrating an "open-ended" pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed.

*Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).

"To satisfy closed-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time.'" *Id.* at 184 (quoting *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999), and *H.J., Inc.*, 492 U.S. at 242). The court in *Spool* further explained that "[a]lthough factors such as the number and variety of predicate acts and the number of participants may be germane to this showing, closed-ended continuity is primarily a temporal concept." *Spool*, 520 F.3d at 184. The court went on to state that "[s]ince the Supreme Court decided *H.J. Inc.*, we have 'never held a period of less than two years to constitute a "substantial period of time."'" *Id.* (quoting *Cofacrèdit*, 187 F.3d at 242).

In the case at bar, the complaint alleges that defendant Coleman acquired the property on February 26, 2004, and that he sold it to defendant Rochester Lube on March 5, 2004. Following a series of transactions involving the property, plaintiffs purchased it in December 2005, and the then-tenants stopped paying rent in August 2007. Assuming the truth of the factual allegations in the complaint, that brought an end to the scheme involving this property.

As the court explained in *Spool*, however, "[t]he relevant period ... is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Id.* Here, plaintiffs' RICO Case Statement states, in its description

of the alleged racketeering activity, that "[f]rom October 2005 to the purchase of the Premises in December 30, 2005, [sic] the Defendants mailed letters" and otherwise communicated with plaintiffs by means of the mails and wires regarding the purported value of the premises. Dkt. #8 at 8. Clearly that three-month period does not satisfy the continuity requirement. *Id.*; *see also Kivisto v. Miller, Canfield, Paddock and Stone, PLC*, No. 10-12654, 2011 WL 207898, at *2 (11th Cir. Jan. 25, 2011) ("When a civil RICO claim is brought with respect to a closed period of time ..., continuity cannot be shown by allegations of a scheme that lasted only nine months").

Plaintiffs also allege that "[i]t is believed" that from late April 2004 to January 2006, "the Defendants engaged in wire fraud activities as the Premises passed from one party to another ... ." Dkt. #8 at 9. Plaintiffs do not identify the nature of those alleged "wire fraud activities," however, much less alleged them with any particularity. They have not alleged any specific acts of wire fraud during that period, nor have they explained how any actions taken by defendants during that time frame were fraudulent. Since these transactions were between the defendants themselves, any mail and wire transmissions in connection with those transactions were presumably not inherently fraudulent in themselves, but were simply used to effectuate the transactions between the defendants, preparatory to the later fraud allegedly perpetrated on plaintiffs.

A number of courts have held that the continuity requirement generally should not be evaluated in terms of otherwise "innocent" mailings or wire transmissions, but that the focus should instead be on actual instances of fraudulent behavior. *See, e.g.*, *Wisdom v. First Midwest Bank*, 167 F.3d 402, 407 (8th Cir. 1999) ("mailings are insufficient to establish the continuity factor unless they contain misrepresentations themselves"); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 781 (7th Cir.1994) ("The Seventh Circuit ... does not look favorably on relying on many instances of mail and wire fraud to form a pattern"); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1414 (3d Cir. 1991) ("[a]lthough the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis"); *Jerome M. Sobel & Co. v. Fleck*, No. 03 Civ.1041, 2003 WL 22839799, at *10-*11 (S.D.N.Y. Dec. 1, 2003)

(continuity was not alleged, where "the predicate acts of mail and wire fraud were of the 'innocent' variety–that is, they are not alleged to have themselves been fraudulent," but rather, "were merely the instrumentalities used to effectuate Fleck's fraudulent scheme"), *Report and Recommendation Adopted*, 2004 WL 48877 (S.D.N.Y. Jan. 8, 2004). Thus, defendants' alleged "wire fraud activities," to the extent that they simply involved wire transmissions incidental to the transactions between the defendants, prior to the carrying out of the alleged scheme to defraud plaintiffs, do not satisfy the continuity requirement.

Furthermore, even assuming that defendants' alleged use of the mails or wires from April 2004 to January 2006 was in furtherance of the scheme, and assuming that such acts could be viewed as racketeering activity, *see* 18 U.S.C. §§ 1341, 1343 (making it a crime to use the mails or wires, respectively, in furtherance of a scheme to defraud), the time period during which the predicate acts occurred still only lasted for about a year and nine months. That does not suggest a continuing scheme. *See Spool*, 520 F.3d at 184 (period of less than two years does not constitute a "substantial period of time").

Although, as stated, "closed-ended continuity is primarily a temporal concept," *id.*, the Second Circuit has also identified a number of other factors that may be relevant to continuity, including "the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes." *GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 467 (2d Cir. 1995). Those factors also weigh against a finding that continuity has been alleged here. Again, plaintiffs have not even identified any particular acts of alleged racketeering, other than the solicitation of and sale to plaintiffs. While plaintiffs vaguely suggest that defendants engaged in other unspecified "wire fraud activities" in connection with the prior transactions involving this property, there is no indication that such acts were numerous or varied, or that they involved many participants. In addition, all these acts are alleged to have formed part of a single scheme with a single set of victims–the plaintiffs–and which had a natural termination point, when plaintiffs purchased the property and the tenants stopped paying rent and left.

Plaintiffs' attempt to transform this single scheme of limited duration into a RICO enterprise, by broadly alleging that multiple acts of racketeering took place during the scheme, fails to meet the RICO pleading standards, particularly under *Twombly* and *Iqbal*. The Second Circuit has cautioned courts to "take care to ensure that the plaintiff[s are] not artificially fragmenting a singular act into multiple acts simply to invoke RICO," and that is what plaintiffs have attempted to do here. *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91 (2d Cir. 1997) (affirming district court's decision to grant judgment as a matter of law for defendants, dismissing RICO claims for lack of continuity, despite allegedly fraudulent acts spanning over three years, on the ground that "[t]he acts complained of ... [we]re subparts of [a] singular act[ of fraud], and not a "pattern" of separate acts with an underlying purpose"). *Cf. Fresh Meadow*, 282 Fed.Appx. at 100 (holding that plaintiffs adequately alleged closed-ended continuity, where the alleged pattern of racketeering activity was not directed solely at the plaintiffs, but at several other people as well, and the predicate acts "ar[o]se out of distinct events" that occurred three and a half years apart).

This conclusion is consistent with the results reached by other district courts from within this circuit. For example, in *Purchase Real Estate Group Inc. v. Jones*, No. 05 Civ. 10859, 2010 WL 3377504 (S.D.N.Y. August 24, 2010), the court granted the defendants' motion to dismiss a RICO claim where the plaintiffs, though they had alleged twenty-two acts of mail and wire fraud, as well as bank fraud and identity fraud, had "offer[ed] little information about the substance of the mail and wire fraud acts and absolutely no information, beyond their own conclusory assertions, about the bank fraud and identity fraud acts." 2010 WL 3377504, at *10. In addition, the court noted, although the complaint named over twenty-five defendants, the plaintiffs had "made only flimsy allegations regarding the involvement of many of these Defendants," and the plaintiffs also "seem[ed] ultimately to [have] allege[d] one overarching scheme, rather than separate schemes. These factors, considered along with the relatively short time span over which the predicate acts allegedly occurred[ about two and a half years], do not suggest a continuous scheme." *Id. See also Cote v. Tennant*, No. 6:09-CV-1273, 2010 WL 1930572, at *4 (N.D.N.Y. May 10, 2010) (complaint

failed to state a plausible claim for relief under RICO, where it "allege[d] only a single isolated act with a single victim," and where allegations of additional meetings and mailings "simply reflect[ed] plaintiff's attempt to fragment the single isolated act into a pattern of separate acts"); *Stein v. New York Stair Cushion Co., Inc.*, No. 04-CV-4741, 2006 WL 319300, at *8 (E.D.N.Y. Feb.10, 2006) (finding that "the racketeering activity alleged here does not constitute the sort of 'long-term criminal conduct' that Congress sought to target in RICO," where plaintiffs alleged only "a single scheme of narrow scope, including one victim and a limited number of related participants"); *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F.Supp.2d 362, 372 (E.D.N.Y. 2002) ("Courts in the Second Circuit have generally held that where the conduct at issue involves a limited number of perpetrators and victims and a limited goal, the conduct is lacking in closed-ended continuity. This is the case even when the scheme's duration exceeds one year") (collecting cases).

The complaint also fails to allege open-ended continuity, *i.e.*, "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S at 241. *See also Spool*, 520 F.3d at 183 (open-ended continuity requires a "pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed"). "The threat of continued criminal activity over an open period can be established" either by a showing that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," such as demands for monthly "protection" money, or "where discrete predicates 'can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes,'" such as an organized crime "family." *United States v. Pizzonia*, 577 F.3d 455, 465 (2d Cir. 2009) (quoting *H.J. Inc.*, 492 U.S. at 242, 243), *cert. denied*, ___ U.S. ___, 130 S.Ct. 1088 (2010).

Again, the allegations here do not indicate such open-ended continuity. This alleged scheme had a single goal–the sale of the property to plaintiffs at an inflated price–and a single pair of victims. Once that goal had been realized, the scheme was effectively over, except for the later abandonment of the property by the tenants. There was no threat of continued criminal activity by

defendants, particularly since defendants are not alleged to have been engaged in "primarily or inherently unlawful" businesses. *Spool*, 520 F.3d at 185 (adding that "[w]hen 'the enterprise primarily conducts a legitimate business,' ... no presumption of a continued threat arises. In such cases, 'there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity'") (quoting *Cofacrèdit*, 187 F.3d at 243).

Plaintiffs here do allege that defendants have engaged in similar activities with regard to ten other Jiffy Lube locations in New York State. In some circumstances, evidence that defendants have engaged in similar acts aimed at other victims may tend to show continuity, insofar as it shows that fraudulent behavior amounted to the defendants' "regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. *See*, *e.g.*, *Menasco*, 886 F.2d at 685 (recognizing that the plaintiffs could allege a pattern if they alleged that the defendants engaged in similar schemes to defraud over twenty other investors). *Cf. North Bridge Associates, Inc. v. Boldt*, 274 F.3d 38, 43 (1st Cir. 2001) (complaint's allegations did not establish continuity, where alleged fraud concluded with foreclosure of plaintiffs' time-share units, and plaintiffs did not allege that defendants engaged in any similar schemes involving others).

As stated, however, the allegations concerning these other properties are vague and conclusory, identifying no particulars other than the locations of those properties. Without some factual allegations indicating that defendants engaged in fraud with respect to the sale of those properties, in a manner and by means similar to those alleged here, plaintiffs' sweeping allegation that defendants "employed the same scheme" in connection with those properties is insufficient to show open-ended continuity. Rule 9(b) does not require that plaintiffs plead with particularity only the facts surrounding the alleged fraud perpetrated against the plaintiffs, but that, in *any* allegations of fraud, the plaintiffs "state with particularity the circumstances constituting fraud ... ." Merely to allege, then, that defendants "employed the same scheme" with respect to these other properties falls far short of compliance with that pleading standard.

There are still other problems with the RICO claims as currently pleaded. On a RICO claim, plaintiffs must allege facts showing that each defendant exerted control over the alleged RICO enterprise. *Smokes-Spirits.com*, 541 F.3d at 449; *In re Terrorist Attacks on September 11, 2001*, 718 F.Supp.2d 456, 494 (S.D.N.Y. 2010). Plaintiffs' conclusory allegations fail to show how each defendant did so. *See Protter v. Nathan's Famous Systems, Inc.*, 925 F.Supp. 947, 955 (E.D.N.Y. 1996). The same is true of plaintiffs' allegations regarding defendants' participation in the operation or management of the enterprise, and their allegations that defendants used "alter ego" corporations to effectuate the scheme. *See Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009) ("RICO 'liability depends on showing that the defendants conducted or participated in the conduct of the "*enterprise's* affairs," not just their own affairs'") (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)). Plaintiffs simply allege, in very general terms, that the individual defendants controlled, or were alter egos, of the corporate defendants, and that they are "agents and officers" of the corporate defendants. Dkt. #8 at 22-24. Such broad, conclusory assertions are not enough.

Many of these same deficiencies were identified by the district court in another action in the Northern District of California, *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, No. C-09-0511, 2010 WL 384736 (N.D.Cal. Jan. 29, 2010). In that action, twenty-six plaintiffs sued thirty-one defendants, including some of the defendants in this case, relating to twenty-two commercial real estate transactions involving a number of properties, fourteen of which were Jiffy Lube franchises. The general theory underlying the plaintiffs' claims in that case was the same as in the instant case, *i.e.*, that one defendant would sell a property to another defendant, at an inflated price, then immediately engage in a leaseback transaction, with inflated rents, to make the property appear to be worth more than its true market value. Through that alleged scheme, each plaintiff was alleged to have purchased one of the properties at a still more inflated price, after which the tenant walked away from the lease.

The plaintiffs brought various claims against the defendants under RICO and state law. Granting motions to dismiss by several of the defendants, the court recited a litany of defects with

the RICO claims, including the failure to allege, with sufficient particularity: "the misrepresentations and omissions that form the foundation of the fraud and knowledge of falsity by the defendants who are alleged to have made them"; "facts demonstrating that each defendant conducted or participated in the conduct of the enterprise's affairs, *i.e.* participated in the operation or management of the enterprise itself"; "that each defendant proximately caused plaintiff's damages"; and facts supporting the conclusory alter ego allegations. 2010 WL 384736, at *3-*4. In more general terms, the district court in that case stated that the twenty-two transactions that formed the basis of the suit had "little obvious connection to each other," that the pleaded facts "show[ed] significant differences between the transactions," that the allegations "d[id] not give rise to a plausible inference of a single fraudulent scheme," that "many of the allegations simply lump[ed] all of the defendants together," and that the RICO allegations were mostly "boilerplate," *Id.* at *1-*3.

While the complaint in the case at bar differs from the complaint in *Eclectic Properties*, at least in the sense that its factual allegations relate to a different piece of property, it nevertheless suffers from most if not all of the same defects. The complaint here alleges a series of events, leading to plaintiffs' eventual purchase of the property and its abandonment by the tenants, and then attempts to make of those events a RICO claim, simply by tacking on boilerplate allegations concerning the RICO elements, such as defendants' conduct of an enterprise, racketeering activity, knowledge, etc. What is missing, however, are allegations of *fact* that render those conclusory assertions plausible. Without some supporting facts, for example, the mere fact that plaintiffs' ownership of the property proved not to be as lucrative as plaintiffs had allegedly been led to believe it would be does not indicate that defendants knew, at the time of their representations to the plaintiffs concerning the property, that it would turn out to be a poor investment. *See Benzman v. Whitman*, 523 F.3d 119, 129 (2d Cir. 2008) ("a bare allegation that the head of a Government agency ... knew that her statements were false and 'knowingly' issued false press releases is not plausible in the absence of some supporting facts").

To the extent that plaintiffs seek to assert a RICO conspiracy claim under 18 U.S.C. § 1962(d), such a claim also fails, because it is based on the defectively pleaded substantive RICO claims. *See McCullough v. Zimmer, Inc.*, 382 Fed.Appx. 225, 232 n.9 (3d Cir. 2010). The conspiracy allegations are also themselves defective in that they contain no more specificity than the other allegations in the complaint. *See American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010).

In short, plaintiffs have taken a series of events involving various individuals and entities, and various communications among them, and attempted to "connect the dots," hoping that when they finish, a RICO claim will emerge. The federal rules of pleading have been designed to discourage such attempts, and accordingly plaintiffs' RICO claims must be dismissed.

Though dismissing the RICO claims, the court in *Eclectic Properties* also gave the plaintiffs leave to replead, and that is the course I follow here.[3] "As with Rule 12(b)(6) dismissals, dismissals for failure to comply with Rule 9(b) should ordinarily be without prejudice." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1108 (9th Cir. 2003). *See also Apace Communications, Ltd. v. Burke*, 522 F.Supp.2d 509, 523 (W.D.N.Y. 2007) ("dismissal under Rule 9(b) is usually without prejudice") (quoting *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259 (2d Cir. 1993)). Accordingly, the Court will dismiss plaintiffs' RICO claims without prejudice to plaintiffs' filing of an amended complaint that complies with the requirements of RICO and the Federal Rules of Civil Procedure, particularly Rule 9(b).

Several other points bear mention in this regard. First, plaintiffs' substantive RICO claims against M&M appear to be foreclosed by the disclaimer in the purchase agreement between plaintiffs and Scotti concerning the sale of the property to plaintiffs in 2005. Section 24 of the agreement states, in part, that plaintiffs and Scotti agreed that plaintiffs' "Agent [*i.e.*, M&M] has not made any

---

[3]According to the docket sheet in *Eclectic Properties*, the plaintiffs in that action filed an amended complaint on March 22, 2010. Motions to dismiss the amended complaint are currently pending before the district court.

investigation, determination, warranty or representation with respect to ... the accuracy or completeness of income and expense information and projections, of square footage figures," and of a number of other matters. Dkt. #1-3 at 151.[4]

Though there is authority that "a general, boilerplate disclaimer of a party's representations cannot defeat a claim for fraud," a disclaimer will bar a claim of reliance on a representation where that representation was "specifically disclaimed" in the agreement. *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 785 (2d Cir. 2003). As explained by the Second Circuit, "a specific disclaimer [in an agreement] destroys the allegations in [a] plaintiff's complaint that the agreement was executed in reliance upon ... contrary oral representations." *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir.1998). *See, e.g., JM Vidal, Inc. v. Texdis USA, Inc.*, ___ F.Supp.2d ___, 2010 WL 3528883, at *21 (S.D.N.Y. 2010) (franchise agreement's express disclaimer, which specifically warranted that plaintiff had not relied on any representation regarding the potential success of its franchise, precluded plaintiff from proving that it reasonably relied on defendant's alleged statement). In the case at bar, the disclaimer specifically cites "income and expense information and projections," which aptly describes the subject of the alleged misrepresentations here.

Since the Court is granting plaintiffs leave to replead, however, the claims against M&M are also dismissed without prejudice. In light of the disclaimer, it appears doubtful at this point that plaintiffs can plead a facially valid claim against M&M, but if plaintiffs are able to do so, consistent with the dictates of Rule 11, the Court will allow them to replead this claim as well. In addition, it

---

[4]In *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), the Supreme Court held that first-party reliance, *i.e.*, reliance by the plaintiff, is not an element of a RICO mail fraud claim. *Bridge* did not, however, change the rule that a plaintiff's injury must be a foreseeable result of the defendant's RICO violation. *See id.* at 659 ("[I]t may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation"). In the case at bar, which does not involve any third-party reliance, it is difficult to see how plaintiffs could show causation as to M&M without showing that they relied on some representation by M&M, to their detriment.

is possible, though not clear at this point, whether plaintiffs will be able to plead a facially valid RICO conspiracy claim against the defendants, including M&M, notwithstanding the disclaimer.

I also note that defendant Paul Morabito has moved to dismiss the claims against him on the additional ground of lack of personal jurisdiction. Morabito contends that plaintiffs have not effected valid service of process on him under Rule 4 of the Federal Rules of Civil Procedure.

The Court's dismissal of the complaint renders it unnecessary for me to reach this issue at this time. If, after plaintiffs' filing of an amended complaint, Morabito continues to maintain that proper service has not been effected, he may renew his motion, seeking dismissal of the amended complaint on that ground.

## II. Claims under State Law

Defendants have also moved to dismiss plaintiffs' claims under state law, on a number of grounds. They contend, for example, that plaintiffs' tort claims are barred by New York's economic-loss rule, which generally bars plaintiffs from recovering in tort purely economic losses flowing from a breach of contract; *see*, *e.g.*, *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987); *Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 414 (S.D.N.Y. 2010). Similarly, defendants argue that plaintiffs' quasi-contractual claims (such as unjust enrichment and promissory estoppel) are barred by the existence of the purchase agreement and the lease for the property. *See M/A-Com, Inc. v. State*, 78 A.D.3d 1293, ___, 910 N.Y.S.2d 246, 247 (3d Dep't 2010) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter") (quoting *Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388 (1987)).

Defendants also contend that § 349 of New York's General Business Law, which makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state," does not apply here. Section 349 generally does not to apply to a "single-shot transaction," unless it is a "typical consumer transaction" with a potential impact

on consumers at large. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995) (quoting *Genesco Entertainment v. Koch*, 593 F Supp 743, 752 (SD N.Y. 1984)). *See*, *e.g.*, *Canario v. Gunn*, 300 A.D.2d 332, 333 (2d Dep't 2002) (dismissing claim under § 349 where defendant's alleged "misrepresentation had the potential to affect only a single real estate transaction involving a single unique piece of property," and "[t]here was no impact on consumers or the public at large").

Though these arguments appear to have some merit, the Court need not address them at this time. All the state law claims ultimately suffer from the same basic defect as the RICO claims, which is that the underlying factual allegations are insufficient under federal pleading standards. Plaintiffs' allegations of fraud lie at the heart of all their claims, and as explained above, those allegations both lack the particularity required by Rule 9(b), and fail to "nudge[] their claims across the line from conceivable to plausible ... ." *Twombly*, 550 U.S. at 570. Plaintiffs' claims under state law are therefore dismissed as well, again without prejudice to plaintiffs' filing of an amended complaint setting forth those claims in a manner that complies with the pleading requirements of the Federal Rules of Civil Procedure.

### III. Judicial Notice

Both Sovereign and plaintiffs have asked the Court to take judicial notice of certain matters. Sovereign asks the Court to take judicial notice of several documents purporting to "establish the widely-known and undeniable fact" that beginning in late 2007, the United States economy suffered a severe downturn. That fact, Sovereign contends, demonstrates plaintiffs' failure to allege facts showing that their losses were caused by defendants, rather than by the economic downturn that coincided with the events giving rise to this action. My decision dismissing plaintiffs' claims renders defendants' request moot, however, and I therefore deny it on that ground.

Plaintiffs have asked the Court to take judicial notice of a copy of the complaint in the *Eclectic Properties* case, which was filed in the Northern District of California in February 2009.

Plaintiffs, who made this request before the California court dismissed that complaint, state that the *Eclectic Properties* complaint "set out similar allegations and claims of a fraudulent scheme and for the most part names the same defendants as parties that are parties in this action." Plaintiffs' Mem. of Law (Dkt. #58) at 3.

Now, of course, the California court has found that those "similar allegations and claims" failed to state a valid RICO claim. In their post-argument submission to this Court, plaintiffs concede that fact, but note that "the plaintiffs in the California Action were afforded the opportunity to file and serve an Amended Complaint." Dkt. #121 at 10.

Even prior to the dismissal of the *Eclectic Properties* complaint, the fact that the complaint in that case had been filed was of virtually no relevance or probative value in this case. Indeed, plaintiffs' request for judicial notice itself fails to articulate what significance that complaint supposedly has here, or, if this Court were to take judicial notice of that complaint, what if any effect that should have in the case at bar.

That some individuals in California have *alleged* a scheme similar to the one alleged in this case, and sued some of the same defendants, does not add any weight to plaintiffs' allegations in the instant case. That would be true even had the district court in that case not found the plaintiffs' allegations insufficient to state a claim. That the court in *Eclectic Properties* has so found, however, only serves to extinguish whatever minimal probative value the complaint in that action might have had here.

While this Court has taken notice of the district court's decision in *Eclectic Properties* dismissing the plaintiffs' RICO claims–as the Court routinely does with reported, relevant decisions from other courts–the mere fact that a complaint was filed in another district, by other plaintiffs, raising claims similar to those now before me, is of no moment here, and plaintiffs' request that the Court take judicial notice of the *Eclectic Properties* complaint is therefore denied.

# CONCLUSION

The motions to dismiss filed by defendants Marcus & Millichap Real Estate Investment Brokerage Company (Dkt. #16), PGP Valuation, Inc. (Dkt. #20), Sovereign JF, LLC and Sovereign JF, SPE Manager, Inc. (Dkt. #21), Glen Kunofsky (Dkt. #41), Andrew R. Dorf, Scott Dragos, and Chris Zorbas (Dkt. #49), Daniel J. Scotti, Jr. (Dkt. #82), and Paul Morabito (Dkt. #88), are granted, and the complaint is dismissed without prejudice. Plaintiffs are granted leave to file an amended complaint that is pleaded in compliance with federal pleading rules and standards, as set forth in the body of this Decision and Order. Plaintiffs' amended complaint must be filed no later than thirty (30) days after the date of entry of this Decision and Order.

The request by defendants Sovereign JF, LLC and Sovereign JF, SPE Manager, Inc. that the Court take judicial notice of certain materials (Dkt. #21) is denied as moot.

Plaintiffs' request that the Court take judicial notice of Exhibit 1 to the Declaration of Kimberly A. Steele, Esq. (Dkt. #56) is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      February 10, 2011.